**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA**

**LULA JONES, CNA,**

     **Plaintiff,**

                            **CASE NO:_____**

vs.

**LIFE CARE CENTERS OF AMERICA, INC.
d/b/a LIFE CARE CENTER JACKSONVILLE,**

     **Defendant.**

_____/

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff **LULA JONES, CNA** (hereinafter referred to as "Jones" and "Plaintiff") by and though the undersigned attorney, files this Complaint and Demand For Jury Trial against Defendant **LIFE CARE CENTERS OF AMERICA, INC.**, d/b/a **LIFE CARE CENTER JACKSONVILLE** (hereinafter referred to as "LCCJ" and "Defendant") and as grounds state as follows:

### I.  NATURE OF THIS ACTION

1.    This action is brought by Jones to enforce the anti-retaliation provisions of the Florida's Whistleblower's Protection Act, Florida Statute §448.102 (3) ("FWPA) and the anti-retaliation provisions of 42. U.S.C. 1981, The Civil Rights Act of 1886 ("Section 1981"). LCCJ's elderly, infirmed nursing residents are being deprived of the proper medications, food and nutrition needed to maintain good health, to live and survive in the ongoing COVID-19

pandemic. LCCJ's healthcare workers are being deprived of the proper PPE, approved surgical/protective masks and they are being forced to work in an unsafe working environment which exposes themselves and LCCJ's nursing home residents to the dangers of COVID-19. LCCJ engaged in discriminatory employment practices and unequal employee discipline standards in order to accomplish its objective of "silencing" Jones and terminating her employment.

## II.  PREAMBLE

2.      Under Florida law, "Residents in assisted living facilities have the right to "live in a safe and decent living environment, free from abuse and neglect, be treated with dignity and have access to adequate and appropriate health care". ---- *Florida's Resident Bill of Rights. Florida Statutes, Section 429.28.*  Healthcare workers in nursing homes and assisted living environments are on the dangerous frontlines of the coronavirus pandemic ("COVID-19").

3.      During the months of March 2020-April 2020, Life Care Center of America Inc., nursing homes across America have experienced hundreds of COVID-19 deaths of employees, residents and led to hundreds of first responders and policeman being quarantined (See *"**Nursing Home Linked To Dozens Of COVID-19 Deaths**";www.npr.org/sections/coronavirus-live; www.cnn.com/2020/03/08/politics/coronavirus-washington-nursing-home-life-care-center-kirkland;* *"***Kansas Health Officials Confirm Another Life Care Center Coronavirus Outbreak***"* www.kansascity.com/news/coronavirus/article241625906.html).

4.      As a matter of public policy, nurses and healthcare workers across America are now demanding *(emphasis supplied)* more personal protective equipment (PPE) as they treat

patients with COVID-19.    On May 1, 2020, nurses with National Nurses United, a nationwide union of registered nurses, protested at 139 hospitals across 13 states.  The May 1, 2020, CBS News Report by Audrey McNamara, https://www.cbsnews.com/news/may-day-protest-nurses-ppe), the CBS News Report "**Entitled Nurses holding May Day protests nationwide demanding PPE**", reports in relevant part:

> "More than 60 nurses across the country have died of COVID-19, according to NNU. The union says, however, that number is likely higher due to a <u>lack of testing</u>."

> "Nurses signed up to care for their patients. They did not sign up to sacrifice their lives on the front lines of the COVID-19 pandemic,"

> "The union is calling on its employers and the government to provide nurses and other health care workers with better protection. The union has specifically cited a need for more gloves, N95 respirator masks, which block at least 95 percent of very small particles, as well as full-body coverings like Powered Air Purifying Respirators, called PAPRs, and coveralls that incorporate head coverings and shoe coverings."

> "Otherwise, hospitals will remain fomites for infection, say NNU RNs, and nurses and health care workers will continue to get sick and sidelined, die, and be unable to care for the next wave of patients."

### III. JURISDICTION AND VENUE

5.  Jones seeks compensatory damages, punitive damages, attorneys' fees, costs, expenses and such other relief in excess of this honorable Court's jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00).

6.  LCCJ is a licensed foreign corporation organized under the laws of the State of Tennessee. Life Care Centers of America Inc.'s corporate office is located at, 3570 Keith Street, N.W. Cleveland, TN 37312-4309.

7.  LCCJ is authorized to engage in business, and interstate commerce in the State of Florida, Duval County, FL; thus, this honorable Court has personal jurisdiction over LCCJ.

8.  LCCJ is recognized as an employer within the meaning of Chapter 448.102(3), The Florida Whistleblower Protection Act ("FWPA") and 42 U.S.C 1981, The Civil Rights Act of 1886 ("Section 1981").

9.  Jones is a resident of Duval County, Florida and she was employed with LCCJ, at all times relevant herein; thus, this honorable Court has personal jurisdiction over Jones.

10.  Jones' race is African American; thus, she is in a protected class that is recognized under Section 1981.

11.  Subject matter jurisdiction of this Court is proper because one of Jones' claims as set forth herein, arise under federal law, specifically Section 1981.

12.  This honorable Court is the proper venue for this action pursuant to 28 U. S. C. §1391 (b)(1) and (b) (2) and Local Rule 1.02, United States District Court, Middle District of Florida because this is the district and division in which Jones resides, and in which a

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

substantial part of the unlawful acts, events and omissions giving rise to Jones' claims, as alleged herein occurred.

