IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

**LULA JONES, CNA,**

      **Plaintiff,**                         CASE NO: <u>3:20-cv-00488 TJC-PDB</u>

vs.

**DUVAL MEDICAL INVESTORS, LLC,**
**d/b/a LIFE CARE CENTERS OF JACKSONVILLE.**
**AND LIFE CARE CENTERS OF AMERICA, INC.,**

      **Defendant.**

_____/

<u>**PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

COMES NOW, Plaintiff **LULA JONES, CNA** (hereinafter referred to as "Jones" and "Plaintiff") by and though the undersigned attorney and pursuant to this honorable Court's Order (Doc. No. 25) files Plaintiff's First Amended Complaint and Demand For Jury Trial against Defendant **LIFE CARE CENTERS OF AMERICA, INC.**, d/b/a **LIFE CARE CENTER JACKSONVILLE** (hereinafter referred to as "LCCJ" and "Defendant") and as grounds state as follows:

## I. <u>NATURE OF THIS ACTION</u>

1.    This action is brought by Jones to enforce the anti-retaliation provisions of the Florida's Whistleblower's Protection Act, Florida Statute §448.102 (3) ("FWPA) and the anti-retaliation provisions of 42. U.S.C. 1981, The Civil Rights Act of 1886 ("Section 1981"). LCCJ's elderly, infirmed nursing residents are being deprived of the proper medications, food

and nutrition needed to maintain good health, to live and survive in the ongoing COVID-19 pandemic.  LCCJ's healthcare workers are being deprived of the proper PPE, approved surgical/protective masks and they are being forced to work in an unsafe working environment which exposes themselves and LCCJ's nursing home residents to the dangers of COVID-19. LCCJ engaged in discriminatory employment practices and unequal employee discipline standards in order to accomplish its objective of "silencing" Jones and terminating her employment.

## II.    PREAMBLE

2.      Under Florida law, "Residents in assisted living facilities have the right to "live in a safe and decent living environment, free from abuse and neglect, be treated with dignity and have access to adequate and appropriate health care". ---- *Florida's Resident Bill of Rights. Florida Statutes, Section 429.28.*  Healthcare workers in nursing homes and assisted living environments are on the dangerous frontlines of the coronavirus pandemic ("COVID-19").

3.      During the months of March 2020-April 2020, Life Care Center of America Inc., nursing homes across America have experienced hundreds of COVID-19 deaths of employees, residents and led to hundreds of first responders and policeman being quarantined (See "**Nursing Home Linked To Dozens Of COVID-19 Deaths**";*www.npr.org/sections/coronavirus-live; www.cnn.com/2020/03/08/politics/coronavirus-washington-nursing-home-life-care-center-kirkland;* "**Kansas Health Officials Confirm Another Life Care Center Coronavirus Outbreak**" www.kansascity.com/news/coronavirus/article241625906.html).

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\* WeReallyCareAboutYou.com**

4.     As a matter of public policy, nurses and healthcare workers across America are now demanding (*emphasis supplied*) more personal protective equipment (PPE) as they treat patients with COVID-19.   On May 1, 2020, nurses with National Nurses United, a nationwide union of registered nurses, protested at 139 hospitals across 13 states.   The May 1, 2020 CBS News Report Audrey McNamara, https://www.cbsnews.com/news/may-day-protest-nurses-ppe), the CBS News Report entitled" **Nurses holding May Day protests nationwide demanding PPE"**, reports in relevant part:

> "More than 60 nurses across the country have died of COVID-19, according to NNU. The union says, however, that number is likely higher due to a <u>lack of testing</u>."

> "Nurses signed up to care for their patients. They did not sign up to sacrifice their lives on the front lines of the COVID-19 pandemic,"

> "The union is calling on its employers and the government to provide nurses and other health care workers with better protection. The union has specifically cited a need for more gloves, N95 respirator masks, which block at least 95 percent of very small particles, as well as full-body coverings like Powered Air Purifying Respirators, called PAPRs, and coveralls that incorporate head coverings and shoe coverings."

> "Otherwise, hospitals will remain fomites for infection, say NNU RNs, and nurses and health care workers will continue to get sick and sidelined, die, and be unable to care for the next wave of patients."

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***
**WeReallyCareAboutYou.com**

### III.  JURISDICTION AND VENUE

5.      Jones seeks compensatory damages, punitive damages, attorneys' fees, costs, expenses and such other relief in excess of this honorable Court's jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00).

6.      LCCJ is a licensed foreign corporation organized under the laws of the State of Tennessee.  Life Care Centers of America Inc.'s corporate office is located at, 3570 Keith Street, N.W. Cleveland, TN 37312-4309.

7.      LCCJ is authorized to engage in business, and interstate commerce in the State of Florida, Duval County, FL; thus, this honorable Court has personal jurisdiction over LLCJ.

8.      LCCJ is recognized as an employer within the meaning of Chapter 448.102(3), The Florida Whistleblower Protection Act ("FWPA") and 42 U.S.C 1981, The Civil Rights Act of 1886 ("Section 1981").

9.      Jones is a resident of Duval County, Florida and she was employed with LCCJ, at all times relevant herein; thus, this honorable Court has personal jurisdiction over Jones.

10.     Jones' race is African American; thus, she is in a protected class that is recognized under Section 1981.

11.     Subject matter jurisdiction of this Court is proper because one of Jones' claims as set forth herein, arise under federal law, specifically Section 1981.

12.     This honorable Court is the proper venue for this action pursuant to 28 U. S. C. §1391 (b)(1) and (b) (2) and Local Rule 1.02, United States District Court, Middle District of Florida because this is the district and division in which Jones resides, and in which a

substantial part of the unlawful acts, events and omissions giving rise to Jones' claims, as alleged herein occurred.

13.      Pursuant to 28 U.S.C. §1367, this Court has supplemental, pendent jurisdiction because Jones' common law claim(s) derive from the same nucleus of operative facts as Jones' federal Section 1981 claim, as alleged herein.

14.      Jones timely filed her claims that are alleged herein, pursuant to statute of limitations provisions for her statutory causes of action, including the FWPA and Section 1981.

15.      All administrative conditions precedent to the filing of this action, have been timely filed, met and performed.

16.      LCCJ's Registered Agent, according to the public record of the Florida's Department of State, Division of Corporations is: Corporation Service Company, 1201 Hayes Street, Tallahassee, Florida 32301.

## IV.   THE PARTIES

17.      Life Care Centers of America, Inc. is recognized as one of the largest privately held long-term elderly care companies in the United States.

18.      Life Care Centers of America, Inc. has over 40,000 employees and it operates over 200 skilled nursing, rehabilitation, Alzheimer's and senior living facilities across 28 states.

19.      Defendant LCCJ is an affiliated, subordinate nursing home company of Life Care Centers of America, Inc.

20.      Plaintiff Jones is a Certified Nursing Assistant ("CNA" - Certificate No:  CNA 99425).  Jones is an African American female.

21.     Jones was employed as a full-time CNA at the LCCJ nursing home facility located at, 4813 Lenoir Ave, Jacksonville, FL 32216 from December 12, 2018 until her wrongful job termination that occurred on April 23, 2020.

## V.   FACTUAL ALLEGATIONS

22.     On December 18, 2018, Jones was hired by LCCJ to work as a full time Certified Nursing Assistant ("CNA") at the LCCJ nursing home facility located at 4813 Lenoir Ave, Jacksonville, FL 32216.

23.     During her tenure of employment with LCCJ, Jones received noteworthy comments from LCCJs residents and their families regarding her excellent caregiver skills.