13.     Pursuant to 28 U.S.C. §1367, this Court has supplemental, pendent jurisdiction because Jones' common law claim(s) derive from the same nucleus of operative facts as Jones' federal Section 1981 claim, as alleged herein.

14.     Jones timely filed her claims that are alleged herein, pursuant to statute of limitations provisions for her statutory causes of action, including the FWPA and Section 1981.

15.     All administrative conditions precedent to the filing of this action, have been timely filed, met and performed.

16.     LCCJ's Registered Agent, according to the public record of the Florida's Department of State, Division of Corporations is: Corporation Service Company, 1201 Hayes Street, Tallahassee, Florida 32301.

## IV.     THE PARTIES

17.     Life Care Centers of America, Inc., is recognized as one of the largest privately held long-term elderly care companies in the United States.

18.     Life Care Centers of America, Inc., has over 40,000 employees and it operates over 200 skilled nursing, rehabilitation, Alzheimer's and senior living facilities across 28 states.

19.     Defendant LCCJ is an affiliated, subordinate nursing home company of Life Care Centers of America, Inc.

20.     Plaintiff Jones is a Certified Nursing Assistant ("CNA" - Certificate No:  CNA 99425).  Jones is an African American female.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

21.    Jones was employed as a full-time CNA at the LCCJ nursing home facility located at, 4813 Lenoir Ave, Jacksonville, FL 32216 from December 12, 2018 until her wrongful job termination that occurred on April 23, 2020.

## V.  **FACTUAL ALLEGATIONS**

22.    On December 18, 2018, Jones was hired by LCCJ to work as a full time Certified Nursing Assistant ("CNA") at the LCCJ nursing home facility located at 4813 Lenoir Ave, Jacksonville, FL 32216.

23.    During her tenure of employment with LCCJ, Jones received noteworthy comments from LCCJs residents and their families regarding her excellent caregiver skills.

24.    Jones was regularly praised for her care, and compassion for LCCJ's residents. and she regularly received praises and Life Care Center of America's "Shining Star Card Program Reward" comments from her co-workers, residents, and family members, including but not limited to:

> A.    "I would like to express my heartfelt thanks and gratitude for the care that Lula Jones provides to my friend R.L. Lula is personable, friendly, caring and efficient with R. and I have noticed R. does better when Lula is taking care of her.  She also makes R. smile and laugh, which is a blessing for that I am thankful.  Lula treats patients like people not just a task to complete and we truly appreciate her and her good work – Friend of Family"
>
> – J.G, Friend of Resident

> B.    "So caring with Resident's daughter".
>
> -- Co-Worker

> C.    "Working extra hard and always helping others" ".
>
> -- Co-Worker

D.  "Excellence in patient care" ".      -- Co-Worker

E.  "Orienting new family to unit. Making them feel welcome"
                                         -- Co-Worker

F.  "Lula Jones …have been very attentive to my mother's needs while she
    has been here and she should be commended for the care given and the
    personal commitment given to her."
                                         – H.G. Son of Resident

G.  "Doing a great job in dining room with three residents".
                                         -- Co-Worker

H.  "The Best Team Player Always" ".   -- Co-Worker

I.  "Lula was our CAN for several days and she did a fabulous job
    helping her to transfer, potty, dress and still keep a good attitude.
    Lula has the IT for working with patients, making them work hard
    without badgering….she knows how to make the laugh".
                                         -- Family Member

J.  " Lula is a hardworking staff member her at life care. She is always on to
    of patient care and consistently goes beyond for the patients she takes
    care of".
                                         – Co-worker

K.  "Lula Jones is an excellent CAN nurse.. She take care of my Godmother
    all the time. She makes sure my Godmother is ok.. She makes my
    Godmother eat. She make my Godmother dress and she make sure
    Godmother is alright. My Godmother M.C. love her. Lula Jones is an
    excellent CNA nurse."
                                         – Family Member

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

## MEDICATION ERRORS AND NEGLIGENT MEDICATION ADMINISTRATION

25. A common problem in hospitals and nursing homes is errors related to medication administration. medical errors and patient neglect/abuse. Some of the various types of medication, medical administration and negligence that can happen in a nursing home environment, including:

A. Documenting the giving of the medication incorrectly;

B. Failing to monitor the resident after giving the medication;

C. Giving residents medication at the wrong time or at the wrong rate;

D. Giving residents expired medications;

E. Giving residents too little medication or skipping a dose of medication;

F. Using an incorrect med administration technique;

G. Following the wrong med pass routine;

H. Slicing or cutting pills that should not be split in halve nor crushed that carry the instructions not to;

I. Giving residents the wrong form of medications or the wrong dosages.

## LCCJ's MEDICATION ERRORS, PATIENT NEGLECT AND PATIENT ABUSE

26. As a CNA healthcare worker, at all material times, Jones was legally, ethically and professionally responsible to ensure that LCCJ's nurses comply with resident physician orders and established medical, treatment plans for LCCJ's nursing home residents.

27. LCCJ's elderly and infirmed residents need quality medical care and nutrition to sustain themselves in the COVID-19 pandemic.

28.     In January 2020, Jones began noticing a decrease in LCCJ's delivery of patient care, medical services and she witnessed repeated patient neglect issues.