24.     Jones was regularly praised for her care, and compassion for LCCJ's residents. and she regularly received praises and Life Care Center of America's "Shining Star Card Program Reward" comments from her co-workers, residents, and family members, including but not limited to:

> A.     "I would like to express my heartfelt thanks and gratitude for the care that Lula Jones provides to my friend R.L. Lula is personable, friendly, caring and efficient with R. and I have noticed R. does better when Lula is taking care of her.  She also makes R. smile and laugh, which is a blessing for that I am thankful.  Lula treats patients like people not just a task to complete and we truly appreciate her and her good work – Friend of Family"
>
> – J.G, Friend of Resident

> B.     "So caring with Resident's daughter".
>
> -- Co-Worker

> C.     "Working extra hard and always helping others" ".
>
> -- Co-Worker

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

D.  "Excellence in patient care" ".          -- Co-Worker

E.  "Orienting new family to unit. Making them feel welcome"
                                                -- Co-Worker

F.  "Lula Jones …have been very attentive to my mother's needs while she
    has been here and she should be commended for the care given and the
    personal commitment given to her."
                                     – H.G. Son of Resident

G.  "Doing a great job in dining room with three residents".
                                                -- Co-Worker

H.  "The Best Team Player Always" ".    -- Co-Worker

I.  "Lula was our CAN for several days and she did a fabulous job
    helping her to transfer, potty, dress and still keep a good attitude.
    Lula has the IT for working with patients, making them work hard
    without badgering….she knows how to make the laugh".
                                        -- Family Member

J.  " Lula is a hardworking staff member her at life care. She is always on to
    of patient care and consistently goes beyond for the patients she takes
    care of".
                                     – Co-worker

K.  "Lula Jones is an excellent CAN nurse.. She take care of my Godmother
    all the time. She makes sure my Godmother is ok.. She makes my
    Godmother eat. She make my Godmother dress and she make sure
    Godmother is alright. My Godmother M.C. love her. Lula Jones is an
    excellent CNA nurse."
                                     – Family Member

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

**MEDICATION ERRORS AND NEGLIGENT MEDICATION ADMINISTRATION**

25.     A common problem in hospitals and nursing homes is errors related to medication administration. medical errors and patient neglect/abuse.   Some of the various types of medication, medical administration and negligence that can happen in a nursing home environment, including:

A.     Documenting the giving of the medication incorrectly:

B.     Failing to monitor the resident after giving the medication;

C.     Giving residents medication at the wrong time or at the wrong rate;

D.     Giving residents expired medications;

E.     Giving residents too little medication or skipping a dose of medication;

F.     Using an incorrect med administration technique;

G.     Following the wrong med pass routine;

H.     Slicing or cutting pills that should not be split in halve nor crushed that carry the instructions not to;

I.     Giving residents the wrong form of medications or the wrong dosages.

**LCCJ's MEDICATION ERRORS, PATIENT NEGLECT AND PATIENT ABUSE**

26.     As a CNA healthcare worker, at all material times, Jones was legally, ethically and professionally responsible to ensure that LCCJ's nurses comply with resident physician orders and established medical, treatment plans for LCCJ's nursing home residents.

27.     LCCJ's elderly and infirmed residents need quality medical care and nutrition to sustain themselves in the COVID-19 pandemic.

**8 |** P a g e

28.     In January 2020, Jones began noticing a decrease in LCCJ's delivery of patient care, medical services and she witnessed repeated patient neglect issues.

29.     Jones witnessed that LCCJ's patient neglect, patient abuse, medication errors and negligent medical administration, "sloppy nursing" and negligence of LCCJ's untrained, incompetent direct caregivers.

30.     Jones also learned that certain direct care employees that were working for LCCJ did not have CNA training certifications and incompetent nurses that were compromising the lives, health and safety of residents.

31.     Jones witnessed that many of LCCJ's residents were becoming sicker, and rapidly dying.

### JONES OPPOSED LCCJ'S MEDICATION ERRORS AND PATIENT NEGLECT/ABUSE

32.     During the approximate time period February 2020 through April 23, 2020, Jones repeatedly complained to LCCJ's management officials SAL DeCARIA, NHA, LCCJ's Executive Director, DARIN TONEY,  LCCJ's new/interim Executive Director,  JACSELY FLORES, RN, BSN, LCCJ's Unit Manager, and her direct work supervisor CHERYL McGRUDER, RN, BSN, LCCJ's Director of Nursing ("DON"), about LCCJ's nurse/caregiver medical errors, patient neglect and patient abuse including but not limited to the following violations:

   A.   The prescribed medicines of residents being left in beds, on tables, and the floors of resident bedrooms;

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

B.  LCCJ's nurses not timely advising the residents' treating physicians and family members about resident (s) that were not taking all of their prescribed medications and the residents that were not eating their meals;

C.  LCCJ's nurse(s) failure to ensure that residents completely swallowed or otherwise took their prescribed medications as ordered by physicians;

D.  LCCJ's nurse(s) falsification and inaccurate completion of Medicine Administration/Med Pass inventory reports reporting the residents took their medications – when in fact the resident's medications were repeatedly found on floors, tables and in beds;

E.  Residents' oxygen tanks (portable tanks) being unsecured, out of their brackets/support system, off of residents and being left emitting oxygen in the rooms of resident(s);

F.  Residents sitting or lying in feces, urine, and soiled diapers for long periods of time;

G.  LCCJ's hiring and retention of incompetent nurses and non-certified CNAs/direct caregivers that were compromising the health, safety and lives of LCCJ's residents;

H.  LCCJ failing to investigate residents and family members' complaints that related to nurses not timely treating and addressing the medical needs of residents;

I.  LCCJ's facilities lack of clean towels which caused Jones and other CNAs to have to resort to the washing/cleaning of residents with pillow cases, sheets and linen;

J.  LCCJ's critical CNA/staffing shortages that compromised LCCJ's ability to care for patient needs and staffing shortages that compromised the lives, safety and health of residents.

## JONES COMPLAINED TO LCCJ'S EXECUTIVE DIRECTOR

33.   In late March 2020, Jones in "good faith" reported the patient safety, medical error and patient neglect complaints alleged in para 32 (A-J), infra to DARIN TONEY, LCCJ's new/interim Executive Director (hereinafter referred to as the "Executive Director").

34.     Jones met face-to-face with the Executive Director in his office and showed him several photographs which proved LCCJ's medication errors, patient neglect and the deplorable living conditions of LCCJ's residents.

35.     Jones also complained about LCCJ exposing LCCJ's employees, residents and their family members to COVID-19 because of LCCJ's poor planning, training and preparation.

36.     After the Executive Director had reviewed the telling photographs, he stated to Jones that he "**knew that LCCJ has serious problems**" in its delivery of medical services and care to residents.

37.     The Executive Director then stated to Jones in part: **"Why did you take the pictures?"**

38.     Jones warned the Executive Director that if she would report LCCJ's medication errors, resident neglect, and resident abuse to Life Care Centers of America's corporate office and Florida's Agency For Healthcare Administration ("AHCA") officials.

39.     After Jones had revealed the existence of the telling photographs to the Executive Director and threated to take further steps to report LCCJ's negligent medical care and dangerous working environment, the Executive Director in concert with McGruder, set in motion their plan to "silence" Jones and they sought pretext reasons to terminate her employment.

40.     LCCJ's management never provided Jones with any feedback regarding her patient safety/neglect complaint(s).

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

## THE CDC's COVID 19, POLICIES, RULES AND REGULATIONS RECOMMEND N95 RESPIRATORS AND SURGICAL MASKS IN HEALTHCARE SETTINGS

41.     Healthcare workers such as nurses, doctors, and technicians are at heightened risk of contracting COVID-19.  According to a recent report from the CDC, more than 9,000 healthcare workers in the United States have contracted COVID-19.

42.     A N95 respirator mask is a respiratory protective device designed to achieve a very close facial fit and very efficient filtration of airborne particles.



### Illustration A – N95 Respirator Recommended By The CDC For Healthcare Workers

43.     N95 respirator masks have been approved by the National Institute for Occupational Safety and Health (NIOSH) to block the inhalation of 95% percent of small airborne particles.

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***

**WeReallyCareAboutYou.com**

44.     The CDC recommend that all direct health caregivers wear N95 respirator masks and surgical masks in the COVID-19 pandemic in order to protect themselves and the health of patients/residents. See **Exhibit A**, The U.S. Food and Drug Administration ("USDA'), Centers for Disease Control and Prevention (CDC) National Institute for Occupational Safety and Health (NIOSH) and Occupational Safety and Health Administration (OSHA) (See *https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95 respirators-and-surgical-masks-face-masks*).