29.     Jones witnessed that LCCJ's patient neglect, patient abuse, medication errors and negligent medical administration, "sloppy nursing" and negligence of LCCJ's untrained, incompetent direct caregivers.

30.     Jones also learned that certain direct care employees that were working for LCCJ did not have CNA training certifications and incompetent nurses that were compromising the lives, health and safety of residents.

31.     Jones witnessed that many of LCCJ's residents were becoming sicker, and rapidly dying.

## JONES OPPOSED LCCJ'S MEDICATION ERRORS AND PATIENT NEGLECT/ABUSE

32.     During the approximate time period February 2020 through April 23, 2020, Jones repeatedly complained to LCCJ's management officials SAL DeCARIA, NHA, LCCJ's Executive Director, DARIN TONEY,  LCCJ's new/interim Executive Director,  JACSELY FLORES, RN, BSN, LCCJ's Unit Manager, and her direct work supervisor CHERYL McGRUDER, RN, BSN, LCCJ's Director of Nursing ("DON"), about LCCJ's nurse/caregiver medical errors, patient neglect and patient abuse including but not limited to the following violations:

> A.     The prescribed medicines of residents being left in beds, on tables, and the floors of resident bedrooms;
>
> B.     LCCJ's nurses not timely advising the residents' treating physicians and family members about resident (s) that were not taking all of their prescribed medications and the residents that were not eating their meals;

C.    LCCJ's nurse(s) failure to ensure that residents completely swallowed or otherwise took their prescribed medications as ordered by physicians;

D.    LCCJ's nurse(s) falsification and inaccurate completion of Medicine Administration/Med Pass inventory reports reporting the residents took their medications – when in fact the resident's medications were repeatedly found on floors, tables and in beds;

E.    Residents' oxygen tanks (portable tanks) being unsecured, out of their brackets/support system, off of residents and being left emitting oxygen in the rooms of resident(s);

F.    Residents sitting or lying in feces, urine, and soiled diapers for long periods of time;

G.    LCCJ's hiring and retention of incompetent nurses and non-certified CNAs/direct caregivers that were compromising the health, safety and lives of LCCJ's residents;

H.    LCCJ failing to investigate residents and family members' complaints that related to nurses not timely treating and addressing the medical needs of residents;

I.    LCCJ's facilities lack of clean towels which caused Jones and other CNAs to have to resort to the washing/cleaning of residents with pillowcases, sheets and linen;

J.    LCCJ's critical CNA/staffing shortages that compromised LCCJ's ability to care for patient needs and staffing shortages that compromised the lives, safety and health of residents.

## JONES COMPLAINED TO LCCJ'S EXECUTIVE DIRECTOR

33.    In late March 2020, Jones in "good faith" reported the patient safety, medical error and patient neglect complaints alleged in para 32 (A-J), infra to DARIN TONEY, LCCJ's new/interim Executive Director (hereinafter referred to as the "Executive Director").

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

34.     Jones met face-to-face with the Executive Director in his office and showed him several photographs which proved LCCJ's medication errors, patient neglect and the deplorable living conditions of LCCJ's residents.

35.     Jones also complained about LCCJ exposing LCCJ's employees, residents and their family members to COVID-19 because of LCCJ's poor planning, training and preparation.

36.     After the Executive Director had reviewed the telling photographs, he stated to Jones that he "**knew that LCCJ has serious problems**" in its delivery of medical services and care to residents.

37.     The Executive Director then stated to Jones in part: **"Why did you take the pictures?"**

38.     Jones warned the Executive Director that if she would report LCCJ's medication errors, resident neglect, and resident abuse to Life Care Centers of America's corporate office and Florida's Agency For Healthcare Administration ("AHCA") officials.

39.     After Jones had revealed the existence of the telling photographs to the Executive Director and threatened to take further steps to report LCCJ's negligent medical care and dangerous working environment, the Executive Director in concert with McGruder, set in motion their plan to "silence" Jones and they sought pretext reasons to terminate her employment.

40.     LCCJ's management never provided Jones with any feedback regarding her patient safety/neglect complaint(s).

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

## THE CDC's COVID 19, POLICIES, RULES AND REGULATIONS RECOMMEND N95 RESPIRATORS AND SURGICAL MASKS IN HEALTHCARE SETTINGS

41. Healthcare workers such as nurses, doctors, and technicians are at heightened risk of contracting COVID-19. According to a recent report from the CDC, more than 9,000 healthcare workers in the United States have contracted COVID-19.

42. A N95 respirator mask is a respiratory protective device designed to achieve a very close facial fit and very efficient filtration of airborne particles.



<u>Illustration A – N95 Respirator Recommended By The CDC For Healthcare Workers</u>

43. N95 respirator masks have been approved by the National Institute for Occupational Safety and Health (NIOSH) to block the inhalation of 95% percent of small airborne particles.

44. The CDC recommend that all direct health caregivers wear N95 respirator masks and surgical masks in the COVID-19 pandemic in order to protect themselves and the health of

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***
**WeReallyCareAboutYou.com**

patients/residents. See **Exhibit A**, The U.S. Food and Drug Administration ("USDA'), Centers

for Disease Control and Prevention (CDC) National Institute for Occupational Safety and

Health (NIOSH) and Occupational Safety and Health Administration (OSHA) (See

*https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95*

*respirators-and-surgical-masks-face-masks*).