### LCCJ'S LEGAL DUTY TO PROTECT THE HEALTH, SAFEY AND WELFARE OF ITS EMPLOYEES AND RESIDENTS IN THE COVID-19 PANDAMIC

45.     The CDC and USFDA policies, rules and regulations require that healthcare workers, including Jones, use N95 respirator masks when providing healthcare services and medical treatments [and] if N95 respirator mask are unavailable, at a minimum, healthcare workers are required to use approved surgical masks in this ever evolving COVID-19 pandemic.

46.     At all times material and at the present time, it was, and remains the responsibility of LCCJ to provide the proper Personal Protective Equipment ("PPE"), including N95 respirator mask/approved surgical masks to LCCJ's healthcare staff and CNAs, including Jones.

47.     Since January 2020, LCCJ had a legal duty to ensure that its nursing homes had a COVID-19 Pandemic crisis intervention plan in place to protect the health, safety and lives of its employees and residents.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

48.     During the months of February 2020-April 2020, Life Care Center of America Inc. nursing homes all across America have experienced hundreds of deaths of employees, residents, and has led to hundreds of first responders and policeman being quarantined (See "**Nursing Home Linked To Dozens Of COVID-19 Deaths**"*; www.npr.org/sections/coronavirus-live;www.cnn.com/2020/03/08/politics/coronavirus-washington-nursing-home-life-care-center-kirkland-cnntv/index.html; ***Kansas Health Officials Confirm Another Life Care Center Coronavirus Outbreak*** www.kansascity.com/news/coronavirus/article241625906.html).

49.     In early March 2020 Jones, and other LCCJ employees learned that COVID-19 was causing a high infection rate and alarming deaths of residents, employees first responders and firemen in Life Care Centers of America, Inc.'s nursing home facilities across America.

50.     Jones and other direct health care employees became increasingly fearful of becoming infected with COVID-19 [and/or] transmitting the COVID-19 virus to LCCJs elderly, sick and infirmed residents because of LCCJs failure to provide them with the proper PPE, in particular, the N95 masks.

## LCCJ "DID NOT" CONDUCT COVID-19 PANDEMIC TRAINING, PLANNING AND TESTING OF ITS EMPLOYEES OR RESIDENTS

51.     Based upon information and belief, during the time period January -April 2020 one or more residents that lived in LCCJ's facilities have tested positive for COVID-19 [and/or] had been exposed to COVID-19 before being admitted as a LCCJ resident.

52.     Based upon information and belief, LCCJ recently hired new employee(s) from other nursing home that had reported cases of COVID-19; but LCCJ did not require that the

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***
**WeReallyCareAboutYou.com**

newly hired employees take COVID-19 tests and LCCJ did not warn its current employees about possible COVID-19 exposure.

53.      CDC's applicable COVID-19 regulations, rules and guidance required that LCCJ implement an intervention plan and training plan for its employees; thus at all material times and during the acts alleged herein, LCCJ had a legal duty to conform its operation in accordance with CDC guidelines, rules and regulations.

54.      At all material times, LCCJ did not require that its employees or residents take COVID-19 tests.

55.      Despite the CDD's COVID-19 guidelines and the COVID-19 infections that were causing the deaths of Life Care Center of America, Inc's residents, employees, first responders and policeman, LCCJ did not require COVID-19 testing of Jones or any of its employees as a condition of their continued employment with LCCJ.

**LCCJ COMPROMISED EMPLOYEE/RESIDENT'S HEALTH AND SAFETY**

56.      Based upon information and belief, during the relevant time period, LCCJ "knowingly" received and admitted patients/residents that were being discharged from Memorial Hospital, Jacksonville, Florida– a local hospital that had documented and reported cases of COVID-19.

57.      Based upon information and belief, one or more residents in LCCJ's facilities where Jones worked have recently tested positive for COVID-19, or they have had the COVID-19 exposure.

58.      On about March 11, 2020, LCCJ advised Jones and other LCCJ employees, that it was mandatory that they take a body temperature test before entering the LCCJ facility.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

59.     In March 2020, LCCJ's management changed the keypad locks/combination on LCCJ's medical supply room and facilities.

60.     Based upon information and belief, at all material times, LCCJ was stockpiling and hoarding N95 respirator masks and surgical masks in LCCJ's facility storage room(s) and supply inventory.

61.     McGruder admitted to LCCJ's CNAs that LCCJ had N95 masks in storage that were being "saved"; during the time that Jones and other CNAs were being denied PPE suitable protective face masks.

62.     Rather than issue its direct caregivers, including Jones, the approved PPE and masks that were in LCCJ's supply inventory, LCCJ's management provided Jones and LCCJ's other direct care staff only "cloth scarfs" during their working hours.

## MCGRUDER'S TRANSPORTION OF DIRTY-COMPROMISED CLOTH SCARFS

63.     Jones and other CNA's were instructed to use LCCJ's "used" cloth scarfs when providing direct medical care and services to residents.

64.      Jones refused to wear LCCJ's' "used", unsanitary cloth masks that had been laying out and openly exposed on a common table.

65.     When Jones complained to McGruder about the uncleanness of LCCJ's cloth-masks, McGruder informed Jones that she (McGruder) was taking LCCJ's soiled cloth masks home and washing them in her personal home washing machine.

66.     Jones complained to McGruder that it was extremely unsanitary and unsafe for her (McGruder) to transport LCCJs used, dirty cloth face masks home back and forth between the JCCL facility and her home.

## JONES OPPOSED LCCJ'S FAILURE TO PROVIDE N95/SURGICAL MASKS

67.    In early April 2020, Jones continued to remind McGruder and other LCCJ management officials of the COVID-19 deaths that were occurring in Life Care Centers of America, Inc.'s nursing homes.

68.    Jones repeatedly advised McGruder and LCCJ's Unit Manager(s) that she and members of her household/immediate family members were in the COVID-19 high risk categories.

69.    Jones re-iterated to McGruder that she and other CNAs greatly feared being exposed to COVID-19 because they were providing "hands on", direct care medical services to COVID-19 residents without having the required N95 mask or at a minimum, approved surgical masks that LCCJ's management was hoarding.

70.    Jones complained that LCCJ's reluctance to issue her the available PPE that was being maintained in LCCJ's supply inventory crippled her ability to safely perform her job functions and jeopardized the health of LCCJ's employees, residents and the family members of residents.

## JONES' REPEATED COMPLAINTS RELATED TO COVID-19 EXPOSURE

71.    When Jones reported back to work on April 23, 2020, one of LCCJ's office secretary(s) gave Jones a COVID-19 temperature test and recorded her body temperature before Jones started her work shift.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

72.     LCCJ's office secretary advised Jones that her body temperature was "just fine" and she authorized Jones to enter into the LCCJ facilities.

73.     At no time did LCCJ or McGruder or Graham allege that Jones had a "higher than normal" body temperature rating.

74.     McGruder and Graham refused to let Jones review her April 23, 2020 body temperature reading.

75.     LCCJ's Staffing Coordinator, McGruder and ANGELA GRAHAM, LCCJ's newly hired, DON, instructed Jones to go to a local urgent care clinic and bring back a physician note.

76.     Jones asked why she was being asked to bring in a physician note, given the fact that she had LCCJ's COVID-19 body temperature test and she had been allowed to enter the LCCJ facilities.

77.     Jones witnessed the Executive Director being physically present in his office on April 23, 2020.

78.     Jones advised McGruder and LCCJ Staffing Coordinator, that she was being "singled out" and she asked them to allow her to talk to the Executive Director via LLCJ's open door policy.

## JONES COMPLAINED ABOUT UNEQUAL TREATMENT/ RACE DISCRIMINATION

79.     On April 23, 2020, Jones continued to complain to McGruder, LCCJ's management that it was unsafe, and illegal for LCCJ to deny her the N95 masks that had been recommended by the CDC's regulations for healthcare workers in the COVID-19 pandemic.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

80.     Jones also reminded McGruder that LCCJ's management needed to ensure that LCCJ's residents receive proper medical care and eat their meals so that they could sustain themselves in the COVID-19 pandemic.

81.     Jones also confronted McGruder about her (McGruder's) failure to wear protective masks during the time that she was interrogating her and working around residents.