## LCCJ'S LEGAL DUTY TO PROTECT THE HEALTH, SAFEY AND WELFARE OF ITS EMPLOYEES AND RESIDENTS IN THE COVID-19 PANDAMIC

45.     The CDC and USFDA policies, rules and regulations require that healthcare

workers, including Jones, use N95 respirator masks when providing healthcare services and

medical treatments [and] if N95 respirator mask are unavailable, at a minimum, healthcare

workers are required to use approved surgical masks in this ever evolving COVID-19 pandemic.

46.     At all times material and at the present time, it was, and remains the

responsibility of LCCJ to provide the proper Personal Protective Equipment ("PPE"), including

N95 respirator mask/approved surgical masks to LCCJ's healthcare staff and CNAs, including

Jones.

47.     Since January 2020, LCCJ had a legal duty to ensure that its nursing homes had a

COVID-19 Pandemic crisis intervention plan in place to protect the health, safety and lives of

its employees and residents.

48.     During the months of February 2020-April 2020, Life Care Center of America

Inc. nursing homes all across America have experienced hundreds of deaths of employees,

residents, and has led to hundreds of first responders and policeman being quarantined (See

"**Nursing Home Linked To Dozens Of COVID-19 Deaths**"*; www.npr.org/sections/coronavirus-*

live;www.cnn.com/2020/03/08/politics/coronavirus-washington-nursing-home-life-care-center-kirkland-cnntv/index.html; **Kansas Health Officials Confirm Another Life Care Center Coronavirus Outbreak**" www.kansascity.com/news/coronavirus/article241625906.html).

49.     In early March 2020 Jones, and other LCCJ employees learned that COVID-19 was causing a high infection rate and alarming deaths of residents, employees first responders and firemen in Life Care Centers of America, Inc.'s nursing home facilities across America.

50.     Jones and other direct health care employees became increasingly fearful of becoming infected with COVID-19 [and/or] transmitting the COVID-19 virus to LCCJs elderly, sick and infirmed residents because of LCCJs failure to provide them with the proper PPE, in particular, the N95 masks.

## LCCJ "DID NOT" CONDUCT COVID-19 PANDEMIC TRAINING, PLANNING AND TESTING OF ITS EMPLOYEES OR RESIDENTS

51.     Based upon information and belief, during the time period January -April 2020 one or more residents that lived in LCCJ's facilities have tested positive for COVID-19 [and/or] had been exposed to COVID-19 before being admitted as a LCCJ resident.

52.     Based upon information and belief, LCCJ recently hired new employee(s) from other nursing home that had reported cases of COVID-19; but LCCJ did not require that the newly hired employees take COVID-19 tests and LCCJ did not warn its current employees about possible COVID-19 exposure.

53.     CDC's applicable COVID-19 regulations, rules and guidance required that LCCJ implement an intervention plan and training plan for its employees; thus at all material times

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256* WeReallyCareAboutYou.com

and during the acts alleged herein, LCCJ had a legal duty to conform its operation in accordance with CDC guidelines, rules and regulations.

54.     At all material times, LCCJ did not require that its employees or residents take COVID-19 tests.

55.     Despite the CDD's COVID-19 guidelines and the COVID-19 infections that were causing the deaths of Life Care Center of America, Inc's residents, employees, first responders and policeman, LCCJ did not require COVID-19 testing of Jones or any of its employees as a condition of their continued employment with LCCJ.

### LCCJ COMPROMISED EMPLOYEE/RESIDENT'S HEALTH AND SAFETY

56.     Based upon information and belief, during the relevant time period, LCCJ "knowingly" received and admitted patients/residents that were being discharged from Memorial Hospital, Jacksonville, Florida– a local hospital that had documented and reported cases of COVID-19.

57.     Based upon information and belief, one or more residents in LCCJ's facilities where Jones worked have recently tested positive for COVID-19, or they have had the COVID-19 exposure.

58.     On about March 11, 2020, LCCJ advised Jones and other LCCJ employees, that it was mandatory that they take a body temperature test before entering the LCCJ facility.

59.     In March 2020, LCCJ's management changed the keypad locks/combination on LCCJ's medical supply room and facilities.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

60.     Based upon information and belief, at all material times, LCCJ was stockpiling and hoarding N95 respirator masks and surgical masks in LCCJ's facility storage room(s) and supply inventory.

61.     McGruder admitted to LCCJ's CNAs that LCCJ had N95 masks in storage that were being "saved"; during the time that Jones and other CNAs were being denied PPE suitable protective face masks.

62.     Rather than issue its direct caregivers, including Jones, the approved PPE and masks that were in LCCJ's supply inventory, LCCJ's management provided Jones and LCCJ's other direct care staff only "cloth scarfs" during their working hours.

### MCGRUDER'S TRANSPORTION OF DIRTY-COMPROMISED CLOTH SCARFS

63.     Jones and other CNA's were instructed to use LCCJ's "used" cloth scarfs when providing direct medical care and services to residents.

64.     Jones refused to wear LCCJ's' "used", unsanitary cloth masks that had been laying out and openly exposed on a common table.

65.     When Jones complained to McGruder about the uncleanliness of LCCJ's cloth-masks, McGruder informed Jones that she (McGruder) was taking LCCJ's soiled cloth masks home and washing them in her personal home washing machine.