82.     Jones complained to told McGruder that she felt that she was being, "singled out", "retaliated against", and treated unequally in comparison to the work attendance of her similarly situated Caucasian co-worker named Brooke (CNA comparator).

83.     Rather than allow Jones to start her schedule work shift, McGruder instructed Jones that she had to wait in LCCJ's lobby area.

### LCCJ'S UNLAWFUL RETALIATION AND WRONGFUL JOB TERMINATION

84.     While waiting to meet with the Executive Director, ANGELA GRAHAM, LCCJ's newly hired DON ("Graham") met with Jones and interrogated about her obsolete, past work attendance and an alleged "call outs" from work that had occurred in the calendar year 2019.

85.     Although Graham had not supervised or worked with Jones, McGruder and the Executive Director used Graham to effectuate their clandestine plan to "silence" Jones and terminate her employment.

86.     The Executive Director ignored LCCJ's "employee open door policy" and he refused to meet with Jones on April 23, 2020 to discuss her concerns regarding LCCJ's failure to protect its employees, residents and family members from COVID-19.

87.     Graham advised that Jones that her employment, was terminated effective April 23, 2020 for her alleged work attendance work issues and for an alleged" no call" to work that had <u>allegedly</u> (*emphasis supplied*) occurred in the calendar year 2019.

88.     Jones refused to sign LCCJ's false job termination letter.

89.     Based on information and belief, <u>prior to terminating Jones' employment</u> (*emphasis supplied*), LCCJ failed to ensure that it had a COVID-19 pandemic crisis and a COVID-19 testing plan in effect in accordance with CDC guidelines, rules and regulations.

90.     Based upon information and belief, and during the acts alleged herein, LCCJ violated acceptable Medicare standards, medical laws and nursing home resident care regulations regarding its delivery of medical care and medical treatment to residents.

91.     Based on information and belief, during the relevant time period, LCCJ McGruder or Graham in particular, did not instruct/force any other CNA or LCCJ employee to pay out of pocket for urgent care/emergency medical room COVID-19 testing record before beginning their scheduled work shifts.

92.     LCCJ's actions, misfeasance and negligence as alleged herein, demonstrate a willful indifference and callous disregard for Jones, employment rights and the health, safety lives, and welfare of LCCL residents, their family members and LCCJ employees.

93.     LCCJ is vicariously liable for the malicious acts, unlawful retaliation, unequal treatment, negligence and misfeasance of its managers, employees and agents, as alleged herein, under the respondent superior doctrine.

## COUNT I
## UNLAWFUL EMPLOYMENT RETALIATION FOR OPPOSING
## FAILURE TO PROVIDE PERSONAL PROCTEVIVE EQUIPMENT NEEDED
## TO PROTECT THE LIVES OF RESIDENTS, FAMILY MEMBERS AND EMPLOYEES
## FLORIDA WHISTLEBLOWER PROTECTION ACT
## FLORIDA STATUTE § 448.102 (3)

94.     Jones hereby incorporates by reference as though restated each of the factual allegations 1- 93, and paragraphs 41-93 with respect to Count I.

95.     Jones engaged in protected employment speech activities within the meaning of the Centers For Disease Control (CDC) and United States Food and Drug Administration (US FDA) guidelines, rules and regulations that pertain to nursing home safety, training and procedure in the COVID-19 pandemic and her manner of opposition to LCCJ's failure to comply with CDC and USFDA laws, rules and regulations were reasonable during the COVID-19 pandemic were reasonable and made by her in "good faith".

96.     A close temporal proximity in time exists between Jones's opposition to LCCJ's violation of CDC and USFDA's COVID-19 rules, regulations and guidelines as alleged herein, and LCCJ's decision to terminate Jones' employment.

97.     As a result of LCCJ's unlawful retaliation and adverse employment action(s), Jones has suffered injuries and damages, including but not limited to, loss of income, benefits and other economic losses, emotional pain and suffering, and other intangible injuries for all of which she is entitled to receive damages.

98.     WHEREFORE, Jones seeks an award of damages against LCCJ, for compensatory damages, attorney's fees, costs, and expenses under the anti-retaliation provisions

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com

of Florida Statute, §448.102 (3) and Chapter §448.104 in an amount, together with prejudgment interest and such other relief as justice so requires under the circumstances.

## COUNT II
### UNLAWFUL EMPLOYMENT RETALIATION FOR OPPOSING PATIENT/RESIDENT NEGLECT AND PATIENT SAFETY VIOLATIONS FLORIDA STATUTE § 448.102 (3)[1]

99.     Jones hereby incorporates by reference as though restated each of the factual allegations 1- 93, and, paragraphs 32 (A-J) -38, 64-68, 74-93 with respect to Count II.

100.    Florida Resident Bill of Rights, Florida Statute, Section 429.28 states in pertinent part that at para (a)  and  (j) that residents in assisted living facilities have the right to: "Live in a safe and decent living environment, free from abuse and neglect".

101.   Jones engaged in protected employment speech activities within the meaning of the Florida's Patient Bill of Rights and Florida's Resident Bill of Rights when she complained about and objected to LCCJ's patient neglect, patient safety violations and LCCJ's failure to provide timely and proper medical treatment as alleged, in particular  paragraphs 32 (A-J)-38, 64-68 and 74-93.

102.   Jones' complaints and her manner of opposition to LCCJ's failure to comply with the Florida Patient Bill of Rights, Florida Resident Bill of Rights, and other applicable laws related to patient/resident safety neglect were reasonable and made by her in "good faith".

---

[1] LCCJ's Law Violations: The acceptable standards of medical care that related to patients/residents and related laws, including but without limitation, the Florida Administrative Code 59A-18.008142; CFR §483.10 Resident rights, and Florida's Resident Bill of Rights, Section 429.28; National Fire Protection Association, Standards, Health Care Facilities Code; Occupational Health Safety Administration 1910.101, 1252 253; 1926.350; Florida State Workmen's Compensation Law 440.56(1); National Fire Protection Association Code 55 and Code 99.

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***

**WeReallyCareAboutYou.com**

103.   A close temporal proximity in time exists between Jones's opposition to LCCJ's patient/resident safety neglect and patient/resident safety violations as alleged herein, in particular paragraph 32(A-J) and LCCJ's decision to terminate Jones' employment.

104.   LCCJ's corporate officials' decision to terminate the employment of Jones as alleged herein were retaliatory and adverse in nature.

105.   As a result of LCCJ's unlawful retaliation and adverse employment action(s), Jones has suffered injuries and damages, including but not limited to, loss of income, benefits and other economic losses, emotional pain and suffering, and other intangible injuries for all of which she is entitled to receive damages.

106.   WHEREFORE, Jones seeks an award of damages against LCCJ, for compensatory damages, attorneys fees, costs, and expenses under the anti-retaliation provisions of Florida Statute, §448.102 (3) and Chapter §448.104 in an amount, together with prejudgment interest and such other relief as justice so requires under the circumstances.

## COUNT III
## UNLAWFUL RETALIATION
## OPPOSITION TO RACE BASED DISCRIMINATION AND UNEQUAL TREATMENT
### The Civil Rights Act of 1866, 42 U.S.C. §1981 et. seq.

107.   The allegations contained in paragraphs 1-93 and in particular, paragraphs 79-93 are hereby incorporated by reference with respect to Count III.

108.   Jones had the right to keep her LCCJ employment and contractual relationship with LCCJ after she reported and opposed the unequal discipline and race-based discrimination that she was experiencing.

109.    Jones' opposition to LCCJ's race-based discrimination was reasonable and made in good faith.

110.    After Jones engaged in protected employment speech activities as alleged herein, LCCJ unlawfully retaliated against Jones and subjected her to adverse employment actions, including but not limited to its decision to terminate and Jones' employment contract without giving her due process.

111.    There exists a close proximity in time and a causal link between Jones' opposition to LCCJ's discriminatory employment practices, and LCCJ's decision to terminate her employment.

112.    As a direct and proximate result of LCCJ's unlawful retaliation, Jones has suffered damages including, loss of income, loss of future income, loss of her personal dignity, emotional distress, attorneys' fees, costs, expenses and other consequential damages not capable of being ascertained at the present time.