66.     Jones complained to McGruder that it was extremely unsanitary and unsafe for her (McGruder) to transport LCCJ's used, dirty cloth face masks home back and forth between the LCCJ facility and her home.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

### JONES OPPOSED LCCJ'S FAILURE TO PROVIDE N95/SURGICAL MASKS

67.     In early April 2020, Jones continued to remind McGruder and other LCCJ management officials of the COVID-19 deaths that were occurring in the Life Care Centers of America, Inc.'s nursing homes.

68.     Jones repeatedly advised McGruder and LCCJ's Unit Manager(s) that she and members of her household/immediate family members were in the COVID-19 high risk categories.

69.     Jones re-iterated to McGruder that she and other CNAs greatly feared being exposed to COVID-19 because they were providing "hands on", direct care medical services to COVID-19 residents without having the required N95 mask or at a minimum, approved surgical masks that LCCJ's management was hoarding.

70.     Jones complained that LCCJ's reluctance to issue her the available PPE that was being maintained in LCCJ's supply inventory crippled her ability to safely perform her job functions and jeopardized the health of LCCJ's employees, residents and the family members of residents.

### JONES' REPEATED COMPLAINTS RELATED TO COVID-19 EXPOSURE

71.     When Jones reported back to work on April 23, 2020, one of LCCJ's office secretary(s) gave Jones a COVID-19 temperature test and recorded her body temperature before Jones started her work shift.

72.     LCCJ's office secretary advised Jones that her body temperature was "just fine" and she authorized Jones to enter into the LCCJ facilities.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

73. At no time did LCCJ or McGruder or Graham allege that Jones had a "higher than normal" body temperature rating.

74. McGruder and Graham refused to let Jones review her April 23, 2020 body temperature reading.

75. LCCJ's Staffing Coordinator, McGruder and ANGELA GRAHAM, LCCJ's newly hired, DON, instructed Jones to go to a local urgent care clinic and bring back a physician note.

76. Jones asked why she was being asked to bring in a physician note, given the fact that she had LCCJ's COVID-19 body temperature test and she had been allowed to enter the LCCJ facilities.

77. Jones witnessed the Executive Director being physically present in his office on April 23, 2020.

78. Jones advised McGruder and LCCJ Staffing Coordinator, that she was being "singled out" and she asked them to allow her to talk to the Executive Director via LLCJ's open door policy.

## JONES COMPLAINED ABOUT UNEQUAL TREATMENT/ RACE DISCRIMINATION

79. On April 23, 2020, Jones continued to complain to McGruder, LCCJ's management that it was unsafe, and illegal for LCCJ to deny her the N95 masks that had been recommended by the CDC's regulations for healthcare workers in the COVID-19 pandemic.

80. Jones also reminded McGruder that LCCJ's management needed to ensure that LCCJ's residents receive proper medical care and eat their meals so that they could sustain themselves in the COVID-19 pandemic.

81.     Jones also confronted McGruder about her (McGruder's) failure to wear protective masks during the time that she was interrogating her and working around residents.

82.     Jones complained to told McGruder that she felt that she was being, "singled out", "retaliated against", and treated unequally in comparison to the work attendance of her similarly situated Caucasian co-worker named Brooke (CNA comparator).

83.     Rather than allow Jones to start her schedule work shift, McGruder instructed Jones that she had to wait in LCCJ's lobby area.

### LCCJ'S UNLAWFUL RETALIATION AND WRONGFUL JOB TERMINATION

84.     While waiting to meet with the Executive Director, ANGELA GRAHAM, LCCJ's newly hired DON ("Graham") met with Jones and interrogated about her obsolete, past work attendance and an alleged "call outs" from work that had occurred in the calendar year 2019.

85.     Although Graham had not supervised or worked with Jones, McGruder and the Executive Director used Graham to effectuate their clandestine plan to "silence" Jones and terminate her employment.

86.     The Executive Director ignored LCCJ's "employee open door policy" and he refused to meet with Jones on April 23, 2020 to discuss her concerns regarding LCCJ's failure to protect its employees, residents and family members from COVID-19.

87.     Graham advised that Jones that her employment, was terminated effective April 23, 2020 for her alleged work attendance work issues and for an alleged" no call" to work that had allegedly (*emphasis supplied*) occurred in the calendar year 2019.

88.   Jones refused to sign LCCJ's false job termination letter.

89.   Based on information and belief, <u>prior to terminating Jones' employment</u> (*emphasis supplied*), LCCJ failed to ensure that it had a COVID-19 pandemic crisis and a COVID-19 testing plan in effect in accordance with CDC guidelines, rules and regulations.

90.   Based upon information and belief, and during the acts alleged herein, LCCJ violated acceptable Medicare standards, medical laws and nursing home resident care regulations regarding its delivery of medical care and medical treatment to residents.

91.   Based on information and belief, during the relevant time period, LCCJ McGruder or Graham in particular, did not instruct/force any other CNA or LCCJ employee to pay out of pocket for urgent care/emergency medical room COVID-19 testing record before beginning their scheduled work shifts.

92.   LCCJ's actions, misfeasance and negligence as alleged herein, demonstrate a willful indifference and callous disregard for Jones, employment rights and the health, safety lives, and welfare of LCCL residents, their family members and LCCJ employees.