113.    WHEREFORE, Jones seeks damages against LCCJ under the anti-retaliation provisions of Section 1981, plus reasonable attorneys' fees, costs, expenses, pre-judgment and post judgment interest, and such other relief as the Court deems and as justice so requires under the circumstances.

## **RESERVATION OF RIGHTS**

114.    Jones reserves her rights to amend the instant Complaint and Demand for Jury Trial and her right to file additional claims against LCCJ.

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*

WeReallyCareAboutYou.com

## **PRAYER FOR RELIEF AND DAMAGES**

115.    WHEREFORE, Jones requests judgment, compensatory and punitive damages against LCCJ as follows:

A.    An award to Jones for compensatory damages, attorneys' fees, costs and expenses under the provisions of the Florida Whistle Blower Protection Act Florida Statute, §448.102 (3) and Chapter §448.104;

B.    An award to Jones for compensatory damages, attorneys' fees, costs, and expenses under the anti-retaliation provisions of Section 1981;

C.    Grant Jones a Jury Trial under the provisions if Section 1981.

D.    Grant Jones the applicable interest on any awards allowed by law; and grant Jones;

E.    Grant Jones such other and further relief as the Court deems just and appropriate under the circumstances.

DATED: May 6, 2020.                    Respectfully submitted:

                                    **THE JONES LAW FIRM, P.A.**

                 BY:    **s/J. Eric Jones, Esquire**
                             Florida Bar No: 0594571
                             10752 Deerwood Parkway, Suite 100
                             Jacksonville, FL 32246
                             Telephone: (904) 434-7553
                             Email: wereallycareaboutu@gmail.com
                             Plaintiff's Attorney

# EXHIBIT A

[CDD US FDA COVID-14 Rules Policies and Regulations]

**\*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256\***

**WeReallyCareAboutYou.com**

# Understanding the Difference



## Surgical Mask



## N95 Respirator

| | Surgical Mask | N95 Respirator |
|---|---|---|
| **Testing and Approval** | Cleared by the U.S. Food and Drug Administration (FDA) | Evaluated, tested, and approved by NIOSH as per the requirements in 42 CFR Part 84 |
| **Intended Use and Purpose** | Fluid resistant and provides the wearer protection against large droplets, splashes, or sprays of bodily or other hazardous fluids. Protects the patient from the wearer's respiratory emissions. | Reduces wearer's exposure to particles including small particle aerosols and large droplets (only non-oil aerosols). |
| **Face Seal Fit** | Loose-fitting | Tight-fitting |
| **Fit Testing Requirement** | No | Yes |
| **User Seal Check Requirement** | No | Yes. Required each time the respirator is donned (put on) |
| **Filtration** | Does NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection | Filters out at least 95% of airborne particles including large and small particles |
| **Leakage** | Leakage occurs around the edge of the mask when user inhales | When properly fitted and donned, minimal leakage occurs around edges of the respirator when user inhales |
| **Use Limitations** | Disposable. Discard after each patient encounter. | Ideally should be discarded after each patient encounter and after aerosol-generating procedures. It should also be discarded when it becomes damaged or deformed; no longer forms an effective seal to the face; becomes wet or visibly dirty; breathing becomes difficult; or if it becomes contaminated with blood, respiratory or nasal secretions, or other bodily fluids from patients. |



Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

*Contains Nonbinding Recommendations*

# Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)

## Guidance for Industry and Food and Drug Administration Staff

### April 2020

This document supersedes "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency" issued March 25, 2020.


**U.S. FOOD & DRUG** ADMINISTRATION

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Devices and Radiological Health

JONES 000036

*Contains Nonbinding Recommendations*

# Preface

## Public Comment

This guidance is being issued to address the Coronavirus Disease 2019 (COVID-19) public health emergency. This guidance is being implemented without prior public comment because the Food and Drug Administration (FDA or the Agency) has determined that prior public participation for this guidance is not feasible or appropriate (see section 701(h)(1)(C) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 CFR 10.115(g)(2)). This guidance document is being implemented immediately, but it remains subject to comment in accordance with the Agency's good guidance practices.

Comments may be submitted at any time for Agency consideration. Submit written comments to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. Submit electronic comments to https://www.regulations.gov. All comments should be identified with the docket number FDA-2020-D-1138 and complete title of the guidance in the request.

## Additional Copies

Additional copies are available from the FDA webpage titled "Coronavirus Disease 2019 (COVID-19)," *available at* https://www.fda.gov/emergency-preparedness-and-response/mcm-issues/covid-19-related-guidance-documents-industry-fda-staff-and-other-stakeholders, and the FDA webpage titled "Search for FDA Guidance Documents," available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents. You may also send an e-mail request to CDRH-Guidance@fda.hhs.gov to receive a copy of the guidance. Please include the document number 20018 and complete title of the guidance in the request.

## Questions

For questions about this document, contact 1-888-INFO-FDA or CDRH-COVID19-SurgicalMasks@fda.hhs.gov

JONES 000037

*Contains Nonbinding Recommendations*

# Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Background | 2 |
| III. | Scope | 2 |
| IV. | Definitions | 4 |
| V. | Policy | 4 |
| | A. | Overview | 4 |
| | B. | Face Masks, Face Shields, and N95 Respirators Not Intended for a Medical Purpose | 5 |
| | C. | Face Masks Intended for a Medical Purpose that are NOT Intended to Provide Liquid Barrier Protection | 5 |
| | D. | Face Shields Intended for a Medical Purpose | 6 |
| | E. | Surgical Masks Intended to Provide Liquid Barrier Protection | 7 |
| | F. | Alternatives When FDA-Cleared or NIOSH-Approved N95 Respirators are Not Available | 8 |
| VI. | FDA's Intended Approach for EUAs for Face Masks and Respirators | 8 |
| | A. | EUAs for Decontamination of Face Masks and Filtering Facepiece Respirators | 8 |
| | B. | EUAs for Face Masks Intended for a Medical Purpose, Surgical Face Masks and N95 Respirators | 10 |

JONES 000038

*Contains Nonbinding Recommendations*

# Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)

## Guidance for Industry and Food and Drug Administration Staff

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff or Office responsible for this guidance as listed on the title page.

## I.   Introduction

The Food and Drug Administration (FDA or the Agency) plays a critical role in protecting the United States from threats such as emerging infectious diseases, including the Coronavirus Disease 2019 (COVID-19) pandemic. FDA is committed to providing timely guidance to support response efforts to this pandemic.

FDA is issuing this guidance to provide a policy to help expand the availability of general use face masks for the general public and particulate filtering facepiece respirators (including N95 respirators) for health care professionals during this pandemic.

This policy is intended to remain in effect only for the duration of the public health emergency related to COVID-19 declared by the Department of Health and Human Services (HHS), including any renewals made by the Secretary in accordance with section 319(a)(2) of the Public Health Services (PHS) Act.

Given this public health emergency, this guidance is being implemented without prior public comment because the FDA has determined that prior public participation for this guidance is not feasible or appropriate (see section 701(h)(1)(C)(i) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 CFR 10.115(g)(2)). This guidance document is being implemented immediately, but it remains subject to comment in accordance with the Agency's good guidance practices.

1

JONES 000039

*Contains Nonbinding Recommendations*

In general, FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidance means that something is suggested or recommended, but not required.

## II.   Background

There is currently an outbreak of respiratory disease caused by a novel coronavirus.  The virus has been named "SARS-CoV-2," and the disease it causes has been named "Coronavirus Disease 2019" (COVID-19).  On January 31, 2020, the Department of Health and Human Services (HHS) issued a declaration of a public health emergency related to COVID-19 and mobilized the Operating Divisions of HHS.[1]  In addition, on March 13, 2020, the President declared a national emergency in response to COVID-19.[2]

SARS-CoV-2 has demonstrated the capability to spread rapidly, leading to significant impacts on healthcare systems and causing societal disruption. The potential public health threat posed by COVID-19 is high, both globally and to the United States. To respond effectively to the COVID-19 outbreak, appropriate clinical management and infection control in conjunction with implementation of community mitigation efforts are critical.