93.   LCCJ is vicariously liable for the malicious acts, unlawful retaliation, unequal treatment, negligence and misfeasance of its managers, employees and agents, as alleged herein, under the respondent superior doctrine.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

## COUNT I
### UNLAWFUL EMPLOYMENT RETALIATION FOR OPPOSING
### FAILURE TO PROVIDE PERSONAL PROCTEVIVE EQUIPMENT NEEDED
### TO PROTECT THE LIVES OF RESIDENTS, FAMILY MEMBERS AND EMPLOYEES
### FLORIDA WHISTLEBLOWER PROTECTION ACT
**FLORIDA STATUTE § 448.102 (3)**

94.     Jones hereby incorporates by reference as though restated each of the factual allegations 1- 93, and paragraphs 41-93 with respect to Count I.

95.     Jones engaged in protected employment speech activities within the meaning of the Centers For Disease Control (CDC) and United States Food and Drug Administration (US FDA) guidelines, rules and regulations that pertain to nursing home safety, training and procedure in the COVID-19 pandemic and her manner of opposition to LCCJ's failure to comply with CDC and USFDA laws, rules and regulations were reasonable during the COVID-19 pandemic were reasonable and made by her in "good faith".

96.     A close temporal proximity in time exists between Jones's opposition to LCCJ's violation of CDC and USFDA's COVID-19 rules, regulations and guidelines as alleged herein, and LCCJ's decision to terminate Jones' employment.

97.     As a result of LCCJ's unlawful retaliation and adverse employment action(s), Jones has suffered injuries and damages, including but not limited to, loss of income, benefits and other economic losses, emotional pain and suffering, and other intangible injuries for all of which she is entitled to receive damages.

98.     WHEREFORE, Jones seeks an award of damages against LCCJ, for compensatory damages, attorney's fees, costs, and expenses under the anti-retaliation provisions

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

of Florida Statute, §448.102 (3) and Chapter §448.104 in an amount, together with prejudgment interest and such other relief as justice so requires under the circumstances.

**COUNT II**
**UNLAWFUL EMPLOYMENT RETALIATION FOR OPPOSING**
**PATIENT/RESIDENT NEGLECT AND PATIENT SAFETY VIOLATIONS**
**FLORIDA WHISTLEBLOWER PROTECTION ACT**
**FLORIDA STATUTE § 448.102 (3)**

99.     Jones hereby incorporates by reference as though restated each of the factual allegations 1- 93, and, paragraphs 32 (A-J) -38, 64-68, 74-93 with respect to Count II.

100.     Florida Resident Bill of Rights, Florida Statute, Section 429.28 states in pertinent part that at para (a)  and  (j) that residents in assisted living facilities have the right to: "Live in a safe and decent living environment, free from abuse and neglect".

101.   Jones engaged in protected employment speech activities within the meaning of the Florida's Patient Bill of Rights and Florida's Resident Bill of Rights when she complained about and objected to LCCJ's patient neglect, patient safety violations and LCCJ's failure to provide timely and proper medical treatment as alleged, in particular  paragraphs 32 (A-J)-38, 64-68 and 74-93.

102.   Jones' complaints and her manner of opposition to LCCJ's failure to comply with the Florida Patient Bill of Rights, Florida Resident Bill of Rights, and other applicable laws related to patient/resident safety neglect were reasonable and made by her in "good faith".

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***
**WeReallyCareAboutYou.com**

103.    A close temporal proximity in time exists between Jones's opposition to LCCJ's patient/resident safety neglect and patient/resident safety violations as alleged herein, in particular paragraph 32(A-J) and LCCJ's decision to terminate Jones' employment.

104.    LCCJ's corporate officials' decision to terminate the employment of Jones as alleged herein were retaliatory and adverse in nature.

105.    As a result of LCCJ's unlawful retaliation and adverse employment action(s), Jones has suffered injuries and damages, including but not limited to, loss of income, benefits and other economic losses, emotional pain and suffering, and other intangible injuries for all of which she is entitled to receive damages.

106.    WHEREFORE, Jones seeks an award of damages against LCCJ, for compensatory damages, attorneys fees, costs, and expenses under the anti-retaliation provisions of Florida Statute, §448.102 (3) and Chapter §448.104 in an amount, together with prejudgment interest and such other relief as justice so requires under the circumstances.

## COUNT III
## UNLAWFUL RETALIATION
## OPPOSITION TO RACE BASED DISCRIMINATION AND UNEQUAL TREATMENT
### The Civil Rights Act of 1866, 42 U.S.C. §1981 et. seq.

107.    The allegations contained in paragraphs 1-93 and in particular, paragraphs 79-93 are hereby incorporated by reference with respect to Count III.

108.    Jones had the right to keep her LCCJ employment and contractual relationship with LCCJ after she reported and opposed the unequal discipline and race-based discrimination that she was experiencing.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

109.    Jones' opposition to LCCJ's race-based discrimination was reasonable and made in good faith.

110.    After Jones engaged in protected employment speech activities as alleged herein, LCCJ unlawfully retaliated against Jones and subjected her to adverse employment actions, including but not limited to its decision to terminate and Jones' employment contract without giving her due process.

111.    There exists a close proximity in time and a causal link between Jones' opposition to LCCJ's discriminatory employment practices, and LCCJ's decision to terminate her employment.

112.    As a direct and proximate result of LCCJ's unlawful retaliation, Jones has suffered damages including, loss of income, loss of future income, loss of her personal dignity, emotional distress, attorneys' fees, costs, expenses and other consequential damages not capable of being ascertained at the present time.