FDA believes the policy set forth in this guidance may help address these urgent public health concerns by clarifying the regulatory landscape of face masks and respirators, helping to expand the availability of general use face masks for use by the general public, and of filtering facepiece respirators (including N95 respirators) for use by health care professionals in healthcare settings.

## III.  Scope

There are many products marketed in the United States as "face masks" that offer a range of protection against potential health hazards. Face masks and respirators are regulated by FDA when they meet the definition of a device under section 201(h) of the Federal Food, Drug, and Cosmetic Act (FD&C Act). Generally, face masks fall within this definition when they are intended for a medical purpose, including for use by health care professionals.[3] Face masks that are not intended for a medical purpose are not medical devices, as described in further detail below. FDA-regulated face masks and respirators are listed in Table 1:

---

[1] Secretary of Health and Human Services Alex M Azar, Determination that a Public Health Emergency Exists. (Jan. 31, 2020), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx).

[2] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3] As used in this guidance "intended for a medical purpose" means that the device is intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease and, therefore, meets the definition of "device" set forth in section 201(h) of the FD&C Act.

2

*Contains Nonbinding Recommendations*

Table 1

| Classification Regulation | Device Type | Product Code[4] |
|---|---|---|
| 21 CFR 878.4040 | Mask, Surgical | FXX |
| | Pediatric/Child Facemask | OXZ |
| | Accessory, Surgical Apparel (Face Shield)[5] | LYU |
| | Surgical mask with antimicrobial/antiviral agent | OUK |
| | Respirator, Surgical | MSH |
| | N95 Respirator with Antimicrobial/Antiviral Agent | ONT |
| 21 CFR 880.6260 | N95 Respirator with Antimicrobial/Antiviral Agent for Use by the General Public in Public Health Medical Emergencies | ORW |
| 21 CFR 880.6260 | Respirator, N95, for Use by the General Public in Public Health Medical Emergencies | NZJ |

This policy does **NOT** apply to other types of masks including but not limited to those in Table 2.

Table 2

| Classification Regulation | Device Type | Product Code |
|---|---|---|
| 21 CFR 868.5450 | Humidifier, Respiratory Mask | OBN |
| | Humidifier, Respiratory Gas | BTT |
| 21 CFR 868.5550 | Mask, Anesthetic, Gas | BSJ |
| 21 CFR 868.5580 | Mask, Oxygen | BYG |
| 21 CFR 868.5600 | Mask, Oxygen, Low Concentration, Venturi | BYG |
| 21 CFR 868.5570 | Mask, Oxygen, Non-Rebreathing | KGB |
| 21 CFR 868.5905 | Resuscitator, Manual, Non Self-Inflating | NHK |
| | Mask, Ventilator, Non-Continuous, Reprocessed | NMC |
| 21 CFR 868.5560 | Strap, Head, Gas Mask | BTK |

FDA recognizes that, when alternatives, such as FDA-cleared masks or respirators, are unavailable, individuals, including healthcare professionals, might improvise PPE. FDA does not intend to object to individuals' distribution and use of improvised PPE when no alternatives, such as FDA-cleared masks or respirators, are available.

---

[4] For more information see the Product Classification Database at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm.
[5] The scope of this guidance is limited to face shields under product code LYU, "Accessory, Surgical Apparel." A face shield is a class I device and is exempt from premarket notification requirements under 510(k) of the FD&C Act. *See* 21 CFR 878.4040. Face shields combined with devices other than a face mask (e.g., a gown, hood or toga) are not within the scope of this guidance. *See* "Enforcement Policy for Gowns, Other Apparel, and Gloves During the Coronavirus Disease (COVID-19) Public Health Emergency" *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/enforcement-policy-gowns-other-apparel-and-gloves-during-coronavirus-disease-covid-19-public-health.

3

*Contains Nonbinding Recommendations*

## IV.  Definitions

For the purposes of this guidance, the following definitions are used.

**Face Mask** – A mask, with or without a face shield, that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels.

**Face Shield -** A face shield is a device used to protect the user's eyes and face from bodily fluids, liquid splashes, or potentially infectious materials. Generally, a face shield is situated at the crown of the head and is constructed with plastic to cover the user's eyes and face.

**Surgical Mask** – A mask that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials. The mask meets certain fluid barrier protection standards and Class I or Class II flammability tests[6].

**Filtering Facepiece Respirator** – A filtering facepiece respirator (FFR) is a device that is a disposable half-face-piece non-powered air-purifying particulate respirator intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates.

**N95 Respirator** – A disposable half-mask filtering facepiece respirator (FFR) that covers the user's airway (nose and mouth) and offers protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181.  Such an N95 FFR used in a healthcare setting is regulated by FDA under 21 CFR 878.4040 (FDA product code MSH) and is either a class II device that is exempt from premarket notification requirements under section 510(k) of the FD&C Act or is a class II cleared device.

**NIOSH Approved N95 Respirator** – An N95 respirator, approved by NIOSH that meets filtration efficiency level per 42 CFR 84.181.

**Surgical N95 Respirator** – A disposable FFR used in a healthcare setting that is worn by HCP during procedures to protect both the patient and HCP from the transfer of microorganisms, body fluids, and particulate material at an N95 filtration efficiency level per 42 CFR 84.181.  A surgical N95 respirator is regulated by FDA under 21 CFR 878.4040 (FDA product code MSH) and is either a class II device that is exempt from premarket notification requirements under section 510(k) of the FD&C Act or is a class II cleared device.

## V.   Policy

### A. Overview

FDA is taking steps to expand the availability of face masks and respirators and believes the policy set forth in this guidance may help address the urgent public health concerns caused by shortages of such products by taking a risk-based approach and clarifying the policies that FDA intends to apply

---

[6] CPSC CS-191-53 Flammability Test Method (16 CFR 1610) Standard for Flammability of Clothing Textiles.

4

*Contains Nonbinding Recommendations*

to masks and respirators, including these products' associated indications and claims.

## B. Face Masks, Face Shields, and N95 Respirators Not Intended for a Medical Purpose

Face masks, face shields, and N95 respirators are devices when they meet the definition of a device set forth in section 201(h) of the FD&C Act. Under section 201(h) of the FD&C Act, these products are devices when they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease.

Other face masks, face shields, and filtering facepiece respirators are marketed to the general public for general, non-medical purposes, such as use in construction and other industrial applications. Because they are not intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, FDA device marketing authorization is **not** required, and all the other requirements of the FD&C Act do **not** apply to manufacturers, importers, and distributors of these products.

Face masks, face shields, and respirators are devices when they are intended for a medical purpose, such as prevention of infectious disease transmission (including uses related to COVID-19). Face masks, face shields, and respirators are not devices when they are intended for a non-medical purpose, such as for use in construction. When evaluating whether these products are intended for a medical purpose, among other considerations, FDA will consider whether:

1) they are labeled or otherwise intended for use by a health care professional;
2) they are labeled or otherwise for use in a health care facility or environment; and
3) they include any drugs, biologics, or anti-microbial/anti-viral agents.

## C. Face Masks Intended for a Medical Purpose that are NOT Intended to Provide Liquid Barrier Protection

In general, FDA recommends that health care providers follow current Centers for Disease Control and Prevention (CDC) guidance regarding personal protective equipment (PPE) that should be used during the COVID-19 outbreak.[7] Health care employers must also comply with standards of the Occupational Safety and Health Administration (OSHA) that require PPE to protect workers and that apply to infectious disease hazards.[8] To help foster the availability of equipment that might offer some benefit to health care providers and the general public during the COVID-19 outbreak, for the duration of the public health emergency FDA does not intend to object to the distribution and use of face masks, with or without a face shield (not including respirators), that are intended for a medical purpose (whether used by medical personnel or the general public), without compliance with the following regulatory requirements where the face mask does not create an undue risk in light of the

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhcp%2Finfection-control.html.
[8] *See* 29 CFR 1910 subpart I.