113.    WHEREFORE, Jones seeks damages against LCCJ under the anti-retaliation provisions of Section 1981, plus reasonable attorneys' fees, costs, expenses, pre-judgment and post judgment interest, and such other relief as the Court deems and as justice so requires under the circumstances.

## RESERVATION OF RIGHTS

114.    Jones reserves her rights to amend the instant Complaint and Demand for Jury Trial and her right to file additional claims against LCCJ.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

## PRAYER FOR RELIEF AND DAMAGES

115.    WHEREFORE, Jones seeks an award of, compensatory and punitive damages against LCCJ as follows:

A.    An award to Jones for compensatory damages, attorneys' fees, costs and expenses under the provisions of the Florida Whistle Blower Protection Act Florida Statute, §448.102 (3) and Chapter §448.104;

B.    An award to Jones for compensatory damages, attorneys' fees, costs, and expenses under the anti-retaliation provisions of Section 1981;

C.    Grant Jones a Jury Trial under the provisions if Section 1981.

D.    Grant Jones the applicable interest on any awards allowed by law; and grant Jones;

E.    Grant Jones such other and further relief as the Court deems just and appropriate under the circumstances.

DATED: May 6, 2020.                        Respectfully submitted:

**THE JONES LAW FIRM, P.A.**

BY:        **s/J. Eric Jones, Esquire**
            Florida Bar No: 0594571
            10752 Deerwood Parkway, Suite 100
            Jacksonville, FL 32246
            Telephone: (904) 434-7553
            Email: wereallycareaboutu@gmail.com
            Plaintiff's Attorney

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

# EXHIBIT A

[CDD US FDA COVID-14 Rules Policies and Regulations]

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

# N95 Respirators and Surgical Masks (Face Masks)

N95 respirators and surgical masks (face masks) are examples of personal protective equipment that are used to protect the wearer from airborne particles and from liquid contaminating the face. Centers for Disease Control and Prevention (CDC) National Institute for Occupational Safety and Health (NIOSH) and Occupational Safety and Health Administration (OSHA) also regulate N95 respirators.

It is important to recognize that the optimal way to prevent airborne transmission is to use a combination of interventions from across the hierarchy of controls, not just PPE alone.

## Coronavirus Disease (COVID-19) (/emergency-preparedness-and-response/counterterrorism-and-emerging-threats/coronavirus-disease-2019-covid-19)

- CDC Recommendation on Cloth Face Coverings for the General Public (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html)

- Surgical Mask and Gown Conservation Strategies - Letter to Healthcare Providers (/medical-devices/letters-health-care-providers/surgical-mask-and-gown-conservation-strategies-letter-health-care-providers)

- FAQs on Shortages of Surgical Masks and Gowns (/medical-devices/personal-protective-equipment-infection-control/faqs-shortages-surgical-masks-and-gowns)

  - FAQ on respirators approved under standards used in other countries, such as KN95 (https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/faqs-shortages-surgical-masks-and-gowns#kn95)

- Emergency Use Authorization for Personal Protective Equipment (/medical-devices/emergency-situations-medical-devices/emergency-use-authorizations)

- CDC Prevention and Treatment (https://www.cdc.gov/coronavirus/2019-ncov/about/prevention-treatment.html)

  - Release of Stockpiled N95 Filtering Facepiece Respirators Beyond the Manufacturer-Designated Shelf Life: Considerations for the COVID-19 Response (https://www.cdc.gov/coronavirus/2019-ncov/release-stockpiled-N95.html)

  - Strategies for Optimizing the Supply of N95 Respirators (https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/index.html?

CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-
ncov%2Fhcp%2Frespirator-supply-strategies.html)

○ Healthcare Supply of Personal Protective Equipment
(https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html)

## On this page:

- N95 Respirators Not for Use by the General Public
- CDC Recommends Cloth Face Coverings for Use by the General Public
- Surgical Masks (Face Masks)
- N95 Respirators
- Comparing Surgical Masks and Surgical N95 Respirators
- General N95 Respirator Precautions
- N95 Respirators in Industrial and Health Care Settings

## N95 Respirators Not for Use by the General Public

The Centers for Disease Control and Prevention (CDC) does not recommend that the general public wear N95 respirators to protect themselves from respiratory diseases, including coronavirus (COVID-19). Those are critical supplies that must continue to be reserved for health care workers and other medical first responders, as recommended by current CDC guidance.

 Top

## CDC Recommends Cloth Face Coverings for Use by the General Public

The CDC recommends that members of the public use simple cloth face coverings when in a public setting to slow the spread of the virus, since this will help people who may have the virus and do not know it from transmitting it to others. For more information, see the CDC's Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission. (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html)

The best way to prevent illness is to avoid being exposed to this virus. However, as a reminder, the CDC always recommends everyday preventive actions, such as hand washing and maintaining at least 6 feet of social distancing, to help prevent the spread of respiratory diseases.

 Top

## Surgical Masks (Face Masks)

A surgical mask is a loose-fitting, disposable device that creates a physical barrier between the mouth and nose of the wearer and potential contaminants in the immediate environment. Surgical masks are regulated under 21 CFR 878.4040. Surgical masks are not to be shared and may be labeled as surgical, isolation, dental, or medical procedure masks. They may come with or without a face shield. These are often referred to as face masks, although not all face masks are regulated as surgical masks.