5

*Contains Nonbinding Recommendations*

public health emergency: prior submission of a premarket notification under section 510(k) of the FD&C Act and 21 CFR 807.81, Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR 820, reports or corrections and removals in 21 CFR Part 806, and Unique Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20. FDA currently believes such devices would not create such an undue risk where:

- The product includes labeling that accurately describes the product as a face mask (as opposed to a surgical mask or FFR) and includes a list of the body contacting materials (which does not include any drugs or biologics);

- The product includes labeling that makes recommendations that would reduce sufficiently the risk of use, for example, recommendations against: use in any surgical setting or where significant exposure to liquid, bodily or other hazardous fluids, may be expected; use in a clinical setting where the infection risk level through inhalation exposure is high; and use in the presence of a high intensity heat source or flammable gas; and

- The product is not intended for any use that would create an undue risk in light of the public health emergency, for example the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses and does not include particulate filtration claims.

## D. Face Shields Intended for a Medical Purpose

In general, FDA recommends that health care providers follow current Centers for Disease Control and Prevention (CDC) guidance regarding personal protective equipment (PPE) that should be used during the COVID-19 outbreak.[9]  Health care employers must also comply with standards of the Occupational Safety and Health Administration (OSHA) that require PPE to protect workers and that apply to infectious disease hazards.[10] To help foster the availability of equipment that might offer some benefit to health care providers and the general public during the COVID-19 outbreak, for the duration of the public health emergency, FDA does not intend to object to the distribution and use of face shields that are intended for a medical purpose (whether used by medical personnel or the general public), without compliance with the following regulatory requirements where the face shield does not create an undue risk in light of the public health emergency: Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR Part 820, reports or corrections and removals in 21 CFR Part 806, and Unique Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20. FDA currently believes such devices would not create such an undue risk where:

- The product includes labeling that accurately describes the product as a face shield and includes a list of the body contacting materials (which does not include any drugs, or biologics);

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhcp%2Finfection-control.html.
[10] *See* 29 CFR 1910 subpart I.

6

*Contains Nonbinding Recommendations*

- The face shield does not contain any materials that will cause flammability, or the product meets Class I or Class II flammability requirement per 16 CFR 1610 (unless labeled with a recommendation against use in the presence of high intensity heat source or flammable gas);

- The product is not intended for any use that would create an undue risk in light of the public health emergency, for example, the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses, or for radiation protection.

## E. Surgical Masks Intended to Provide Liquid Barrier Protection

Surgical masks are class II devices that cover the user's nose and mouth and provide a physical barrier to fluids and particulate materials and are tested for flammability and biocompatibility. For the duration of the declared public health emergency, FDA does not intend to object to the distribution and use of surgical masks without compliance with the following regulatory requirements where the surgical mask does not create an undue risk in light of the public health emergency:  prior submission of a premarket notification under section 510(k) of the FD&C Act and 21 CFR 807.81, Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR 820, reports or corrections and removals in 21 CFR Part 806, and Unique Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20. FDA currently believes such devices would not create such an undue risk where:

- The product meets fluid resistance testing (liquid barrier performance) consistent with standard ASTM F1862[11] Standard Test Method for Resistance of Medical Face Masks to Penetration by Synthetic Blood (Horizontal Projection of Fixed Volume at a Known Velocity);

- The product meets Class I or Class II flammability requirement per 16 CFR 1610 (unless labeled with a recommendation against use in the presence of high intensity heat source or flammable gas);

- The product includes labeling that accurately describes the product as a surgical mask and includes a list of the body contacting materials (which does not include any drugs or biologics); and

- The product is not intended for any use that would create an undue risk in light of the public health emergency, for example the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses and does not include particulate filtration claims.

---

[11] For the current edition of the FDA-recognized standard(s) referenced in this document, see the FDA Recognized Consensus Standards Database available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfStandards/search.cfm. For more information regarding use of consensus standards in regulatory submissions, refer to FDA guidance titled "Appropriate Use of Voluntary Consensus Standards in Premarket Submissions for Medical Devices," available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/appropriate-use-voluntary-consensus-standards-premarket-submissions-medical-devices.

7

*Contains Nonbinding Recommendations*

## F. Alternatives When FDA-Cleared or NIOSH-Approved N95 Respirators are Not Available

CDC published on its website <u>Strategies for optimizing the Supply of N95 Respirators: Crisis/Alternate Strategies,</u>[12] which, as part of a set of crisis management recommendations, identifies alternatives to FDA-cleared or NIOSH-approved N95 respirators approved under standards used in other countries, some of which were evaluated under methods that are similar to NIOSH-approved N95 respirators. For the duration of the public health emergency, when FDA-cleared or NIOSH-approved N95 respirators are not available, FDA does not intend to object to the distribution (including importation) and use of respirators identified in the CDC recommendations without compliance with the following regulatory requirements: prior submission of a premarket notification under section 510(k) of the FD&C Act and 21 CFR 807.81, Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR 820, reports of corrections and removals in 21 CFR Part 806, and Unique Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20.

Because FDA cannot confirm the authenticity of the respirators described above, FDA recommends that importers take appropriate steps to verify the authenticity of the products they import.

# VI.  FDA's Intended Approach for EUAs for Face Masks and Respirators

## A. EUAs for Decontamination of Face Masks and Filtering Facepiece Respirators

FDA is responsible for the oversight of reprocessed[13] single use medical devices and generally requires the submission of a 510(k) from entities performing these activities. For the duration of the public health emergency, to facilitate the safe reuse and conservation of PPE for a medical purpose, FDA is interested in interacting with manufacturers on the decontamination[14] of otherwise disposable face masks and filtering facepiece respirators to facilitate marketing authorization through an emergency use authorization (EUA) for decontaminated devices. FDA recommends that firms contact FDA and provide the following information to <u>CDRH-COVID19-SurgicalMasks@fda.hhs.gov,</u> if available. FDA will work with manufacturers through its EUA process to facilitate expedited evaluation of the request. To help facilitate the pre-EUA discussions, we recommend that you send FDA as much of the following information you have available:

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/crisis-alternate-strategies.html.

[13] The term 'reprocessed', with respect to a single-use device, means an original device that has previously been used on a patient and has been subjected to additional processing and manufacturing for the purpose of an additional single use on a patient. See FDA's Guidance "Medical Device User Fee and Modernization Act of 2002, Validation Data in Premarket Notification Submissions (510(k)s) for Reprocessed Single-Use Medical Devices" available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/medical-device-user-fee-and-modernization-act-2002-validation-data-premarket-notification.

[14] As defined in ANSI/AAMI ST79:2017 Comprehensive guide to steam sterilization and sterility assurance in health care facilities, decontamination is the "process of cleaning and disinfecting soiled medical devices to render them safe for handling and to the extent necessary for subsequent processing."

8

*Contains Nonbinding Recommendations*

1) A description of the process for disinfection/decontamination controls, including:
    a) Critical cycle parameters (e.g., concentration, time, heat, relative humidity) required for appropriate bioburden reduction.
    b) Information on chemical indicators (CI) and biological indicators (BI) used to demonstrate that your cycle is appropriately implemented and continues to be executed as intended. CI and BI should be placed evenly throughout the load to demonstrate that at all areas of a chamber the critical process parameters have been achieved. CI and BI should provide a worst-case challenge to the cycle.
2) Validation of bioburden reduction/disinfection, including:
    a) Evidence to demonstrate a robust ability to reduce bioburden on the face mask or respirator. FDA recommends this include demonstration of viricidal activity (≥3-log reduction) as well as either mycobactericidal (≥6-log reduction) or sporicidal (≥6-log reduction) activity. FDA also recommends demonstration of mycobactericidal or sporicidal activity because pathogens may be present on the face mask or respirator and reuse of the face mask or respirator between different users may increase unintended transmission of COVID-19 or other pathogens. For viricidal activity testing, FDA recommends submitting data demonstrating that the process is effective against multiple viral pathogens, specifically coronaviruses (e.g., the coronaviruses causing Sudden Acute Respiratory Syndrome [SARS], Middle East Respiratory Syndrome [MERS], transmissible gastroenteritis coronavirus [TGEV]). FDA also recommends demonstration of mycobactericidal or sporicidal activity because pathogens may be present on the face mask or respirator and reuse of the face mask or respirator between different users may increase unintended transmission of COVID-19 or other pathogens.
    b) Evidence to demonstrate that soils (e.g., blood, mucus, sebum) are either removed or do not interfere with the bioburden reduction/disinfection processes. This information is important as it may limit the ability of the face mask or respirator contaminated with certain soils to undergo a specific process. For example, blood will rapidly degrade hydrogen peroxide. Therefore, the face mask or respirator soiled with blood should not undergo disinfection with hydrogen peroxide.
    c) Protocols and acceptance criteria for scale-up of the process, if applicable.
3) Description of chain of custody and safeguards to prevent inadvertent exposure, including:
    a) Details regarding the chain of custody of the soiled face mask or respirator from the point of collection in the healthcare facility, to the decontamination facility, through the decontamination cycle, repackaging, and distribution back to the healthcare facility.
    b) A description of the safety considerations through each step. At the facility where decontamination will occur, also include a description of the safety considerations which will be in effect, including but not limited to the following:
        i)   What are the PPE requirements for personnel decontaminating respirators?
        ii)  Will this be performed under biosafety level (BSL) 2 or BSL-3 conditions?
        iii) If this will occur under BSL-2 conditions, are there any additional precautions which will be implemented?
        iv)  Will personnel performing decontamination be routinely screened for COVID-19 to ensure that personnel have not been exposed due to decontamination processes and that decontaminated masks or respirators are not contaminated by personnel?
    c) Describe how the face masks or respirators will be handled to ensure they are not