Surgical masks are made in different thicknesses and with different ability to protect you from contact with liquids. These properties may also affect how easily you can breathe through the face mask and how well the surgical mask protects you.

If worn properly, a surgical mask is meant to help block large-particle droplets, splashes, sprays, or splatter that may contain germs (viruses and bacteria), keeping it from reaching your mouth and nose. Surgical masks may also help reduce exposure of your saliva and respiratory secretions to others.

While a surgical mask may be effective in blocking splashes and large-particle droplets, a face mask, by design, does not filter or block very small particles in the air that may be transmitted by coughs, sneezes, or certain medical procedures. Surgical masks also do not provide complete protection from germs and other contaminants because of the loose fit between the surface of the face mask and your face.

Surgical masks are not intended to be used more than once. If your mask is damaged or soiled, or if breathing through the mask becomes difficult, you should remove the face mask, discard it safely, and replace it with a new one. To safely discard your mask, place it in a plastic bag and put it in the trash. Wash your hands after handling the used mask.

▲ Top

## N95 Respirators

An N95 respirator is a respiratory protective device designed to achieve a very close facial fit and very efficient filtration of airborne particles.

The 'N95' designation means that when subjected to careful testing, the respirator blocks at least 95 percent of very small (0.3 micron) test particles. If properly fitted, the filtration capabilities of N95 respirators exceed those of face masks. However, even a properly fitted N95 respirator does not completely eliminate the risk of illness or death.

 Top

## Comparing Surgical Masks and Surgical N95 Respirators

The FDA regulates surgical masks and surgical N95 respirators differently based on their intended use.



A **surgical mask** is a loose-fitting, disposable device that creates a physical barrier between the mouth and nose of the wearer and potential contaminants in the immediate environment. These are often referred to as face masks, although not all face masks are regulated as surgical masks. Note that the edges of the mask are not designed to form a seal around the nose and mouth.



An **N95 respirator** is a respiratory protective device designed to achieve a very close facial fit and very efficient filtration of airborne particles. Note that the edges of the respirator are designed to form a seal around the nose and mouth. Surgical N95 Respirators are commonly used in healthcare settings and are a subset of N95 Filtering Facepiece Respirators (FFRs), often referred to as N95s.

The similarities among surgical masks and surgical N95s are:

- They are tested for fluid resistance, filtration efficiency (particulate filtration efficiency and bacterial filtration efficiency), flammability and biocompatibility.
- They should not be shared or reused.

 Top

## General N95 Respirator Precautions

People with chronic respiratory, cardiac, or other medical conditions that make breathing difficult should check with their health care provider before using an N95 respirator because the N95 respirator can make it more difficult for the wearer to breathe. Some models have exhalation valves that can make breathing out easier and help reduce heat build-up. Note that N95 respirators with exhalation valves should not be used when sterile conditions are needed.

All FDA-cleared N95 respirators are labeled as "single-use," disposable devices. If your respirator is damaged or soiled, or if breathing becomes difficult, you should remove the respirator, discard it properly, and replace it with a new one. To safely discard your N95

respirator, place it in a plastic bag and put it in the trash. Wash your hands after handling the used respirator.

N95 respirators are not designed for children or people with facial hair. Because a proper fit cannot be achieved on children and people with facial hair, the N95 respirator may not provide full protection.

⊼ Top

# N95 Respirators in Industrial and Health Care Settings

Most N95 respirators are manufactured for use in construction and other industrial type jobs that expose workers to dust and small particles. They are regulated by the National Personal Protective Technology Laboratory (NPPTL) in the National Institute for Occupational Safety and Health (NIOSH), which is part of the Centers for Disease Control and Prevention (CDC)

However, some N95 respirators are intended for use in a health care setting. Specifically, single-use, disposable respiratory protective devices used and worn by health care personnel during procedures to protect both the patient and health care personnel from the transfer of microorganisms, body fluids, and particulate material. These surgical N95 respirators are class II devices regulated by the FDA, under 21 CFR 878.4040, and CDC NIOSH under 42 CFR Part 84.

N95s respirators regulated under product code MSH are class II medical devices exempt from 510(k) premarket notification, unless:

- The respirator is intended to prevent specific diseases or infections, or
- The respirator is labeled or otherwise represented as filtering surgical smoke or plumes, filtering specific amounts of viruses or bacteria, reducing the amount of and/or killing viruses, bacteria, or fungi, or affecting allergenicity, or
- The respirator contains coating technologies unrelated to filtration (e.g., to reduce and or kill microorganisms).

The FDA has a Memorandum of Understanding (MOU) (/about-fda/domestic-mous/mou-225-18-006) with CDC NIOSH which outlines the framework for coordination and collaboration between the FDA and NIOSH for regulation of this subset of N95 respirators.

For additional differences between surgical masks and N95 respirators, please see CDC's infographic (https://www.cdc.gov/niosh/npptl/pdfs/UnderstandDifferenceInfographic-508.pdf).

## CERTIFICATE OF SERVICE

This is to certify that on this **6th** day of May 2020, the forgoing, Plaintiff Lula Jones Complaint and Jury Demand was electronically filed on the CM/ECF, United States District Court, Middle District of Florida's (Jacksonville Division) E-Portal:

**s/ J. Eric Jones**
Attorney