9

*Contains Nonbinding Recommendations*

contaminated or mixed with face masks or respirators to be decontaminated after the face mask or respirator has been disinfected/undergone the proposed decontamination steps.

4) Material compatibility, including:

 a) Evidence to demonstrate that the materials used in both the filters and the straps (elastic bands) are compatible with the proposed decontamination steps, as applicable.

 b) Identification of any face mask or respirator materials known to be incompatible with your method of decontamination. For example, cellulose-based materials are incompatible with hydrogen peroxide as hydrogen peroxide will degrade cellulose.

 c) Evidence to demonstrate that the decontamination residues remaining on the decontaminated face mask or respirator are insignificant to cause a health hazard or deleterious effect to the user.

 d) Identification of the number of times a face mask or respirator may be decontaminated by the proposed method and a method for tracking the number of decontamination cycles to which the face mask or respirator has been exposed. If you are proposing to mark the face mask or respirator during the decontamination cycle to track the number of cycles a face mask or respirator has undergone, FDA recommends including data to demonstrate that the markings are indelible (e.g., will not deface, smudge, change color, otherwise be removed) on the face mask or respirator or strap surface.

 e) Identification of the number of repeated cycles that the mask or respirator and the straps (elastic bands) can withstand.

5) Filtration performance, as applicable:

 a) Evidence to demonstrate that repeated exposure to decontamination cycles does not interfere with the filtration ability or breathability of the respirator.

6) Fit test data:

 a) Evidence to demonstrate that repeated exposure to your decontamination cycle steps does not decrease the ability of the mask or respirator to form a tight fit to the wearer's face, as applicable.

 b) Evidence to demonstrate that the decontamination cycle steps do not compromise the integrity of the elastic bands to maintain an appropriate fit to the wearer.

7) A copy of the decontaminated device product labeling, which FDA recommends should:

 a) Clearly state the mask or respirator is decontaminated.

 b) Identify how many times the mask or respirator may be decontaminated.

 c) Advise users to discard mask or respirator that are visibly damaged or that fit poorly and not decontaminate.

 d) Identify materials (including filter and strap/elastic band) that are incompatible with your proposed decontamination approach.

## B. EUAs for Face Masks Intended for a Medical Purpose, Surgical Face Masks and N95 Respirators

Wherever possible, health care facilities should continue to use FDA-cleared face masks and NIOSH-approved and/or FDA-cleared N95 respirators, or better. In response to the COVID-19 pandemic, FDA has also issued EUAs that authorize certain FFRs, including NIOSH-approved

10

*Contains Nonbinding Recommendations*

FFRs[15] and imported non-NIOSH-approved disposable FFRs[16], for use in healthcare settings by healthcare personnel. These EUAs are intended to help increase availability of these devices to front-line personnel during the public health emergency.

For devices that do not fall within the scope of the March 2, 2020 or March 24, 2020 EUAs, both updated on March 28, 2020, FDA is interested in interacting with manufacturers on additional device-specific EUAs. This may include manufacturers of masks and respirators that are not currently legally marketed in the US as well as manufacturers who have not previously manufactured masks or respirators with capabilities to increase supply of these devices.

FDA would find it helpful if such manufacturers (whether foreign or domestic) send FDA the following information to CDRH-COVID19-SurgicalMasks@fda.hhs.gov; FDA believes this information will be valuable in assessing whether the device would be able to meet the EUA requirements. FDA believes that companies may already have available information to help support an EUA request such as the information outlined below. FDA will expeditiously review this information, and other required information[17], to determine whether the device can be authorized under an EUA.

1) For current face mask and respirator manufacturers whose product(s) are not currently marketed in the US, FDA recommends providing the following information:
   a. General information such as your contact information, name and place of business, email address, and contact information for a U.S. agent (if any) in addition to general information about the device such as the proprietary or brand name, model number, and marketing authorization in your country (or region).
   b. A copy of the product labeling.
   c. Whether the device currently has marketing authorization in another regulatory jurisdiction (including certification number, if available).
   d. Whether the device is manufactured in compliance with 21 CFR Part 820 or ISO 13485: *Medical Devices – Quality Management Systems – Requirements for Regulatory Purposes* or an equivalent quality system and the manufacturer or importer has documentation of such.
   e. Description of testing conducted on the device, including any standards met, such as liquid barrier protection, flammability, biocompatibility, and filtration performance, as appropriate. For surgical N95 respirators, FDA recommends including fluid resistance testing (liquid barrier performance).

2) For face mask manufacturers who have not previously been engaged in medical device manufacturing but with capabilities to increase supply of these devices:

   FDA welcomes the opportunity to work with manufacturers not previously engaged in medical device manufacturing with the interest and capability to manufacture face masks and respirators. This may include US manufacturers in other manufacturing sectors. These manufacturers should send an email to the address above and describe their proposed

---

[15] https://www.fda.gov/media/135763/download.
[16] https://www.fda.gov/media/136403/download.
[17] See Section 564 of the FD&C Act.

11

*Contains Nonbinding Recommendations*

approach. FDA intends to work collaboratively with these manufacturers through its EUA process.

For any face mask or filtering facepiece respirator (including N95 respirators) issued an EUA, FDA will include appropriate conditions of authorization in accordance with section 564 of the FD&C Act. Although this is a case-by-case determination, based on current information and experience, we will likely include the following conditions:

- Appropriate conditions designed to ensure that health care professionals administering the device are informed—
  - o that FDA has authorized the emergency use of the device;
  - o of the significant known and potential benefits and risks of the emergency use of the device, and of the extent to which such benefit and risks are unknown; and
  - o of the alternatives to the device that are available, and of their benefits and risks.
- Appropriate conditions designed to ensure that individuals to whom the device is administered are informed—
  - o that FDA has authorized the emergency use of the device;
  - o of the significant known and potential benefits and risks of the emergency use of the device, and of the extent to which such benefit and risks are unknown; and
  - o of the option to accept or refuse administration of the device, of the consequence, if any, of refusing administration of the device, and of the alternatives to the device that are available and of their benefits and risks.
- Appropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the device. FDA intends to include conditions that are consistent with those promulgated under 21 CFR Part 803.
- For manufacturers of the device, appropriate conditions concerning recordkeeping and reporting, including records access by FDA, with respect to emergency use of the device.

JONES 000050

## CERTIFICATE OF SERVICE

This is to certify that on this **15th** day of July 2021, Plaintiff Lula Jones First Amended Complaint and Jury Demand was electronically filed on the CM/ECF, United States District Court, Middle District of Florida's (Jacksonville Division) E-Portal:

**s/ J. Eric Jones**
Attorney

*The Jones Law Firm, PA, 10752 Deerwood Parkway, Suite 100, Waterview Office, Jacksonville, FL 32256*
WeReallyCareAboutYou.com