United States District Court
Middle District of Florida
Jacksonville Division

LULA JONES,

     *Plaintiff,*

V.                              **No. 3:20-cv-488-TJC-PDB**

LIFE CARE CENTERS OF AMERICA, INC.,
& DUVAL MEDICAL INVESTORS, LLC,
D/B/A LIFE CARE CENTERS OF JACKSONVILLE,

     *Defendants.*

---

## Report & Recommendation

Lula Jones, a certified nursing assistant, claims Life Care Centers of America, Inc., a company providing long-term care for elderly residents, fired her in April 2020 (shortly after the start of the COVID-19 pandemic) for opposing patient-neglect and safety issues, opposing a failure to provide personnel with personal protective equipment, and opposing race discrimination. She brings three claims for unlawful retaliation, two under state law and one under federal law. Life Care denies liability, contending Ms. Jones was fired because she violated an attendance policy.

Before the Court are two motions for sanctions by Life Care, the second resulting from the response to the first.

The motions have generated many filings. *See* D29 (first motion for sanctions), D29-1 (exhibits to motion), D34 (response), D34-1 (affidavit and other exhibits to response), D37 (order directing reply), D38 (reply), D38-1 to

D38-4 (exhibits to reply), D40 (order scheduling conference to discuss whether evidentiary hearing is warranted), D41 (minutes of conference), D52 (transcript of conference), D42 (order scheduling evidentiary hearing), D44 (minutes of evidentiary hearing), D44-1 to D44-11 (exhibits from evidentiary hearing), D45 (transcript of evidentiary hearing), D47 (order scheduling conference to hear arguments on motion and follow up on results of forensic examination), D48 (report of digital forensic examiner), D49 (response to report of forensic examiner), D50 (minutes of conference), D63 (transcript of conference), D51 (second motion for sanctions), D51-1 to D51-10 (exhibits to motion), D56 (response), D61-1 to D61-4 (exhibits to response); D62 (order scheduling conference to follow up on three matters), D65 (minutes of conference), D66 (order continuing conference), D67 (notice by Ms. Jones), D68 (minutes of conference), D69 (transcript of conference), D70 (transcript of conference).

Considering the seriousness of the allegations Life Care makes (fraud on the Court) and the relief Life Care requests (dismissal with prejudice), the undersigned errs on the side of providing more rather than fewer details.

Discovery is complete. The Court vacated the deadlines and trial schedule pending a decision on the motions. A few procedural oddities (the absence of allegations against a second defendant and the absence of an answer or response to Ms. Jones's latest pleading) are discussed.

## I.    Overview

Important to Ms. Jones's claim of retaliation for opposing patient-neglect and safety issues are photographs she claims she took on her cell phone at the Life Care facility where she worked. The photographs show or appear to show

an exposed mattress, unremoved food trays, dirty dishes, abandoned pills, unsecured oxygen cylinders, soiled diapers, and similar conditions.

In her pleading, Ms. Jones alleges she showed the photographs to a supervisor and warned the supervisor she would report the conditions. She alleges the supervisor and another supervisor thereafter implemented a plan to silence her, culminating in her termination three weeks later.

For a local news story about her allegations airing on the same day she filed the complaint, Ms. Jones's counsel, Eric Jones (no relation), provided a reporter five photographs of purported conditions.

Ms. Jones, through Mr. Jones, later provided different photographs to Life Care during discovery in hard-copy form. She retained two expert witnesses who base their opinions on those photographs.

During a deposition, Ms. Jones testified she did not think the photographs were still on her cell phone because they were taking up too much space. She testified she had never uploaded the photographs to the "cloud." She testified she no longer uses the cell phone because it was "getting hot" and she was receiving unwanted communications on it. She testified she still has the cell phone. She testified she had not recorded and could not recall details about the photographs, like exactly when she had taken them. She testified she had taken them while working on her shifts but was not responsible for the conditions. And she testified that while employed by Life Care, she had been working fulltime for a similar company with similar problems.

After the deposition, to obtain electronically stored information (ESI) about the photographs, including the days, times, and places they were taken,

Life Care requested a forensic examination of the cell phone. Mr. Jones responded by saying Ms. Jones no longer possessed old, broken, and inoperable "Obama type cell phones"[1] she had possessed in 2019 and 2020. He accused Life Care's counsel of harassing her.

The first motion for sanctions followed. Contending Ms. Jones had spoliated the ESI, Life Care asked the Court to dismiss some claims, prevent her from countering Life Care's reasons for her termination, or prohibit her from using as evidence both the photographs themselves and expert testimony based on the photographs.

Ms. Jones responded by filing an affidavit stating Life Care's counsel had confused her with his wording when she testified at her deposition she still possessed the cell phone. She emphasized that the cell phone had been lost or replaced before she retained Mr. Jones and before she decided to sue. Based on the statements in her affidavit, she argued sanctions were unwarranted.

The undersigned met with the parties to discuss whether an evidentiary hearing was necessary. Mr. Jones argued against one, pressed that the Court should decide the motion based on the affidavit, and represented that at an evidentiary hearing Ms. Jones would repeat the statements in her affidavit. He contended the matter was wasting judicial resources.

Finding an evidentiary hearing necessary to determine Ms. Jones's intent and the whereabouts of the cell phone considering the differences between her deposition testimony (she still has the cell phone) and her affidavit

---

[1]The Lifeline Assistance program—known as the "Obama Phone" program—helps low-income Americans obtain free cell phones. *See What is the Obama Phone?*, Obama Phone, https://www.obamaphone.com/what-is-the-obama-phone (last visited Aug. 11, 2022).

(she no longer has the cell phone), the undersigned conducted one. At the hearing, evidence established Ms. Jones had replaced the cell phone not before she retained Mr. Jones or before she decided to sue as she had claimed in her affidavit but nearly a year after she sued.

The second motion for sanctions followed. Contending Ms. Jones and Mr. Jones, through the affidavit, committed fraud on the Court about a fact material to the first motion for sanctions, Life Care asks the Court to dismiss the action with prejudice. Life Care emphasizes other inconsistencies in, or troubling aspects of, their representations.

Ms. Jones and Mr. Jones respond not by explaining inconsistent testimony but by shifting the focus to when she had taken the photographs (before she retained Mr. Jones and before she decided to sue); asserting indignation over any suggestion of wrongdoing; attacking Life Care, its witnesses, and its counsel; arguing various improper motives for the motion; arguing the merits of the underlying claims for relief; claiming a First Amendment right to expose wrongdoing; and asking the Court to sanction Life Care's counsel.

## II.   The Pleadings

### A.   *Allegations*

Life Care hired Ms. Jones to work as a fulltime certified nursing assistant on December 12, 2018. D27 ¶ 22; D5 ¶ 22. Life Care fired her sixteen months later, on April 23, 2020. D27 ¶ 21; D5 ¶ 21. That much is undisputed.

In the pleadings, Ms. Jones alleges these facts, D27, and Life Care denies them, D5.

In January 2020, Ms. Jones witnessed "repeated patient neglect issues" and noticed a decrease in delivery of patient care and medical services. D27 ¶ 28. She also witnessed "negligent medical administration, 'sloppy nursing' and negligence of [Life Care's] untrained, incompetent direct caregivers." D27 ¶ 29.

Starting in February 2020, Ms. Jones repeatedly complained about patient-neglect issues to her direct supervisor (Cheryl McGruder), the unit manager (Jacsely Flores), and the executive directors (Darin Toney and Sal DeCaria). D27 ¶ 32.

The next month, in March 2020, Ms. Jones "met face-to-face" with Mr. Toney and "showed him several photographs which proved [Life Care's] medication errors, patient neglect and the deplorable living conditions of [Life Care's] residents." D27 ¶ 34. He reviewed the photographs and told her he "'knew that [Life Care] has serious problems' in its delivery of medical services and care to residents." D27 ¶ 36 (emphasis omitted). She warned him she would report the issues to Life Care's corporate office and to Florida's Agency for Health Care Administration. D27 ¶ 38. After the meeting, Mr. Toney and Ms. McGruder "set in motion their plan to 'silence' her and they sought pretext reasons to terminate her employment." D27 ¶ 39.

On April 23, 2020, Ms. Jones "reminded [Ms.] McGruder that [Life Care's] management needed to ensure that [Life Care's] residents receive proper medical care and eat their meals so that they could sustain themselves in the COVID-19 pandemic." D27 ¶¶ 79–80. Ms. Jones "told [Ms.] McGruder that she felt that she was being[ ] 'singled out[,]' 'retaliated against[,]' and treated unequally in comparison to the work attendance of a similarly situated Caucasian co-worker[.]" D27 ¶ 82. Ms. Jones then met with Mr. Toney, who

6

said "her employment[ ] was terminated effective April 23, 2020 for her alleged work attendance … issues and for an alleged 'no call' to work that had allegedly … occurred in the calendar year 2019." D27 ¶ 87 (emphasis omitted).

Life Care contends Ms. Jones had accumulated ten "points" or "occurrences" between April 2 and 22, 2020, including for a "no call no show" for a scheduled shift on April 12, 2020, violating its attendance policy and resulting in her termination. D29 at 3–4.

## B.   *Procedural Oddities*

In the original complaint, Ms. Jones named as the defendant "Life Care Centers of America, Inc., d/b/a Life Care Center Jacksonville." D1 at 1. The only summons in the record is for "Life Care Centers of America, Inc., d/b/a Life Care Center of Jacksonville." D3.

Life Care Centers of America, Inc., answered the original complaint. D5. In the answer, that entity explained, "Plaintiff has improperly named the Defendant. The proper Defendants in this action are Duval Medical Investors, LLC d/b/a Life Care Centers of Jacksonville, and Life Care Centers of America, Inc." D5 at 1 n.1.

More than nine months later, Ms. Jones moved to amend the complaint to name the correct defendants and to "conform her pleadings with the facts, evidence, affidavits and deposition testimony in the record." D16 at 3. Life Care opposed amendment except to the extent Ms. Jones wanted to name the correct defendants, observing that the deadline to amend the complaint had expired six months prior and arguing Ms. Jones failed to show why she could not have requested amendments sooner. D22.

The undersigned gave Ms. Jones leave to amend her pleading to name the correct defendants but otherwise denied the motion to amend. D25. The undersigned directed Ms. Jones to "file an amended complaint that differs from the original complaint only to the extent the correct defendants are named." D25 at 4.

Ms. Jones filed an amended complaint naming in the caption the correct defendants (Duval Medical Investors, LLC, d/b/a Life Care Centers of Jacksonville, and Life Care Centers of America, Inc.), but continuing to allege facts pertaining only to Life Care Centers of America, Inc. *See generally* D27. And, contrary to the order permitting amendment, she added a footnote about "acceptable standards of medical care that related to patients/residents and related laws" and replaced the exhibit to the original complaint with a new exhibit—additions that kept the body of the pleading the same. *Compare* D1 & D1-1, *with* D27 at 22 n.1, 26–43.

Neither named defendant answered the amended complaint, moved to strike the amended complaint as a violation of the order permitting a limited amendment, or otherwise responded to the amended complaint. Duval Medical Investors, LLC, appears to have filed only two papers during the case, including the second motion for sanctions. *See* D48, D51.

Mr. Jones recently clarified that the allegations in the amended complaint are intended to be against both defendants. D69 at 9–10. Life Care's counsel clarified that the answer to the original complaint was intended to be by both correct defendants and contended failing to answer to the amended complaint was an "oversight." D69 at 5.

The parties have agreed to construe the allegations in the amended complaint as allegations against both defendants and have agreed to construe the answer to the original complaint by Life Care Centers of America, Inc., as an answer to the amended complaint by both defendants. D69 at 27–28.

## III.   The Motions for Sanctions and the Facts Underlying Them

### A.   *Ms. Jones's Pre-Suit Agency Complaint*

In February 2020, while still employed by Life Care, Ms. Jones completed a questionnaire and submitted it to the Jacksonville Human Rights Commission. D44-8 at 3; D45 at 41–42. According to Ms. Jones, nothing came of the matter because the agency informed her she had complained to the wrong agency. D45 at 74.

### B.   *Ms. Jones's Retention of Mr. Jones and the Initiation of this Lawsuit*

On April 20, 2020 (three days before she was fired), or on April 28, 2020 (five days after she was fired), Ms. Jones retained Mr. Jones. D49 at 2; D63 at 4; D67 at 2–5; D70 at 2–3. The exact day is unclear because Mr. Jones first represented he was retained on "April 20, 2021 [sic]" and later represented he was retained on "April 28, 2020." D49 at 2; D63 at 4; D67 at 2–5; D70 at 2–3.

On May 6, 2020—two weeks after Ms. Jones's termination—Mr. Jones signed the original, twenty-five-page complaint. D1.

On May 13, 2020—seven days after Mr. Jones signed the complaint—he filed the complaint and appeared with Ms. Jones on "*Channel 4 News*" to publicize the allegations. D1; D45 at 60. The media aired four photographs of

poor conditions purportedly at the Life Care facility where Ms. Jones had worked.[2] D56 at 3.

## C.    Ms. Jones's Post-Suit Federal Agency Complaint

On May 19, 2020—six days after filing the complaint—Ms. Jones filed an online complaint with the Occupational Safety and Health Administration (OSHA), claiming retaliation for objecting to Life Care's alleged failure to take precautions against COVID-19. D44-6; D45 at 61. As part of those proceedings, in response to Life Care's explanation about her termination, she signed an affidavit on August 18, 2020, in which she stated she had been approved to miss work on April 12, 2020; her car had broken down on the way to work on April 20, 2020; she had accumulated enough vacation and leave time to be off work on April 20, 21, and 22, 2020; Life Care had approved her time off for those days; and her absence on those days had not affected Life Care's business. D44-2 at 4 & n.1. She added, "I have preserved my and [Life Care's] voice mail recordings which prove that I was not absent from work on April 20–22, 2020 without authorization." D44-2 at 4 n.1.

## D.    Life Care's Discovery Requests and Ms. Jones's Responses

Discovery in this lawsuit formally began on October 15, 2020. D6. The Court established a discovery deadline of June 7, 2021, later extended at the

---

[2] *See    Jacksonville    Nurse    Sues    Nursing    Home*,    News4JAX, https://www.news4jax.com/video/video/2020/05/14/jacksonville-nurse-sues-nursing-home-says-its-not-doing-enough-to-keep-people-safe/ (May 13, 2020).

In the response to the second motion for sanctions, Ms. Jones refers to the news story and provides a link, D56 at 3, but the link she provides is broken.

parties' request to October 29, 2021, and at Life Care's request to December 3, 2021. D7, D13, D18, D21, D30, D32.

On October 26, 2020, Life Care requested discovery, including ESI relating to Life Care and the allegations. D70 at 15–16; *see* D44-7 at 6–7 (supplemental response quoting the original request).

On January 4, 2021, Ms. Jones produced hard copies of photographs. D70 at 16. Later, Ms. Jones produced a voicemail that "Kim" at Life Care had left on her cell phone on April 23, 2020, D51 at 6, which Ms. Jones contended demonstrated approval of her absences from work on April 20, 21, and 22, 2020, D51-9 at 4 n.1.[3]

### E.    *Ms. Jones's Replacement of Her Cell Phone*

On March 5, 2021—nearly a year after she sued—Ms. Jones visited T-Mobile and traded her Revvlry cell phone for a Samsung cell phone.[4] D44-11.

### F.    *Ms. McGruder's and Mr. Toney's Deposition Testimony*

At a deposition on March 9, 2021, Mr. Jones asked Ms. McGruder whether Ms. Jones had ever shown her photographs of medications on the floor, soiled diapers, or residents left in soiled diapers. D51-3 at 17 (Tr. 63). Ms. McGruder answered no. D51-3 at 17 (Tr. 63). Mr. Jones asked her whether she

---

[3]When Ms. Jones produced the voicemail is unclear. In one filing, Life Care represents Ms. Jones produced the voicemail on February 22, 2021. D51 at 6. During the evidentiary hearing, Life Care's counsel confirmed through questioning of Ms. Jones that Mr. Jones had produced a clip of the voicemail in May 2021. D45 at 65. Ms. Jones's testimony at that hearing suggests she may have produced the text of the voicemail initially and an audio clip of the voicemail later. D45 at 65–68.

[4]In some filings, the cell phone is referred to as a "Reverie" or "REVVL." The correct spelling is "Revvlry." *See* D44-11.

knew if Ms. Jones had shown photographs to Mr. Toney or anyone else. D51-3 at 17 (Tr. 63–64). She answered she did not know. D51-3 at 17 (Tr. 63–64). Mr. Jones asked her if she had ever heard Ms. Jones had photographs. D51-3 at 17 (Tr. at 63). She answered no. D51-3 at 17 (Tr. at 63). Mr. Jones did not show Ms. McGruder the photographs or otherwise ask her about them. *See generally* D51-3.

At a deposition on March 10, 2021, Mr. Jones asked Mr. Toney, "Sir, isn't it true Lula Jones showed you some pictures during her tenure of employment?" D51-2 at 4 (Tr. 12). He answered, "I do not remember any pictures, no. No pictures." D51-2 at 4 (Tr. 12). Mr. Jones asked him, "Did Lula Jones step up to you with some pictures on her cell phone showing you patient neglect-type issues?" D51-2 at 4 (Tr. 12). He answered, "No." D51-2 at 4 (Tr. 12). Mr. Jones later asked him, "You don't recall Lula Jones showing you any photographs whatsoever?" D51-2 at 26 (Tr. 99). He answered, "No, sir." D51-2 at 26 (Tr. 99). Mr. Jones asked him whether Ms. McGruder or her successor had "ever [told him] Lula Jones had some photos of patient neglect issues." D51-2 at 5, 26 (Tr. 13, 99). He answered, "Not that I recall." D51-2 at 26 (Tr. 99). Mr. Jones did not show Mr. Toney the photographs or otherwise ask him about them. *See generally* D51-2.

### G.   *Ms. Jones's Deposition Testimony*

At a deposition on May 11, 2021, Life Care's counsel asked Ms. Jones about the cell phone she had been using when working for Life Care. D44-1 at 4 (Tr. 13–14). She testified she had used a Revvlry cell phone, she had had to replace her Revvlry with a Samsung cell phone because the Revvlry was getting "hot" (temperature wise, *see* D45 at 87) and she was receiving

unwanted messages on it, and she still possessed her Revvlry.[5] D44-1 at 4 (Tr. 13–14).

Life Care's counsel asked Ms. Jones about the photographs, whether she had taken them on her Revvlry, and whether she still had the photographs. D44-1 at 5 (Tr. 19–20). She testified she had taken the photographs on her Revvlry, now possessed only hard-copy photographs she had given to Mr. Jones, had not backed up the photographs on the cloud or otherwise, and did

---

[5]Life Care's counsel asked, and Ms. Jones answered:

Q. Do you have a smartphone, like a cell phone?

A. Yes.

Q. And is it the same phone that you had when you worked at Life Care?

A. No.

Q. And when did you -- what kind of phone did you have when you worked at Life Care?

A. A [Revvlry] 2.

Q. Okay. And what happened to that phone?

…

A. It was getting hot. I was getting e-mails from people I didn't know, phone calls, threats about a transaction I guess the owner of the phone -- of that phone number could have had. The major reason was those concerns, but also the major reason, it was getting hot.

Q. Okay. And so that's the phone that you had when you worked at Life Care?

A. Yes.

Q. Okay. And what happened to that phone? Do you have it any more or did you sell it, throw it away, lose it?

A. I still have it.

Q. You still have it, okay. But you have a new cell phone; right?

A. Right.

D44-1 at 4 (Tr. 13–14).

not think she had the photographs anymore because they had been taking up too much space.[6] D44-1 at 5 (Tr. 19–20).

Life Care's counsel asked Ms. Jones about details of the photographs (date, time, and place). D44-1 at 5–6 (Tr. 20–21). She testified nothing was written down to indicate when or where she had taken them and she could not remember when she had taken them but could "somewhat" remember where she had taken them.[7] D44-1 at 5–6 (Tr. 20–21).

---

[6]Life Care's counsel asked, and Ms. Jones answered:

Q. … When you worked at Life Care, there are some photographs that you took of patient conditions and the conditions of their room that you came across when you were providing care as a CNA. Do you know those photographs that I'm talking about?

A. Yes.

Q. Okay. Were those taken with your cell phone?

A. Yes.

Q. Okay. And would that have been the cell phone that got hot and you don't use anymore?

A. Yes.

Q. Okay. And then you -- are those backed up on, you know, a cloud somewhere, or are they just on your cell phone?

A. No, it's not backed up, just on my cell phone, and I don't think I even have those anymore. Taking up too much space.

Q. So you don't have those pictures anymore?

A. No. Only the ones that I gave to my attorney.

Q. Okay. So those were hardcopies.

A. And I don't have -- right.

Q. Is it your testimony that the cell phone -- you don't believe that the cell phone that you used to take those pictures still has those pictures on them?

A. No.

D44-1 at 5 (Tr. 19–20).

[7]Life Care's counsel asked, and Ms. Jones answered:

Life Care's counsel asked Ms. Jones if she had kept track of her work schedule. D44-1 at 7 (Tr. 25). She answered she had recorded the days she worked—"the begin shift, end shift"—on a calendar on her cell phone as proof because she and others had been accused of not working on days they worked. D44-1 at 7–9 (Tr. 25, 28–29, 34). Life Care's counsel asked her if the information was still on her cell phone. D44-1 at 8 (Tr. 29). She answered, "I have to go back and look." D44-1 at 8 (Tr. 29). Elsewhere, she testified she had worked on April 12, 2020 (the day she received five "points" or "occurrences" for a "no call/no show"). D44-1 at 62–63 (Tr. 247–48, 251). *But see* D29 at 3–4

---

Q. Now I've only seen the front of those pictures. Is there anything on the back of those pictures in terms of a date or time or place?

A. I don't know.

Q. Okay. Do you -- did you ever make any sort of list or write down or, you know, document --

A. No.

Q. Wait, before you say no -- document where those pictures were taken or when they were taken or what time of day they were taken?

A. No, I didn't, but -- not day and time, but as far as some memory.

Q. Okay. So you would be able to identify the date or time a certain picture was taken?

A. No, but I can remember -- somewhat remember where the -- the location.

…

Q. … So in terms of the pictures that you took, you don't believe that those pictures still exist on the cell phone, is that right?

A. True.

Q. Okay. And you don't have any separate document that -- whether it's a piece of paper or a document you created or an e-mail or any sort of stuff, anything like that which would tell you the date or time on which any of those photos was taken?

A. No.

D44-1 at 5–6 (Tr. 20–21).

(summarizing Life Care's defense); D44-2 (affidavit submitted to OSHA stating she had been approved to miss work on April 12, 2020).

Life Care's counsel asked Ms. Jones whether she had worked anywhere else while working for Life Care and about details of the employment. D44-1 at 14 (Tr. 53–55). She answered that while working at Life Care as a certified nursing assistant, she also worked at Brookdale Senior Living as a certified nursing assistant. D44-1 at 14 (Tr. 53). She testified she worked there fulltime but considered Life Care her "main job" and "brought … an end" to her employment with Brookdale by "[t]echnically" resigning after writing a letter about conditions there.[8] D44-1 at 14 (Tr. 53–54). She described the conditions

---

[8]Life Care's counsel asked, and Ms. Jones answered:

Q. When you worked at Life Care, did you have any jobs outside of Life Care, or is that your only job?

A. In the beginning, no. Later, I picked up a job with Brookdale Senior Living.

Q. Okay.

A. Off of Atrium Way.

Q. And what was that job? Was that as a CNA?

A. Yes.

Q. And was that PRN or what?

A. Well, I did it full-time. I would leave my main job, which was Life Care, and I'd go to Brookdale. But Brookdale had an understanding that I had -- Life Care was my main job, and there's a certain time I have to leave, and once -- if they allow me to leave early sometimes, I would try, but if not, remember, Life Care [is] my main job and I'm coming over there.

Q. Okay. Did you -- did your employment at Brookdale come to an end?

A. No, it didn't come to an end. I brought it to an end myself.

Q. Okay. And did you resign?

A. Technically, yes. What I did was I wrote a letter based on conditions that was going on there, and how you-all call it, the camel broke the back.

Q. What broke the camel's back? What was -- did something happen, a situation of some sort?

at Brookdale as "similar" to the conditions at Life Care and explained, among other problems, she had had to use blankets to protect the beds because Brookdale had no sheets.[9] D44-1 at 14 (Tr. 54).

Life Care's counsel returned to the subject of the photographs. Ms. Jones testified she could identify neither the date nor the time when she had taken them but knew she had taken them when she was on her shift at Life Care and the photographs concerned residents for whom she was caring. D44-1 at 42–43 (Tr. 167–71). Viewing the photographs, she testified she did not know how long residents had been in soiled diapers, how long a tray had been left, who had moved the oxygen cylinders or how long they had been there, how long trash had been in a waste bin, or how long pills had been left, but she knew the problems had not been isolated and had been caused by others. D44-1 at 44–45 (Tr. 173–78).

---

A. Similar -- similar, the same thing that was going on -- well, similar to the same thing that was going on at Life Care. But when you got -- when you don't have but a -- to do patient care, only thing you had was a can of shaving cream. one bottle of Peri-Wash, and you scraping to find something to clean with, you don't have any sheets to put on the bed, so we using blankets, we using whatever we can to protect the beds. I'm seeing some things that was going on which wasn't being reported, so I had to report what wasn't being reported. You had, I think, private-pay patients, which they can't really pay for their items. They was -- I mean, it was struggling. I'll put it like this: They was struggling real bad.

D44-1 at 14 (Tr. 53–55).

[9]One photograph Ms. Jones produced here is of a bed with an exposed mattress partially covered by a bunched blanket or sheet. D29-1 at 41. The photograph is different from the other photographs in the record insofar as it is in black and white and they are in color. *Compare* D29-1 at 41, *with* D29-1 at 36–40. The photograph is not with the other photographs in the expert reports. *See* D61-1, D61-2. The photograph is an example of why metadata is important here, as the photograph appears to show a condition Ms. Jones said was present at Brookdale. *Compare* D29-1 at 41, *with* D44-1 at 14 (Tr. 54).

Life Care's counsel turned to Ms. Jones's pleading allegation that she had warned Mr. Toney she would report Life Care's issues to Florida's Agency for Health Care Administration. D44-1 at 53–54 (Tr. 209–13); *see also* D27 ¶ 38. He asked, "You never filed a complaint with [Florida's Agency for Health Care Administration], did you?" D44-1 at 53 (Tr. 209). She answered she had. D44-1 at 53 (Tr. 209). Asked to repeat her answer, she repeated she had, adding, "I didn't get a response back." D44-1 at 53 (Tr. 209). Asked how she had filed the complaint and whether she still had a copy, she answered she had handwritten it and she had had a copy but thinks she tore it up or, later in her testimony, would not know where to find it. D44-1 at 53 (Tr. 209–11). After vigorous examination, she testified she "think[s]" she filed a complaint with Florida's Agency for Health Care Administration after she spoke with Mr. Toney but cannot remember for sure. D44-1 at 53–54 (Tr. 211–12).

Life Care's counsel asked Ms. Jones whether she needed to change her testimony or add anything to it. D44-1 at 14, 25, 45, 55 (Tr. 55, 98, 179, 219). She did not change the above testimony. But in response to a follow-up discovery request, Mr. Jones said Ms. Jones had filed a complaint with the Jacksonville Human Rights Commission and apparently not with Florida's Agency for Health Care Administration. D44-8 at 2–3.

## H.   *Life Care's Attempt to Discover ESI About the Photographs*

On May 13, 2021—two days after the deposition—Life Care's counsel informed Mr. Jones that Life Care wanted to forensically examine the cell phone on which Ms. Jones had taken the photographs. D44-9 at 7.

Mr. Jones responded, "[Ms. Jones] again went through her belongings this weekend. She is unable to find the old, broken and inoperable 'Obama'

type cell phones [sic] that she had in the calendar years 2019–2020." D44-9 at 4. He continued, "Hence the photos that were produced to your client are all of the photos that [Ms.] Jones has relevant to this litigation that are in her/my possession." D44-9 at 4. He added in red font, "There is no need to continue harassing Ms. Jones about cell phones and photos that are not in her possession." D44-9 at 4.

Life Care's counsel replied by summarizing Ms. Jones's deposition testimony that she still had the cell phone and stating, "Asking that she produce the phone on which this critical information was supposedly kept is not harassment and I ask you to ask Ms. Jones to once again look for that phone. If she still claims to not have the phone, please let us know." D44-9 at 3. Mr. Jones responded,

> [Ms.] Jones confirmed she does not have any old phones. She has produced all photos in her possession.
>
> She did not do any cloud storage of photos on her phone.
>
> As you know [Ms.] Jones is not sav[v]y at technology or computers.
>
> She and I have in good faith have already and will produce all evidence in her possession.
>
> Respectfully, there is no need for your client to engage in a litigious discovery battle over collateral photos and documents that [Ms.] Jones [does] not have in her possession—as I will advise the Court in re[s]ponse to any perfunctory motions that your client may choose to file to multiply this proceeding.
>
> Your client's managers saw/reviewed the photos before making the decision to terminate [Ms.] Jones—regardless of them lying under oath in their depositions.
>
> Respectfully, there is not a … legitimate need to keep harassing my client[ ] about photos or old cell phones that are not in her possession.

If so then as a matter of equality, please expect [Ms.] Jones to request the Court to compel the production of the cell phones of Cheryl McGruder, Angela Graham, Darien [sic] Toney, Sal Decaria and others.

Frankly, the photos that are in the record are telling, and are indeed sufficient to prove [Ms.] Jones'[s] allegations re [Life Care's] patient/resident neglect.

It is the relevancy/quality of the photos—not the quantity.

So we don[']t need to keep quibbling about coll[a]teral photos or old cell phones not in my client's possession.

D44-9 at 1–2.

## I.   *Ms. Jones's Expert Witnesses*

On June 5, 2021, Ms. Jones filed a notice of expert-witness designations and expert reports. D15. The experts—Thomas Witte and Dr. Ankush Bansal—included in their reports some of the photographs produced in hard-copy form during discovery and relied on the photographs for their opinions. D61-1, D61-2. Mr. Witte opined Life Care had failed to properly secure, store, and maintain oxygen cylinders in residential rooms. D61-2 at 5, 6. Dr. Bansal opined Life Care had violated acceptable standards of medical care for nursing-home residents. D61-1 at 8.

Inexplicably, both reports include another case name and number—not this case's name and number—as a footer on each page. D61-1, D61-2. That case was brought in July 2020 (about two months after the current case was filed) by Shirley Jones, M.D., another client of Mr. Jones alleging wrongful termination for complaining about conditions affecting patient care and health (and for race-based discrimination and harassment). *See Jones v. Univ. of Fla. (UF) Dep't of Cmty. Health & Fam. Med., Coll. of Med.*, No. 3:20-cv-737-TJC-JBT (settled early on). Ms. Jones also listed Dr. Jones as another expert

witness in this lawsuit and provided her biography. D44-8. No report by Dr. Jones is in the record.

## J.     Life Care's First Motion for Sanctions

On October 22, 2021, Life Care moved for sanctions for spoliation. D29. The filing was approximately five months after the unfruitful exchange with Mr. Jones but within the discovery period. *See* D21, D32.

Life Care asked the Court to find Ms. Jones had spoliated the ESI relating to the photographs and calendar entries, impose sanctions necessary to address the spoliation, and award Life Care its attorney's fees and costs related to the motion. D29 at 19. As sanctions, Life Care suggested dismissing the "claims concerning patient abuse and neglect" and "a ruling preventing [her] from being able to counter [Life Care]'s legitimate, non-discriminatory and non[-]retaliatory reason for her dismissal." D29 at 17. Life Care suggested as an alternative prohibiting her from using as evidence both the photographs and expert testimony based on the photographs and prohibiting her from submitting evidence of having worked on April 12, 2020. D29 at 17.

Life Care argued Ms. Jones's case "hinges" on the photographs "as demonstrative proof of [Life Care's] purported resident abuse and neglect." D29 at 7. Life Care observed the hard copies of the photographs "contain absolutely no identifiers that indicate the location, date, or time they were taken[.]" D29 at 7. Life Care argued the cell phone used to take them "at the very least would have contained time, date, and geolocation information" even had Ms. Jones deleted the photographs. D29 at 12. Life Care argued it cannot challenge the photographs without the metadata. D29 at 7–8. Life Care also complained Ms.

Jones failed to preserve ESI about the entries she assertedly had made in the calendar on her cell phone as proof of the days she had worked. D29 at 5–6.

## K.    *Ms. Jones's Response to the First Motion for Sanctions*

Ms. Jones responded to Life Care's motion with an affidavit, D34-1, which later became the linchpin of the second motion for sanctions.

In the affidavit, Ms. Jones began, "I, **LULA JONES, CNA**, hereby declare that under the penalty of perjury and the laws of the United States of America that the allegations in this Affidavit are true and accurate. I testify under oath to the foregoing [sic] facts based on my personal knowledge[.]"[10] D34-1 at 1.

Ms. Jones stated she had read the motion for sanctions and the cited portions of the transcript of her deposition. D34-1 ¶ 1. She emphasized with repetition, bolding, and underlining that the cell phone she used to take the photographs had been lost or replaced before she retained Mr. Jones and before she decided to sue:

> 4. The cell phone that I took the Photographs [sic] was lost or replaced, before I decided to file[ ] my lawsuit against Defendant and before I retained the Jones Law Firm, PA to represent me in this lawsuit.
>
> …

_____

[10]Under federal law, whoever "having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true" is "guilty of perjury and shall … be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1621(1).

7. I have produced [sic] of Defendant's patient neglect and resident abuse were taken by me on a cell phone that I lost or was damaged and replaced by my telephone carrier for a new phone.

…

31. Defendant now seek[s] to have me sanctioned by the Court for a cell phone that was "lost" before I filed my lawsuit against Defendant[.]

…

34. I repeat the cell phones that I took the Photographs [sic] is lost or was replaced by my telephone service carrier, **before I filed my lawsuit** against Defendant **and before I** retained the Jones Law Firm, PA to represent me in this lawsuit.

D34-1 ¶¶ 4, 7, 31, 34 (citation omitted). She added, "My current cellular telephone is a new, replacement phone **that I got after Defendant's wrongful termination of my employment**." D34-1 ¶ 5.

Ms. Jones implied the photographs she allegedly had shown Mr. Toney were in hard-copy form:

8.     During my tenure of employment with Defendant and during my working hours, I took photographs (Photographs) of Defendant's resident neglect and abuse.

9.     I decided to take Photographs of the resident neglect, resident abuse and medical errors.

10.    I got my Photographs printed in hard copies to use as evidence to prove my concerns for the safety and health of Defendant's residents.

11.    In March 2020, I "personally" showed the Photographs to Defendant's Administrator (Darien [sic] Toney)[.]

12.    In March 2020, I also showed Photographs to my direct work supervisor Cheryl McGruder[.][11]

---

[11]In the original and amended complaints, Ms. Jones alleges she showed the photographs to Mr. Toney. *See* D1 ¶ 34; D27 ¶ 34. She does not allege she showed the

D34-1 ¶¶ 8–12.

Ms. Jones stated Mr. Toney and Ms. McGruder had "**lied**" when they testified they had not viewed the photographs, adding, "[Y]et, when [they] viewed the Photographs in discovery, [they] did not deny the fact that the Photographs were taken [sic] the Defendant's residential facilities." D34-1 ¶¶ 17, 18. She added, "I believed [sic] that Mr. Toney and Ms. McGruder was [sic] coached, **they intended to lie under oath** and lied about the fact that they had seen the Photographs." D34-1 ¶ 19.

Ms. Jones blamed her previous testimony that she still possessed her Revvlry on how Life Care's counsel had asked a question during her deposition, stating, "When Defendant's attorney … asked me in my May 11, 2020 [sic] deposition his tricky question about '**do you have a cell**' phone, I honestly misunderstood [his] question," "I thought [he] was asking me '**if I had a cell phone**,'" and "I do currently possess a cellular phone—so my answer was '**Yes**.'" D34-1 ¶¶ 22–24.

Ms. Jones signed the affidavit, and a notary signed and sealed the affidavit with the jurat "Sworn to (or affirmed) and subscribed and acknowledged before me this 10th day of November 2021." D34-1 at 7, 8.

Ms. Jones, through Mr. Jones, used the statements in her affidavit to oppose the motion for sanctions, including by asserting:

> Ms. Jones "testified that some of the Photographs that she took in [Life Care]'s residential facilities and calendars of her work schedules could

---

photographs to Ms. McGruder, *see generally* D1, D34, and she did not request amendment to add an allegation to that effect, *see generally* D16.

have been stored on a cell phone(s) that she did not have in her possession when she filed the instant lawsuit." D34 at 2.

Ms. Jones "testified that the subject 'lost' cell phone was either replaced by her telephone carrier, discarded, or lost <u>before</u> … [Ms. Jones] contemplated the filing of the instant lawsuit and <u>before</u> … she retained the legal services of [Mr. Jones]." D34 at 3 (citation omitted).

Ms. Jones's "innocent loss of her old cell phone, that she had before the filing of the instant lawsuit was harmless, unintentional, and does not in any way cause undue harm or prejudice to [Life Care]." D34 at 8.

"When [Ms. Jones] lost her phone, she had not contemplated the filing of the instant lawsuit and she had not discussed her case with [Mr. Jones]." D34 at 10.

Ms. Jones's "innocent 'loss' of an irrelevant, non-controlling cell phone before she contemplated filing a lawsuit, and before she decided to retain legal counsel to file the instant lawsuit is indeed innocent and harmless." D34 at 12.

Ms. Jones contended Life Care's motion was designed to "mislead" the Court, "distort" her deposition testimony, and prevent her from using evidence. D34 at 2, 10. She continued, "[Life Care]'s meritless motion for sanctions is designed by [Life Care] as a distraction and another malicious means that [Life Care] is using to unlawfully retaliate against [Ms. Jones] because of her 'good faith' complaints related to [Life Care]'s medical errors, resident neglect, resident abuse, and resident safety violations." D34 at 2. She contended her "'lost' cell phone … is not controlling and the 'lost' cell phone is certainly not needed by [Life Care] to prepare for trial." D34 at 2.

Ms. Jones argued that insofar as her cell phone may have had additional photographs of "gross medical errors, resident neglect, and resident abuse," destroying the cell phone would have been "illogical." D34 at 2–3.

And Ms. Jones argued, "If [Life Care] had actually believed that the Photographs are not authentic, [Life Care] has had over 1.5 years to retain a forensic[ ] expert to inspect the Photographs rather than wait until the eve of the discovery deadline to make an issue of a non-controlling cell phone that has no bearing on the instant litigation." D34 at 4.

**L.    Life Care's Reply**

The Court directed Life Center to reply. D37. Life Care replied that Ms. Jones's response "further cements why sanctions based on the loss or destruction of her cell phone are not just warranted, but necessary." D38 at 1. Life Center contended her assertions she had not had the cell phone when she sued and that Mr. Toney and Ms. McGruder had not denied Ms. Jones took the photographs or that the photographs depict the Life Care offices and facilities were "demonstrably false" and "warrant further sanctions in and of themselves[.]" D38 at 2. Life Care emphasized that she had testified in her deposition she possessed the cell phone but in the response to the motion she "repeatedly" stated the cell phone was lost or destroyed before she sued. D38 at 3–4. Life Care pointed out that "neither Mr. Toney nor Ms. McGruder were even shown the Photographs by [Mr. Jones] during their depositions or asked a single question about what was depicted in the Photographs." D38 at 6.

Life Care observed, "Inexplicably, … [Ms. Jones] simultaneously argues that her cell phone was lost before she contemplated filing or actually filed her lawsuit and also that [Life Care] had over 1.5 years to conduct a forensic examination of her cell phone to inspect the Photographs." D38 at 2 n.1.

Life Care argued, "[Ms. Jones] compounds the gravity of her having destroyed evidence she was obligated to maintain by going to great lengths …

to elaborate on why the evidence maintained on her cell phone is so critical to her claims and in making these arguments perhaps unintentionally why they are likewise so critical to [Life Care]'s defenses." D38 at 2.

## M.    *The Evidentiary Hearing*

Neither side requested an evidentiary hearing to decide the motion. *See generally* D29, D34, D38. The undersigned scheduled a telephone conference to discuss whether one was necessary. D40 at 1.

At the conference, both sides agreed the motion concerns ESI and Federal Rule of Civil Procedure 37(e) applies. D52 at 4. The undersigned asked, "[I]s this going to require an evidentiary hearing?" D52 at 3. Life Care's counsel responded, "I don't think it would require one … unless the Court still has questions regarding the credibility of Ms. Jones as it relates to what she said under oath, the documents that she's produced, [and] what her attorney has represented to the Court in his response to our motion for sanctions." D52 at 3–4. He continued, "If the Court believes that there are issues with credibility, then we believe an evidentiary hearing on … a limited basis would be helpful to the Court, if there are questions." D52 at 4.

Mr. Jones again referenced "temporary-type phones" (what he had called "Obama type cell phones" in his email to Life Care's counsel, *see* D44-9 at 4), saying, "[Ms. Jones] testified she had these temporary-type phones. She is a very low-paying employee, barely making it. Homeless nearby, if not today -- that living on these phones that they get temporarily, buy them here, pay here, those things -- she wasn't anticipating litigation." D52 at 7. He said, "I just don't see what an evidentiary hearing would produce, other than her saying the same thing she said in her affidavit." D52 at 8. He said Ms. Jones would

"gladly go back to her carriers, the only one she had, if I recall, and try to get photos that are nowhere" and would not object to a subpoena, adding, "I'm just trying to see why are we wasting judicial resources on matters that could have been entertained prior to the discovery cutoff date[.]" D52 at 9. He added, "We're willing to come [to an evidentiary hearing]. She's going to state the same thing she stated in her affidavit. I mean, she can't find the phone." D52 at 13.

To determine what happened to the cell phone and Ms. Jones's intent, the undersigned conducted an evidentiary hearing. D52 at 12.

Ms. Jones was placed under oath. D45 at 7. The undersigned stated, "You just took an oath to tell the truth. If you don't tell the truth or leave something important out, that could subject you to a prosecution for perjury or making a false statement." D45 at 7. The undersigned then asked, "Do you understand the significance and importance of being placed under oath?" D45 at 7. She answered yes. D45 at 7.

Life Care's counsel pointed Ms. Jones to a statement she had made in her affidavit: "[Y]ou state, in paragraph 22, under oath, that 'When defendant's attorney Richard Margulies' – that's me – 'asked me in my May 11, 2020 [sic], deposition his tricky question about "Do you have a cell phone?" I honestly misunderstood Mr. Margulies' question.'" D45 at 12 (quoting D34-1 ¶ 22). He asked her, "Is that a true statement?" D45 at 12. She answered yes. D45 at 12. To a similar question, she answered, "When I was asked the question do I have a cell phone, I thought he was asking do I own a cell phone, just a cell phone period." D45 at 12.

Life Care's counsel pointed Ms. Jones to Mr. Jones's email referencing her "old, broken, inoperable Obama-type cell phones" she purportedly had

looked for but could not find. D45 at 13. She denied having had an "Obama cell phone," explaining she "had just a regular … cell phone" like a Samsung, Galaxy, or iPhone, but agreeing that "otherwise it's a correct statement" insofar as she had looked for the cell phone and could not find it.[12] D45 at 13–14.

---

[12]Life Care's counsel asked, and Ms. Jones answered:

Q. [Reading Mr. Jones's email] "Jones again went through her belongings this weekend. She is unable to find the old, broken, inoperable Obama-type cell phones that she had in the calendar years 2019/2020."

Do you see that? Is that a correct statement, Ms. Jones?

A. Yes and no. I didn't have an Obama cell phone. I had just a regular Samsung cell phone.

Q. Like a Galaxy or a Samsung --

A. Yes.

Q. -- or an iPhone, that sort of stuff?

A. Yes.

Q. So -- but otherwise it's a correct statement.

A. Yes. I did look for it.

Q. Okay. So is it correct, then, that in May of 2021, you looked through your belongings to try to find your old cell phones, but you couldn't find them?

A. True.

…

Q. And we're just talking about one cell phone, and you couldn't find it.

A. I couldn't find it.

…

THE COURT: And just to clarify, because we're talking about two cell phones and one cell phone, you were looking for one Samsung cell phone?

THE WITNESS: No. It was a [Revvlry].

MR. MARGULIES: A [Revvlry] 2.

THE WITNESS: Right.

D45 at 13–14.

Life Care's counsel pointed Ms. Jones to another statement she had made in her affidavit: "In paragraph 4 you state under oath: 'The cell phone that I took the photographs [sic] was lost or replaced before I decided to file my lawsuit against defendant and before I retained the Jones Law Firm, P.A., to represent me in this lawsuit.'" D45 at 16 (quoting D34-1 ¶ 4). He asked her, "Is that a truthful statement?" D45 at 16. She answered, "To my recollection, yes." D45 at 16. He responded, "Pardon me?" D45 at 16. She answered yes. D45 at 16. He continued, "And so when you repeat that same statement in … paragraph 34, it is your testimony that this [Revvlry] 2 cell phone was lost or replaced before you filed your lawsuit and before you retained Mr. Jones," and asked, "Is that a truthful statement?" D45 at 16. She answered yes. D45 at 16.

Ms. Jones twice denied having said something different during her deposition. D45 at 16–17. Life Care's counsel thus took her through what she had said in her deposition about replacing her cell phone but still having it. D45 at 16–21. Referring to the transcript of the deposition provided to her, she testified, "In writing, that's what it says," adding, "But when you asked me the question, you asked me did I have the phone, at that time I didn't know whether or not I had the phone or not. I couldn't say no, and I couldn't say yes." D45 at 21. She continued, "So to keep from being -- not telling the truth -- I wasn't certain, so I gave you a yes answer because I didn't know whether I had it or not so I didn't want to say I didn't have it and I did have it." D45 at 21. Asked when she had discovered she did not have the cell phone, she answered, "When I couldn't find it. I promised you I was going to go and look for it. I couldn't find it." D45 at 21–22.

Ms. Jones testified, "I don't have those photos in my possession. My lawyer -- I gave those photos to my lawyer. I just want to make that -- I don't have them. I gave him what I had." D45 at 23.

Life Care's counsel turned to the subject of the notes Ms. Jones had said she added to her cell phone calendar to document her schedule and about whether she had worked on April 12, 2020. D45 at 25–36. Life Care's counsel asked, "Consistent with your prior testimony, then, you would have entered information into your cell phone that you had worked the day and shift, correct?" D45 at 33. She answered, "No, because sometimes I forget. I ain't say I was accurate, now. Sometimes I -- I mean, I try to be on point, but sometimes I didn't write down the date." D45 at 33. Asked if she was saying she had not entered information about April 12, 2020, on her cell phone, she answered, "No, I'm not saying that. Sometimes I don't put that data in there at that time. Sometimes I have to sit and, … if it goes for a period, have to go back and -- you know, thinking, then enter it, yeah." D45 at 33–34.

After further questioning, Ms. Jones testified she has a "hard copy" of the days and shifts she had worked. D45 at 36. When Life Care's counsel asked why she had not produced the documents during discovery, she answered, "You never asked for them." D45 at 37. After additional questioning by Life Care's counsel and the undersigned to clarify confusing testimony, Ms. Jones testified, "After I -- after -- before I got rid -- before I traded the phone in? Before I traded the phone in, I took my -- went back and took all that stuff out because … [m]y schedule, because that was important to me." D45 at 39. She ultimately testified she copied by hand her schedule notes from the Revvlry onto notebook paper and then typed the information into a document using a laptop computer. D45 at 38–40. (After the hearing, she produced documents

purporting to be her handwritten notes relating to her shifts but apparently no typed document. D51 at 7 n.5.)

Life Care's counsel observed that Ms. Jones testified during her deposition she would have to "go back and look" to determine if the information about having worked on April 12, 2020, was still on her cell phone. D45 at 34. Ms. Jones testified she was referencing her new cell phone. D45 at 34.

Life Care's counsel asked Ms. Jones if she had filed the complaint with the Jacksonville Human Rights Commission in February 2020 intending to file a charge of discrimination against Life Care. D45 at 42. She answered, "Honestly when I went there, I was hoping that they could come and see what was going on. … I went there to get help." D45 at 42–43. Life Care's counsel observed she had completed a "discrimination preinterview questionnaire," and she responded, "My intention were [sic] to go to them so they could come in … review what I -- my complaints and concern was, and make things different, make things better, not only for me but the -- also the residents." D45 at 43. Ms. Jones appeared to deny she had taken the photographs as proof to show the Jacksonville Human Rights Commission. D45 at 46–48.

Life Care's counsel returned to the subject of the photographs. D45 at 49. Ms. Jones testified she had given Mr. Toney her cell phone to look at the photographs. D45 at 50. This colloquy between Life Care's counsel and Ms. Jones ensued:

> Q. Okay. So after showing, then, Mr. Toney the pictures on your cell phone, then you go back, because your cell phone's getting hot and you -- and it's -- you need to get rid of some stuff on your cell phone, then you go back and delete those photographs, correct?
>
> A. No. No.

Q. Well, you printed them off and then you deleted them.

A. No.

Q. I'm sorry. All right. You describe it for me.

A. What happened was my cell phone -- I was having problems with my cell phone, which at that time Mr. Toney was still able to see the pictures on that phone.

When I was having problems with my cell phone, I took it to my provider at that time, and what they did was -- they wasn't going to change out my phone. It was doing the thing where you -- they had where the phone was exploding and all this stuff. My phone was getting hot. I was afraid, so I was trying to get rid of that phone.

Q. So you took the cell phone to your provider, and the provider removed the pictures --

A. No.

Q. -- from -- so you testified in your deposition, Ms. Jones, that you deleted the pictures from your cell phone, correct?

A. I told you I -- you -- you're -- what you're saying, as though I deliberately just got rid of those pictures.

No. What I did was I took pictures -- I took the copies of those pictures -- everything that supposedly -- when I got the new phone, supposedly transferred over to my phone, all the things did not transfer over to my phone. Not even my -- some of my contacts.

When I got the new phone, it was like a couple of days -- when I left, I thought it just takes time. Everything will transfer over. It didn't happen.

I went, like, maybe two -- maybe two -- maybe two days, maybe three, went back to T-Mobile so they can see what's going on. They said, "Give it some time eventually," because I asked them, "Where is my other phone?"

Because I actually sat there and watched him put my phone there and that phone there, and it connect with the phone, and everything supposed to transfer. They said everything was straight.

Q. When did you --

A. So I went back to try to get -- get that particular phone. They said they had got rid of the phone.

Q. Okay. So if I'm understanding this correctly, your phone's getting hot. You go to your provider. You complain it's getting hot. And you have the information on your cell phone transferred to -- or you try at least to get it transferred to a new phone, correct?

A. Once I trans- -- once you get a new phone, they supposed to transfer all that information to your new phone to keep you from manually doing it, all the information.

Q. Okay. And when did you do that?

A. Oh, God.

Q. After you were terminated from Life Care, right?

A. No. No.

Q. Well, when did you do it?

A. When -- when I transferred my phone?

D45 at 50–52.

Ms. Jones pointed Life Care's counsel to two documents filed earlier that day (a T-Mobile receipt and a purported statement by a T-Mobile employee) and testified the documents show that not all the information from the Revvlry had transferred to her new cell phone as well as the date she had "transferred" the cell phone. D45 at 52–53. Life Care's counsel stated he had not really looked at the documents, and the following colloquy ensued:

Q. … So what -- my question is, did you go to your carrier to get the information from your [Revvlry] 2 on to your new phone -- when did you do that? Was it after you were terminated from Life Care?

A. Repeat that question again.

34

Q. Pardon me?

A. Repeat the question again.

Q. Sure. Okay.

A. You said --

Q. So what I understand you testified to --

…

What I understand you testified to is that your [Revvlry] 2 cell phone's getting hot. It -- you need to -- you go to the … carrier, and you're getting a new phone. And you're having the information -- they tried to transfer the information on to your new phone.

My question is, did you do that, go to the … carrier, after you were terminated from Life Care?

A. Yeah, because I got the phone in March. I think I got the phone in March.

THE COURT: March of which year?

THE WITNESS: Yeah.

BY MR. MARGULIES:

Q. Okay.

A. I think I --

THE COURT: I'm sorry. March of which year?

THE WITNESS: 2021.

BY MR. MARGULIES:

Q. Okay. All right.

A. I think it's 2021.

D45 at 53–54.

Life Care's counsel pointed Ms. Jones to another statement she had made in her affidavit: "You say, 'I got my photographs printed in hard copy to use as evidence to prove my concerns for the safety and health of defendant's residents,' okay? When did you … have the photographs printed?" D45 at 54–55 (quoting D34-1 ¶ 10). She answered, "I can't give you exact date. You have to ask my attorney, because he asked me to get -- make copies of … the pictures and so I can give it to him." D45 at 55. Life Care's counsel repeated the question, and she repeated she could not provide an "exact date." D45 at 55. She added, "It had to be in March. I can't give you an exact date." D45 at 55. Life Care's counsel asked for a "[b]allpark" and whether she was still employed by Life Care when she printed the photographs, and she answered no, testifying that she had printed them when Mr. Jones asked her to print them and did so by going to a Walgreens, where someone took the Revvlry, "connected it to their system," and printed them. D45 at 55–56. She added that she thought she had printed them in black and white, prompting questioning about why the photographs relied on by her experts are in color. D45 at 56–57. The following exchange then occurred:

> Q. … And when you went to Walgreens to get the pictures printed, was it from the [Revvlry] phone?
>
> A. Yes.
>
> Q. Okay. And you had already been terminated by that point.
>
> A. (No response.)
>
> Q. I think that's consistent with your testimony just a little bit ago, right?
>
> A. (No response.)
>
> Q. I'll move on.

D45 at 57–58.

Life Care's counsel observed that Ms. Jones was terminated on April 23, 2020; Mr. Jones signed the complaint on May 6, 2020; she and he appeared on the news on May 13, 2020; and she filed her OSHA complaint on May 19, 2020. D45 at 60–61. Life Care's counsel pointed out that only 13 days had passed between her termination and when Mr. Jones signed the complaint, and the following colloquy ensued:

> Q. Okay. And so you still, then, have that cell phone -- don't you? -- after you're terminated from Life Care, the [Revvlry] 2, right?
>
> A. Repeat that again?
>
> Q. You still have that cell phone --
>
> A. No.
>
> Q. -- the [Revvlry] 2 --
>
> A. Repeat everything you just said again.
>
> Q. Sure. So there's 13 days between the time that you were terminated on April 23, 2020, and when your attorney signs a 25-page complaint on May 6.
>
> During that time you still have the cell phone -- don't you? -- the [Revvlry] 2.
>
> A. Correct.

D45 at 61–62.

Told she testified in her deposition that she removed photographs from her cell phone, she stated, "I didn't say I removed the photos from the cell phone. I said that all my pictures did not come through my phone, my new phone." D45 at 62.

Life Care's counsel asked Ms. Jones about the April 23, 2020, voicemail from "Kim" she had produced during discovery. D45 at 63–65. She confirmed the voicemail had been on the Revvlry and Mr. Jones had provided Life Care a clip of the voicemail. D45 at 65. She testified she had tried to give Mr. Jones the voicemail in text form, but he needed to hear the voice, and she worked with a family member to get the voicemail to Mr. Jones. D45 at 65–68. She testified she did not know when but "it could have been a little longer after [she] got fired[.]" D45 at 68.

Mr. Jones asked Ms. Jones if she had deliberately intended to destroy the photographs. D45 at 69. She answered no. D45 at 69. He asked her if she had taken the photographs in the Life Care facility where she worked. D45 at 76. She answered yes. D45 at 76. He asked her questions about her allegations. D45 at 76–77. He asked her whether he had asked her, "for the purposes of this hearing," to go to T-Mobile and ask if the photographs were in the cloud. D45 at 79. She answered yes and testified a T-Mobile employee determined that she was "not set up" to store photographs on the cloud but Google might have them and that T-Mobile had kept the cell phone. D45 at 79–81.

Mr. Jones asked the Court to admit into evidence the two documents filed earlier in the day—the T-Mobile receipt and the purported statement by an unidentified T-Mobile employee. D45 at 76–79, 82–85. The receipt shows Ms. Jones traded in her old cell phone for her new cell phone. D44-11. Elsewhere, the receipt shows the transaction occurred on March 5, 2021. D44-11. The statement, unsigned and undated with a copy of a T-Mobile business card without a name, provides:

To whom it may concern,

Ms. Lula Jones was concerned if [sic] there were pictures in a cloud service that were still not synced to her phone. The T-Mobile retail location assisted her in logging into her Google Photos account to see what pictures were backed up to her phone. Some photos are backed up to her Google account. Any photos that are not showing in her cloud account are either lost or not accounted for, but her Google Photos account is backed up since 2016. The T-Mobile store does not have access to any customer photos, so any missing photos may be lost entirely.

D44-12. The undersigned admitted into evidence the receipt. D45 at 85. Life Care's counsel objected to admitting the purported statement as hearsay and unauthenticated. D45 at 83–84. The undersigned reserved ruling on the objection, D45 at 84–85, and now sustains it (while observing that overruling the objection and accepting the facts in the statement as true does not affect the result).

Upon the undersigned's questioning, Ms. Jones testified she had looked through her belongings to find the old cell phone, adding, "I'm trying to think what could I have done with it." D45 at 86. The following colloquy ensued:

THE COURT: … Did you ask T-Mobile, when you switched phones, to transfer everything?

THE WITNESS: I talked with them and asked them why did all my stuff didn't transfer over, because the day I got the phone, I -- none of my stuff didn't -- I seen them do it. It actually went through. He says, "Everything done." He did everything that he supposed to did right.

But when I got ready to get ready to go to work and stuff, it's like my phone wasn't -- even my phone wasn't even working properly. And so I see where none of my information -- even my contacts wasn't there. All -- you know what I'm saying, all my contacts?

THE COURT: So what did you do about it?

THE WITNESS: So I had to go to work, so I couldn't take care of it then.

Then the next day --

…

THE COURT: Where were you working at that time?

THE WITNESS: Signature. I called them, and they told me just give it some time. It will probably take some time for it to -- you know, everything to come up, come through.

THE COURT: And then did it?

THE WITNESS: In three days it did.

THE COURT: Everything came through?

THE WITNESS: Yeah, which I didn't know it would take that long.

THE COURT: But when you say everything, not everything -- everything came through, calendar and photographs?

THE WITNESS: Not all the -- not all the photographs. But my son send me -- all that I didn't have, I just told him -- that I missed, ones that I could remember that was on there, I just had him to send it to me.

THE COURT: Did you follow up with T-Mobile after that?

THE WITNESS: After my phone got working and everything, I was happy that the phone was working. I did get some of my contacts and stuff, so all that didn't -- I just, like -- the pictures and stuff like that, I just had family members to do it.

And then maybe a couple of contacts I just, you know, called someone and put them in.

D45 at 95–96.

## N.    *The Forensic Examination of Ms. Jones's New Cell Phone*

At the end of the evidentiary hearing, the undersigned asked whether anyone had tried to forensically examine Ms. Jones's new cell phone to determine if the photographs and calendar entries could be found on that cell

phone. D45 at 98. Life Care's counsel said no but that he would appreciate the opportunity to do that and would pay for it and try to maintain Ms. Jones's privacy, and Mr. Jones, after much protest, ultimately agreed to one. D45 at 98–109. Reviewing the requirements for sanctions for ESI spoliation, the undersigned asked Mr. Jones whether Ms. Jones had possessed a duty to preserve the ESI. D45 at 103. He answered, "She would have had a duty … had she known of the duty." D45 at 103.

Life Care retained a digital forensic examiner with Alvarez & Marsal Disputes and Investigations, LLC (A&M). D48. According to the examiner's declaration, A&M made a digital image of Ms. Jones's cell phone and searched the digital image for metadata related to the photographs and the calendar entries pertaining to her work schedule from January 1 to April 30, 2020. D48 ¶¶ 2–3. A&M identified 304 photographs with metadata, none of which were the photographs at issue. D48 ¶ 4(a)(i). The examiner observed, "There was also no evidence, i.e., metadata, that the Photographs had at any time been stored on or transferred to the [cell phone]." D48 ¶ 4(a)(i). A&M "extracted" 146 calendar entries for the period requested. D48 ¶ 4(b)(i). The examiner explained the cell phone does not record the creation day of the entries ("that is, the date and time when [they] were entered into the mobile device"). D48 ¶ 4(b)(ii). The examiner explained that of the entries, 61 are associated with the Google calendar for lulaabutler54@gmail.com, 12 are United States holidays, and 73 are not associated with a particular calendar. D48 ¶ 4(b)(iii). The examiner stated A&M "also extracted metadata" for 70 entries for the period requested. D48 ¶ 4(b)(iv).

Ms. Jones, through Mr. Jones, responded to the declaration. D49. She argued Life Care has suffered no harm by her "inability to produce the non-

controlling, cumulative … work schedules and photographs … that [Life Care] vexatiously seek[s]." D49 ¶ 1. She argued the declaration proves nothing about her intent. D49 ¶ 2. She represented that she had retained Mr. Jones on "April 20, 2021 [sic]" and that at that time Mr. Jones had made her "aware of her legal obligation to preserve ESI relevant to the claims and issues[.]" D49 ¶ 3. She stated she and Mr. Jones have participated in discovery in good faith, and she has exhibited no bad faith regarding the ESI. D49 ¶ 4. She asserted that "if the Court should somehow conclude that the … ESI has caused [Life Care] undue prejudice [or] if the Court should conclude that the ESI was lost through [Ms. Jones's] carelessness, negligence and in particular when viewing [her] testimony and her 'apparent' ignorance regarding the storage and transfer of cellular telephone documents/photographs, rather than sanction [her], … the Court could read an adverse inference jury instruction to the jury at Trial." D49 ¶ 6 (third alteration in original) (footnote omitted). She repeated that she "wishes" she still had the ESI because it "would only serve as additional evidence of [Life Care's] resident neglect, resident abuse, and patient safety violations." D49 ¶ 7.

The undersigned conducted a status conference to discuss the examiner's declaration. D47, D50, D63. Life Care's counsel argued, "It is now beyond dispute that the Court has been presented without [sic] outright lies and false impressions by Ms. Jones and her attorney about what they knew happened to the [cell] phone and when." D63 at 8. He said "a picture is worth a thousand words" and argued the photographs are the "center stage," "centerpiece," and "smoking[ ]gun" of Ms. Jones's claims. D63 at 8–9. He stated, "Without the metadata that Ms. Jones had an obligation to preserve, these photographs could have been taken anytime, anywhere, because there is not a single identifier that they were taken at Life Care, or when they were supposedly

42

taken." D63 at 9. He added, "And in that regard, it would be virtually impossible for Life Care to overcome the prejudice it will suffer if jurors are allowed to stare at PDF images presented to them by Ms. Jones and her attorney of [soiled] diapers, pills, half-eaten food, trash, and unsecured canisters that could have just been printed off of the internet." D63 at 9–10; *see also* D63 at 40–41 (Life Care's counsel explaining the importance of information about the time, day, and place where the photographs were taken, including to determine if the conditions occurred during Ms. Jones's shift when she was responsible for addressing them, if the conditions were staged, and if the conditions were at another facility). He concluded, "To that end, even an adverse jury instruction will not overcome the prejudice that Life Care will suffer if the jury is still bombarded with these photographs and her experts are allowed to testify as to what these photographs mean as it relates to a standard of care." D63 at 10.

Life Care's counsel agreed that, considering the examiner's discovery of the calendar entries, the motion for sanctions for spoliation now concerns only the photographs. D63 at 12. He further agreed that Ms. Jones's claims could proceed without the photographs. D63 at 13–14. He disagreed that cross-examining Ms. Jones about her inconsistent statements made under oath would be a worse sanction than excluding the photographs or expert witness testimony based on the photographs. D63 at 13–16. He conceded Ms. Jones had not intended to spoliate ESI but still had exhibited bad faith. D63 at 21–22.

During questioning about inconsistencies, Mr. Jones stated that he had gone "by what [his] client told [him]," that "to repeat what [his] client said is not a lie," that Ms. Jones thought she had lost the phone, and that she had "ultimately learned she … replaced the phone." D63 at 23–24. Asked to explain

when the facts stated in the affidavit would have been cleared up had the undersigned relied on those and not conducted an evidentiary hearing, Mr. Jones answered that he was dealing with the death of his mother. D63 at 25. The undersigned explained that if he could not answer hard questions, the conference could be continued. D63 at 25–26. He said he was prepared to continue but did not answer the question. D63 at 26. Instead, he argued the Court should deny the motion because Life Care established neither bad faith nor harm, emphasizing that Life Care had long possessed the photographs without challenging their authenticity. D63 at 26–29. The undersigned asked what the Court should do with Ms. Jones's inconsistent testimony. D63 at 32–33. He answered, "Well, Your Honor, that's a hard question. I mean, you know, I would have to …, in this situation, look at the evidence and say, 'How is it harming the defendant?'" D63 at 33. Asked whether the Court can ignore that a litigant said two different things under oath, he responded that Ms. Jones had admitted questions she did not understand, she "misunderstands a lot of things," it is "sometimes difficult communicating," and no ill will or malice exists. D63 at 33–34.

The undersigned revisited whether the ESI was recoverable. Asked if Ms. Jones had ever emailed the photographs to Mr. Jones, he answered, "Not that I recall." D63 at 35. Asked if she had ever texted him the photographs, he answered, "No. No, ma'am. As far as I recall, … [w]e had them in a brown manila folder." D63 at 36.

## O.   *Life Care's Second Motion for Sanctions*

On April 22, 2022—a month after the status conference—Life Care filed the second motion for sanctions. D51. Life Care asks the Court to use its

inherent authority to sanction Ms. Jones by dismissing the action with prejudice and awarding Life Care attorney's fees and costs. D51.

According to Life Care, "Ms. Jones allowed critical evidence to be destroyed, committed perjury about that evidence and in concert with her attorney, Eric Jones …, committed fraud on the Court by egregiously and repeatedly misrepresenting what they had done." D51 at 1. Life Care argues they knew the statements in her affidavit, reaffirmed at the evidentiary hearing, were untrue. D51 at 15–16. Life Care contends any lesser sanctions are insufficient. D51 at 16, 24.

Life Care asserts that if Ms. Jones's testimony and Mr. Jones's representations "are to be believed," the following information can be gleaned from them:

- [Mr.] Jones was hired by Ms. Jones on April 20, 2020, three (3) days before she was terminated by Life Care.

- Ms. Jones maintained possession of the [Revvlry] 2 cell phone through March 5, 2021, when she turned in that phone to T-Mobile for a new Samsung Galaxy.

- Within two or three days after March 5, 2021, when all the information on her [Revvlry] 2 cell phone did not transfer, including the Photographs, to the Samsung Galaxy, Ms. Jones was told by a T-Mobile representative that it no longer had her [Revvlry] 2 cell phone.

- Ms. Jones therefore knew two (2) months before her deposition on May 11, 2021, that she no longer had the [Revvlry] 2 cell phone on which the Photographs were taken. Yet Ms. Jones testified at her deposition that she still had the cell phone and represented to [Mr.] Jones that she looked through her belongings in May 2021, and discovered she no longer had the [Revvlry] 2 cell phone; representations [Mr.] Jones shared with Life Care's counsel and then repeated to the Court in his Response to Motion for Sanctions and the Jones Affidavit Regarding Photographs.

- At the Evidentiary Hearing, in trying to explain her deposition testimony, Ms. Jones testified that at her deposition she was not sure if she still had the [Revvlry] 2 cell phone and that she did not discover she no longer had the [Revvlry] 2 cell phone until she went to look for it in May, 2021.

- Ms. Jones testified at the Evidentiary Hearing that she showed Darin Toney the Photographs using her [Revvlry] 2 cell phone.

- However, in the Jones Affidavit Regarding Photographs, [Mr.] Jones stated that Ms. Jones had the Photographs printed in hard copies and then "personally" showed the Photographs to Mr. Toney and Ms. McGruder, implying that Mr. Toney and Ms. McGruder saw the same hardcopy Photographs as were attached to her Complaint, the OSHA complaint, and given to her experts.

- In the Response to Motion for Sanctions, [Mr.] Jones represented to the Court that Mr. Toney and Ms. McGruder "did not deny" that the Photographs were taken by Ms. Jones, and they "did not deny" that the Photographs depicted the inside of Life Care's offices and residential facilities, knowing full well that he never posed any of these questions to either Mr. Toney or Ms. McGruder or even showed them the Photographs during their depositions.

- [Mr.] Jones asked Ms. Jones to print off the Photographs from her [Revvlry] 2 cell phone, although the record is unclear whether he made this request before or after Ms. Jones was terminated from Life Care on April 23, 2020. After she was terminated from Life Care, [Mr.] Jones asked Ms. Jones to make him a copy of the voicemail message on her [Revvlry] 2 cell phone.

- In response to Life Care's Motion for Spoliation Sanctions, [Mr.] Jones prepared and submitted to the Court the Response to Motion for Sanctions, along with Jones Affidavit Regarding Photographs which repeatedly represented that Ms. Jones "lost" the [Revvlry] 2 cell phone before she contemplated litigation and before she retained [Mr.] Jones as her lawyer.

- The week before the Evidentiary Hearing, [Mr.] Jones instructed Ms. Jones to go to the T-Mobile store and obtain proof of when she turned in her [Revvlry] 2 cell phone for the Samsung Galaxy. At the Evidentiary Hearing, [Mr.] Jones introduced the receipt for that transaction, showing a date of March 5, 2021.

46

- Nonetheless, at the Evidentiary Hearing, Ms. Jones testified that the statements in the Jones Affidavit Regarding Photographs about her [Revvlry] 2 cell phone being lost or replaced before she filed her lawsuit and before she retained the Jones Law Firm were true. Not once either before or during the Evidentiary Hearing did [Mr.] Jones attempt to correct or even explain the multitude of contradictory statements provided by his client or for that matter how, as an officer of the Court, he could make or perpetuate representations he knew were demonstrably false.

- Finally, in response to the Court's questions at the Evidentiary Hearing as to whether Ms. Jones had a duty to preserve the information on the [Revvlry] 2 cell phone, [Mr.] Jones stated to the Court that she would have had a duty had she known about the duty. However, in the Response to ESI Forensic Affidavit, [Mr.] Jones informed the Court that he had indeed informed Ms. Jones of her duty to preserve the [Revvlry] 2 cell phone.

D51 at 20–23.

According to Life Care, Ms. Jones and Mr. Jones's "representations to the Court cannot reasonably be excused as an honest mistake, confusion, or faulty memory. Instead, taken together, [they] willfully attempted in bad faith to abuse the judicial process and avoid spoliation sanctions." D51 at 24.

## P.   *Ms. Jones and Mr. Jones's Response*

In their response, Ms. Jones and Mr. Jones do not explain any inconsistencies in her testimony or their representations. *See generally* D56. They now emphasize she *took* the photographs, she *printed* the photographs, and Life Care managers *saw* the photographs before her termination and before she hired Mr. Jones. D56 at 3. They say, "Prior to retaining [Mr. Jones] and the filing of the instant lawsuit, Ms. Jones downloaded and printed the subject photographs." D56 at 11 n.14.

Focusing on the cell phone rather than the ESI, Ms. Jones and Mr. Jones argue the cell phone is "non-controlling," "pointless," "inoperable," "broken/inoperable," "inconsequential," and "immaterial." D56 at 2, 3, 16. Calling the motion an "eleventh-hour" move, they argue that if Life Care's counsel were genuinely concerned about the cell phone, they would have requested it long ago, emphasizing Life Care possessed the photographs at least as early as June 2020 when Life Care's "prior well[-]resourced, retained law firm" acknowledged receipt of her offer to compromise. D56 at 5 & n.10. They say Life Care's current counsel work for a "well-resourced defense law firm" and contend Life Care's counsel failed to take timely action "despite its bevy of attorneys having unfettered access to legal consultants, and expert witnesses, that could and should have easily and timely investigated … the origin, dates/times of subject photographs." D56 at 11–12.

Ms. Jones and Mr. Jones assert they "did not lie, and they did nothing wrong in litigating this proceeding." D56 at 15. They claim "it is more than likely" that Mr. Toney and Ms. McGruder are the ones who perjured themselves during their depositions. D56 at 2 n.6. They emphasize Life Care does not contend her claims are frivolous or lacking a factual basis and argue the dispute presents issues of material fact that jurors should decide. D56 at 13 n.21, 15. They contend that, "like most seniors," she is unaware of "cellular telephone capabilities." D56 at 11 n.14. They contend she "innocently" replaced the cell phone, they did not abuse the discovery process, she did not intentionally spoliate critical evidence, and they exhibited no bad faith. D56 at 2, 7, 11, 15. They assert they have a First Amendment right to expose issues involving patient care and treatment. D56 at 6. They observe they "have their right to free speech and to speak to the press under the United States Constitution and the Florida State Constitution." D56 at 6.

48

Ms. Jones and Mr. Jones describe the second motion for sanctions as an "attack" on their "veracity, professionalism, and character" and a "hodge-podge" of "conjectures," "meritless opinions," and "self-serving statements." D56 at 4, 13 n.21. They describe the allegations as "unwarranted," "humiliating," "vicious," "ad hominem," "inflammatory," "defamatory," "misleading," "callous," "personal," "acrimonious," "foundationless," "harmful," and "false." D56 at 2, 4, 9, 11, 12, 15, 16, 17.

Ms. Jones and Mr. Jones claim the motion derives from "zeal to engage in protracted, vexatious litigation" and that Life Care's counsel has "improper," "ulterior," and "vindictive" purposes; specifically, to "mislead" the Court; to "distort" her testimony and her "comprehension level"; to "callously disparage, harm and undermine" their "good name[s], character, [and] integrity"; to harass and defame them; to "needlessly multiply this proceeding"; to "distract the Court from the salient fact at issue"; to try to "cover up" Life Care's "discovery shortfalls"; to prevent her expert witnesses from testifying; and to make a "clandestine effort" to avoid damaging testimony. D56 at 4 & n.8, 5, 8–11, 13 n.21, 15, 17.

Ms. Jones and Mr. Jones contend Life Care has a "personal vendetta" against her because "she had to courage to inform the public about" Life Care's alleged wrongdoing. D56 at 6. And they contend Life Care and its counsel "obviously have a personal animosity against" him because of his "effective legal representation" of her, "his courage to represent employees and whistleblowers" who report or complaint about patient safety violations, and "his proper discovery methods that prove … unlawful retaliation and illegal discrimination." D56 at 9 (citation omitted).

Ms. Jones and Mr. Jones ask the Court to sanction Life Care's counsel, including by awarding her attorney's fees, contending Life Care's counsel failed to "timely exercise their due diligence in discovery" by failing to subpoena or depose her cell phone "carriers"; failed to timely retain expert witnesses; retained an "immaterial expert" to "further annoy and harass" Ms. Jones (i.e., the digital forensic examiner the undersigned suggested, *see* D45 at 98); ignored Ms. Jones's pre-suit demand letter that included the photographs; refused to participate in early voluntary mediation; and participated in court-ordered mediation in bad faith. D56 at 4 & nn.8 & 9. They claim that if anyone has committed fraud on the court, it is Life Care's counsel. D56 at 12.

Mr. Jones argues he should not be sanctioned because Ms. Jones initiated the "employment dispute" before he knew her, he is not the plaintiff, he had no control over her "responses and comprehension level" when "she was harassed, interrogated and demeaned by [Life Care]'s attorneys in her deposition," he investigated her claims and sued in good faith, and he was unaware she had replaced her cell phone until Life Care raised the issue. D56 at 7, 8, 11 n.14.

 Ms. Jones and Mr. Jones contend Life Care "illogically" asserts that her "February 2020 visit to the Jacksonville Human Rights Commission … is a basis to sanction" her and Mr. Jones. D56 at 7 n.11. They emphasize she was a pro se litigant then with no knowledge about electronic-retention rules. D56 at 7 n.11. They contend she filed the agency complaint "long before" Mr. Jones had met or agreed to represent her. D56 at 7 n.11.

Mr. Jones contends, "It is troubling that [Life Care's counsel]'s attempt to make the court not believe that the undersigned mother's sudden,

unexpected death occurred and that [Mr. Jones] was making 'excuses' for the alleged actions of Ms. Jones." D56 at 10.

Ms. Jones and Mr. Jones end, "If the Court deem[s] necessary, the Court should present the jury a jury inference/instruction rather than issuing sanctions against Ms. Jones and [Mr. Jones] and dismissing Ms. Jones's Amended Complaint." D56 at 15.

## Q.   *Follow-up*

While preparing this report and recommendation and questioning the absence of all ESI relating to the photographs, the undersigned entered an order directing Mr. Jones to explain how he had sent photographs to the news station to publicize the lawsuit and directing him to "forward" to Life Care's counsel any emails or text messages in which he had attached the photographs. D62.

Mr. Jones responded not by forwarding any email or text message but by emailing the undersigned's courtroom deputy and Life Care's counsel and attaching a document in .pdf format containing both argument and a compilation of emails between Mr. Jones and the news reporter and the reporter's assistant. D65-1, D65-2. Mr. Jones argued he and Ms. Jones have First Amendment rights and she had a legal duty to oppose and report patient issues. D65-2 at 1. He included the syllabus of a United States Supreme Court case about a lawyer's right to free speech and an article about the case. D65-2 at 7–13. He observed that during the media interview, he merely sat next to Ms. Jones and listened to the interview. D65-2 at 1. He asserted the photographs had been attached to the complaint. D65-1 at 1. *But see* D1 (original complaint without photographs); D27 (amended complaint without

photographs). He observed Life Care had never tried to subpoena the news station. D65-1 at 1; D65-2 at 1.

Forwarded with Mr. Jones's email to the courtroom deputy and Life Care's counsel was an email Mr. Jones had sent to a news reporter on May 11, 2020, in which he stated, "We need to talk asap re a huge case that has national implications. I'm filing today and we have pictures and telling evidence." D65-1 at 3.

The .pdf document attached to Mr. Jones's email to the courtroom deputy and Life Care's counsel shows Mr. Jones emailed the news reporter and the reporter's assistant five photographs in .jpg format on May 12 and 13, 2020. D65-2 at 5–6. But because Mr. Jones sent the document in .pdf format to the courtroom deputy and Life Care's counsel, the photographs could not be opened to determine what they were and whether they contained the missing ESI. *See* D69 at 12 (Life Care's counsel's confirmation that she did not receive the photographs in .jpg format).

At a status conference, Mr. Jones stated Ms. Jones had provided him the photographs sent to the news reporter first by email and then in hard-copy form to Mr. Jones's assistant (who, he added, is "gone with COVID"). D69 at 12–13. The undersigned asked Mr. Jones to forward the email from Ms. Jones with the photographs. D69 at 14–15. Mr. Jones said he was forwarding "the exact e-mail" and then asked opposing counsel if she had received it. D69 at 16. She had not. D69 at 16. After taking a break to give Mr. Jones more time, he said he could not "get this e-mail to work[.]" D69 at 18. He asked to take a "quick recess" to allow him to "get with [his] technician[.]" D69 at 19.

The undersigned pointed Mr. Jones to his earlier representation that Ms. Jones had retained him on April 20, 2021, confirmed the year was actually 2020, and asked if that is the day she had signed a retainer agreement. D69 at 17. He answered yes. D69 at 17; *see* D49 ¶ 3. Asked if she had seen or talked to him earlier, he answered, "No, ma'am. In fact, I was out of town. I remember the discussions, telling me a lady was there trying to -- trying to find me, because Lula is the kind of person going to go face to face. But I didn't ever meet her, I didn't know she existed until April -- the end of April 2020." D69 at 17. Asked if the date of the retainer agreement is the day he talked to her for the first time, he answered, "Yes. … That's when I kind of met her." D69 at 17.

Mr. Jones ultimately forwarded to Life Care's counsel only the email exchange between him and the news reporter and the reporter's assistant, with the photographs as .jpg attachments (not any email or text message Ms. Jones had sent). D69 at 20–21. Mr. Jones stated, "Again, I do not recall receiving an email from Ms. Jones with these pictures. The pictures were given to us. We downloaded them -- sorry, scanned them. And that's what you see." D69 at 21. When reminded he had represented earlier during the conference that Ms. Jones had emailed the photographs, he said he "might have [been] mistaken" and that he did not "recall her ever e-mailing" him. D69 at 21.

Asked how the photographs had become digital, he said Ms. Jones might have emailed them to his assistant (adding, "And God bless my assistant, she's gone in Ireland. I can't even ask her about it"). D69 at 22. He ultimately said, "[W]e got them in an e-mail perhaps and we got them hard copy. I also scanned the hard copy. And that's the attachment that's the exhibit to her original complaint." D69 at 22. *But see* D1 (original complaint without photographs); D27 (amended complaint without photographs).

The undersigned asked Mr. Jones who helped with information technology at his firm. Doc. 69 at 24. He responded, "I don't -- I don't -- ma'am, I don't have an IT person. I just use a computer -- when I have things break down, I call a computer company, whoever I can get to work on it. But rarely do I have computer problems. You know, I go to Office Depot and get my computers repaired, Office Max. Those computers that I had back then are long gone." D69 at 24–25.

The undersigned asked Mr. Jones, "[Y]ou were able to find the e-mails … with the news channel … but you're unable to find e-mails right around the same time from Ms. Jones?" D69 at 25. He responded, "That's what I've been looking for. … I've been looking all over for e-mails from Ms. Jones. Because she rarely communicated to me in an e-mail. I mean, she was always on her phone. She didn't even have a computer." D69 at 25. *But see* D45 at 38–40 (Ms. Jones's testimony at the evidentiary hearing she used a laptop computer to convert her handwritten notes about her work schedule into a typed document). The undersigned continued the conference to give Life Care's counsel an opportunity to determine if the photographs from the forwarded emails between Mr. Jones and the news reporter contained some of the missing ESI. D69 at 25–26.

Mr. Jones then filed copies of text messages between him and Ms. Jones describing photographs but not including the photographs themselves. D67. In text messages dated April 25, 2020, she texts photographs with these descriptions: "Medication," "This was in 127 room stay in there over a week. Belong to a patient in 101private room," "Found in shower rom [sic] on top of scale," "In patient rm," "In patient room no carry case," "Med on patient tsbke [sic]," "Gauges left on floor after changing bandages," "End of patient bed,"

54

"Employee with bike in building," "Medcation [sic] in chair in day room," "Medcation [sic] in shier [sic] room," "Parasites on patient hemrods [sic] nurse ask me what it was and what do I want her do with it," "Double diaper on patient," "Med on patient table use spoon left in cup to make sure it was made in it. And it was could see residue around inside of u ust [sic] want make sure of what I found," "Same cup," "Same cup," "Another pill," "Medcation [sic] on bedside table," "Meds on meal tray," "How I find rooms when come in," "Left from lunch," "Two containers on top use for ice pass to take fiil [sic] up also dirty trays under," "In patient room," and "118 rm." D67 at 3–5. In a text message dated April 27, 2020, she says, "Pic." D67 at 6.

In a text message dated August 1, 2020, Ms. Jones appears to discuss allegations of sexual harassment of someone at Life Care. D67 at 6–7. Why Mr. Jones filed this text message—whether by mistake, or to improperly influence the decision with more unflattering allegations against Life Care, or for some other reason—is unclear.

In text messages sent on March 11, 2021 (six days after Ms. Jones traded the Revvlry for the Samsung cell phone, D44-11, and the day after Mr. Toney's deposition, D51-2), Ms. Jones texted Mr. Jones: "Found this picture dated March 19," "This form don[']t even display what in-service cover," "This one look how blurred it is even up where it tells what's covered. Very suspect to me," "I truly believe they doctored all these forms," "May need to talk with housekeeping staff. As well[. A]sk why the left," "Oh they can tell you about 127b infection of legs of puddle of liquid on floor," "Why would late be put by his name. Everyone else sign. Why he didn't. Even though late still could sign. Hmmm," "Look at Bermuda unit manager. On one no name the other the name

is smug," "Even this one for Bermuda manager," and "Don't make [yo]u wonder why certain names can't make out. His [sic] another one."[13] D67 at 8.

Mr. Jones stated that in 2020, he and Ms. Jones "innocently did not know about the process or a need to storing cellular telephone photographs in the electronic cloud" and "recently learned about the technical steps related to programming their respective cellular telephones for electronic cloud storage capability." D67 at 2. Mr. Jones did not state whether he had asked Ms. Jones to check her latest cell phone for the text messages, nor did he explain how she could have texted him a photograph or photographs of alleged conditions at Life Care *after* she replaced her Revvlry. *See generally* D67.

At the reconvened status conference, the undersigned asked about the filing, and Mr. Jones stated, "You know, that was a very trying time. I had a little -- I had to sit back and really reflect on how I got the photographs." D70 at 2. He stated he had visited T-Mobile and a manager helped him find "Google photographs" and retrieve the text messages but could not retrieve the photographs sent with them. D70 at 2–3. Moments later, he said he "went with a Google representative. They just simply pulled up Google photographs." Tr. 70 at 4. He said, "Those pictures are no -- I don't even have those old phones. We've gone through about eight or nine phones with me and my three sons." D70 at 3–4. He said, "And as I reflected on it and looked at it, all of these pictures did, indeed, come to me via text. Once I got them, we just simply

_____

[13]To the extent a photograph was included with each description, as they apparently were, and to the extent all photographs Ms. Jones produced during discovery are in the record, Ms. Jones failed to produce all photographs relevant to her claims. For example, no photograph in the record appears to correspond to "Parasites on patient hemrods [sic] nurse ask me what it was and what do I want her do with it[.]" D67 at 3–4. Photographs taken on a personal cell phone inside a residential facility, especially a photograph with the former description, may pose serious patient privacy issues not raised by either side.

forwarded it -- forwarded it then to [the news reporter's assistant]." D70 at 4. Mr. Jones said, "Ms. Jones text[ed] [the photographs] to me clearly. And I forwarded them on to the reporter. And they've been presented in litigation." D70 at 5–6.

Life Care's counsel explained that four of the five photographs that Mr. Jones had emailed the news reporter were in fact never produced during discovery. D70 at 8–10. Life Care's counsel explained an expert obtained some metadata relating to the photographs (time, date, and type of phone on which they were taken but not location). D70 at 12–13. The metadata showed four of the five were taken on a Revvlry Plus cell phone and one on an LG MP260 cell phone. D70 at 13. One was taken on June 8, 2019, at 3:50 p.m.; one on September 14, 2019, at 7:57 p.m.; one on October 23, 2019, at 3:50 p.m.; one on March 16, 2020, at 3:33 p.m.; and one on April 8, 2020, at 3:20 p.m. D70 at 13. According to Life Care's counsel, the expert explained he could not ensure the accuracy of the metadata considering how Mr. Jones had sent the photographs to Life Care's counsel and the best evidence of metadata is on the cell phone used to take the photographs. D70 at 13.

## IV.   Law

A federal court has many sources of authority to sanction a party or lawyer, whether on motion or its own, and considerable discretion in deciding which source best suits the circumstances presented. Sources arguably available here are Federal Rules of Civil Procedure 11(c), 16(f), 26(g), and 37(e); 28 U.S.C. § 1927; and inherent authority.

### A.     Rule 11(c)

Under Rule 11(b), "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney … certifies that to the best of the [attorney]'s knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the paper "is not being presented for any improper purpose" and "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1), (b)(2).

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). The "order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction." Fed. R. Civ. P. 11(c)(6).

A party may move for sanctions after giving the violator an opportunity to cure. Fed. R. Civ. P. 11(c)(2). Or "[o]n its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3). A show-cause order "provides the person with notice and an opportunity to respond." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

The standard is objective. *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). The court must "determine whether a reasonable attorney in like circumstances could believe his actions were factually and legally justified."

*Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). "Blind reliance on the client is seldom a sufficient inquiry[.]" *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986); *abrogated on other grounds by Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988). If the court is acting sua sponte, the court must use "a higher standard (akin to contempt) than in the case of party-initiated sanction." *Kaplan*, 331 F.3d at 1255 (internal quotation marks omitted).

The purpose of Rule 11 sanctions is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Id*. "A sanction imposed under [Rule 11(c)] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.*; *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (explaining sanctions may include "striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; [and] referring the matter to disciplinary authorities").

"The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." Fed. R. Civ. P. 11 advisory committee's note to

1993 amendment. Considerations in deciding whether to impose a sanction and the type of sanction to impose include:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants[.]

*Id.*

"Rule 11 is not the exclusive source for control of improper presentations of claims, defenses, or contentions." *Id.* The rule "does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under … § 1927." *Id.* The rule, however, "does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37." Fed. R. Civ. P. 11(d).

## B.    *Rule 16(f)*

Rule 16 governs conferences, scheduling, and case management. Under Rule 16(f), "On motion or on its own, the court may issue any just orders … if a party or its attorney … fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with [Rule 16], unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2).

Rule 16(f) was added to the rules in part to obviate dependence on a court's inherent authority to regulate litigation. Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. "Furthermore, explicit reference to sanctions reenforces the rule's intention to encourage forceful judicial management." *Id.*

Sanctions authorized by Rule 16(f) include entering a preclusion order; striking a pleading; staying the proceeding; entering a default judgment; holding a lawyer, a party, or both in contempt; and charging a party, a lawyer, or both with the expenses, including attorney's fees, caused by the noncompliance. *Id.* A "court has discretion to impose whichever sanction it feels is appropriate under the circumstances." *Id.* "The contempt sanction, however, is only available for a violation of a court order." *Id.*

## C.   *Rule 26(g)*

Rule 26 governs disclosures and general discovery obligations. Under Rule 26(g), "every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name[.]" Fed. R. Civ. P. 26(g)(1). "By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry: (A) with respect to a disclosure, it is complete and correct as of the time it is made; and (B) with respect to a discovery request, response, or objection, it is … consistent with these rules[.]" Fed. R. Civ. P. 26(g)(1)(A), (B)(i). "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3). As stated, Rule 11 does not apply to such violations. Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment; *see also* Fed. R. Civ. P. 11(d).

"Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of" the discovery rules. Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. "In addition, Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Id.* "The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection." *Id.*

"If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *Id.* Under the rule, a lawyer must "make a reasonable inquiry into the factual basis of his response, request, or objection." *Id.* "The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances." *Id.* "It is an objective standard similar to the one imposed by Rule 11." *Id.* "In making the inquiry, the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances." *Id.* "Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances." *Id.*

"Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request." *Id.* "Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." *Id.*

"Concern about discovery abuse has led to widespread recognition that there is a need for more aggressive judicial control and supervision." *Id.*

"Sanctions to deter discovery abuse would be more effective if they were diligently applied 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Id.* (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)). "Thus the premise of Rule 26(g) is that imposing sanctions on attorneys who fail to meet the rule's standards will significantly reduce abuse by imposing disadvantages therefor." *Id.*

"Because of the asserted reluctance to impose sanctions on attorneys who abuse the discovery rules, Rule 26(g) makes explicit the authority judges … have to impose appropriate sanctions and requires them to use it." *Id.* (citations omitted). Rule 26(g) "mandates that sanctions be imposed on attorneys who fail to meet the standards" of the rule. *Id.*

A sanction under Rule 26(g) "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g)(3). "The nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances." Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. Of course, "[t]he sanctioning process must comport with due process requirements." *Id.* "The kind of notice and hearing required will depend on the facts of the case and the severity of the sanction being considered." *Id.*

## D.   *Rule 37(e)*

Spoliation is "the destruction of evidence or the significant and meaningful alteration of a document or instrument." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). "[F]ederal law governs the

imposition of spoliation sanctions … because spoliation sanctions constitute an evidentiary matter." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Sanctions for spoliation of evidence are intended to "prevent unfair prejudice to litigants" and ensure "the integrity of the discovery process." *Id.*

Amended in 2015 to address the loss of ESI, Rule 37(e) provides:

(e) FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e)(1)–(2). Rule 37(e) thus authorizes sanctions only if four prerequisites are met: (1) the allegedly spoliated evidence constitutes ESI; (2) the ESI should have been preserved; (3) the ESI was lost because the opponent failed to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced through additional discovery.

Rule 37(e) "does not apply when information is lost before a duty to preserve arises." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "[T]he duty to preserve arises when litigation is 'pending or

reasonably foreseeable' at the time of the alleged spoliation." *Ala. Aircraft Indus., Inc. v. Boeing Co.*, No. 20-11141, 2022 WL 433457, at *14 (11th Cir. Feb. 14, 2022) (quoted authority omitted). "Courts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "[S]ome litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation." *Id.* The court thus should be "sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts[.]" *Id.*

If the four prerequisites are met, a court may order sanctions under Rule 37(e)(1) if the movant was prejudiced by the spoliation or under Rule 37(e)(2) if the opponent acted with the "intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(1)–(2).

In ordering sanctions under Rule 37(e)(1), "[m]uch is entrusted to the court's discretion." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The sanctions may be "no greater than necessary to cure the prejudice" and may include "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies." *Id.* Rule 37(e) "forecloses reliance on inherent authority or state law to determine when certain measures should be used." *Id.*

Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other." *Id.* Instead, the court should determine which party bears the burden case by case:

> Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

*Id.* The court should not hold the movant "to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of evidence." *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 742 (N.D. Ala. 2017), *aff'd*, *Ala. Aircraft*, 2022 WL 433457.

## E.   *Section 1927*

Under § 1927, "Any attorney or other person admitted to conduct cases in any court of the United States … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Unlike Rule 11, which is aimed primarily at pleadings, under section 1927 attorneys are obligated to avoid dilatory tactics throughout the entire litigation." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoted authority omitted).

Unreasonable and vexatious conduct is "tantamount to bad faith." *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir. 2010) (quoted authority

omitted). The standard is objective, comparing the lawyer's conduct to how a reasonable lawyer would have acted. *Id.* at 1282, 1284. "The statute imposes a high standard that requires the moving party to show" the lawyer "engaged in behavior that grossly deviates from reasonable conduct." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (internal quotation marks omitted). The statute is penal and thus strictly construed. *Norelus*, 628 F.3d at 1281.

## F.  *Inherent Authority*

Besides rule-based and statutory authority, a court has inherent authority to sanction a lawyer or party for litigation misconduct. *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). To use inherent authority, a court must find the lawyer or party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 44, 45–46 (quoted authority omitted); *accord Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith."). This standard "narrows the range of conduct that can satisfy this higher threshold for sanctions." *Peer*, 606 F.3d at 1314–15.

Whereas the standard for use of Rule 11 is objective, the standard for use of inherent authority is subjective. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223–24 (11th Cir. 2017). A party acts in bad faith

by, among other things, delaying or disrupting the litigation, or hampering enforcement of a court order.[14] *Barnes*, 158 F.3d at 1214.

While Rule 11 and § 1927 only "reach certain individuals or conduct, the inherent power extends to a full range of litigation abuses and must continue to exist to fill in the interstices." *In re Sunshine*, 456 F.3d at 1314 (internal quotation marks omitted). "Indeed, the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct, for these rules are not substitutes for the inherent power." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (cleaned up).

Still, if the bad-faith conduct is "adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50; *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ("*Chambers* cautions … against reliance upon inherent powers if appropriate sanctions can be imposed under provisions such as Rule 11, and the procedures specified in Rule 11—notice, opportunity to respond, and findings—should ordinarily be employed when imposing a sanction under the court's inherent powers."). But the court may rely on its inherent authority if "in the informed discretion of the court, neither the statute nor the Rules are

---

[14]Fraud on the court "embrac[es] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct." *S.E.C. v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988) (quoted authority and internal quotation marks omitted). To find a party has committed fraud on the court, the court must find "by clear and convincing evidence, an unconscionable plan designed to improperly influence the court in its decision." *Johnson v. L. Offs. of Marshall C. Watson, PA*, 348 F. App'x 447, 448 (11th Cir. 2009) (citing *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338–39 (5th Cir. 1978)). "[T]he fraud on the court standard comes from [Eleventh Circuit] precedents interpreting the requirements for a motion for relief from judgment, not the conditions under which a court may exercise its inherent power to dismiss a pending case[.]" *Oniha v. Delta Air Lines, Inc.*, No. 21-13532, 2022 WL 580933, at *2 (11th Cir. Feb. 25, 2022).

up to the task[.]" *Chambers*, 501 U.S. at 50; *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (Rule 11 "does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under 28 U.S.C. § 1927").

"Dismissal of a case with prejudice is considered a sanction of last resort, applicable only in extreme circumstances." *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985). Dismissal with prejudice is warranted only if "(1) a party engages in a clear pattern of delay or willful contempt (contumacious conduct); and (2) the district court specifically finds that lesser sanctions would not suffice." *Betty K Agencies, Ltd. v. M/V MONADA*, 432 F.3d 1333, 1337–38 (11th Cir. 2005). Mere negligence or confusion cannot justify a finding of willful conduct. *Zocaras v. Castro*, 465 F.3d 479, 483 (11th Cir. 2006). Instead, "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983). "[T]he harsh sanction of dismissal with prejudice is thought to be more appropriate in a case where a party, as distinct from counsel, is culpable." *Betty K Agencies*, 432 F.3d at 1338.

## V.   Analysis

In the motion for sanctions for spoliation, Life Care relies on Rule 37(e). *See generally* D29. In the motion for sanctions for perjury and other malfeasance, Life Care references Rule 11(c), § 1927, and inherent authority but relies on inherent authority. *See generally* D51. If the Court grants the second motion, the Court need not decide the first motion. The undersigned thus starts with the second motion.

### A.    Second Motion

Contending the circumstances are extreme, Life Care requests the sanction of last resort—dismissal with prejudice. D51.

The undersigned finds that Ms. Jones lied under oath in her affidavit she presented to the Court to support her opposition to the motion for sanctions for spoliation when she stated she lost or replaced her cell phone before she retained Mr. Jones and before she decided to sue. The undersigned further finds that she lied under oath at the evidentiary hearing when she initially affirmed that the chronology in her affidavit was true. These findings are based primarily on the T-Mobile receipt showing she traded in her cell phone nearly a year after she sued.

The undersigned finds that Ms. Jones acted intentionally and not because of faulty memory, confusion, or the like. This finding is based on the materiality of the chronology. Had the undersigned accepted her false chronology as true, the undersigned would have denied the motion for sanctions for spoliation, finding she had not had a duty to preserve ESI because she—a non-lawyer—lost or replaced her cell phone before she retained Mr. Jones and before she decided to sue. Denial of the motion was important to winning her case both because her expert witnesses relied on the photographs for their opinions and because the photographs would have been powerful evidence to present to jurors.

This finding is also based on the clear wording in Ms. Jones's affidavit statements and evidentiary-hearing testimony and on her repetition and emphasis of the false chronology.

This finding is also based on the undersigned's observations at the evidentiary hearing. Before answering questions, Ms. Jones appeared to think about what answer would best help her position, sometimes asking Life Care's counsel to repeat questions seemingly to buy time. She never appeared genuinely confused. She had no communication difficulties. She was evasive at times. Her demeanor was guarded throughout.

This finding is also based on the great number of other unexplained inconsistencies and perplexing explanations.

As an example, during Ms. Jones's deposition, Life Care's counsel clearly asked her if she still had her Revvlry cell phone, and she clearly answered she still had it. *See* D44-1 at 4 (Tr. 13–14). In the affidavit, to account for her representation she had lost or replaced the cell phone before she retained Mr. Jones and before she decided to sue, she described the question as "tricky" and said she "honestly misunderstood" the question, thinking he was asking whether she had a cell phone—an assertion that cannot be reconciled with the clear wording of the questions and answers. *See* D34-1 ¶¶ 22–24. Later, at the evidentiary hearing, she testified the affidavit statement was truthful, D45 at 12, but after Life Care's counsel took her through her deposition testimony, she testified that when he had asked her the question at the deposition, she did not know whether she still had the cell phone and answered yes merely because she did not want to say she did not have it if she did have it. D45 at 21.

As another example, in the original and amended complaint, Ms. Jones alleged she had met with Mr. Toney and showed him photographs of poor conditions. D1 ¶ 34; D27 ¶ 34. In the affidavit, she implied she had shown the photographs to him in hard-copy form, which would have supported her contention that she possessed no ESI relating to the photographs by the time

she retained Mr. Jones and decided to sue. *See* D34-1 ¶¶ 10–11. But at the evidentiary hearing, she testified she had handed Mr. Toney her cell phone, and he scrolled through the photographs. D45 at 49–50; *see also* D51-2 at 4 (Tr. 12) (Mr. Jones's question to Mr. Toney during Mr. Toney's deposition, "Did Lula Jones ever step up to you with some pictures on her cell phone showing you patient neglect-type issues?").

Similarly, as another example, Ms. Jones stated in her affidavit she had printed the photographs in hard-copy form to use as evidence of her concerns for the safety and health of residents and implied she had done so while still working at Life Care. *See* D34-1 ¶¶ 10-11. And Ms. Jones (through Mr. Jones) represented, "Prior to retaining [Mr. Jones] and the filing of the instant lawsuit, Ms. Jones downloaded and printed the subject photographs." D56 at 11 n.14. But at the evidentiary hearing, she testified she had printed the photographs when Mr. Jones asked her to print them. D45 at 55.

As another example, in her deposition, Ms. Jones testified she thought the photographs were no longer on her cell phone because they were taking up too much space. D44-1 at 5 (Tr. 19–20). But at the evidentiary hearing, she testified the photographs had disappeared because not all the photographs on her Revvlry transferred to her Samsung cell phone when replacing the former cell phone with the latter cell phone. D45 at 34, 51–52.

As another example, at the evidentiary hearing, Ms. Jones testified she had used just one cell phone—the Revvlry—throughout her employment with Life Care and that is the cell phone she had used to take the photographs. D45 at 13–15. But one of the five photographs Mr. Jones ultimately emailed the reporter appears to have been taken on a different cell phone (an LG MP260). D70 at 13.

As another example, at the evidentiary hearing, Ms. Jones testified that before she had replaced her cell phone, she handwrote her work schedule from the cell phone and then—because her handwriting is messy and Mr. Jones might want the information—typed the information into a document using a laptop computer. D45 at 38–39. But after the evidentiary hearing, she produced only the purported handwritten notes. D51 at 7 n.5.

Ms. Jones's own introduction of the T-Mobile receipt showing when she replaced the Revvlry with a Samsung cell phone arguably supports that she was merely forgetful or confused about the chronology. But the undersigned finds otherwise considering all the circumstances, including that she appeared to introduce the receipt primarily to support her testimony that T-Mobile kept the Revvlry cell phone when she replaced it with the Samsung cell phone, making the Revvlry cell phone no longer available for digital forensic analysis.

For all these reasons, the undersigned finds that Ms. Jones intentionally lied under oath in her affidavit presented to the Court and at the evidentiary hearing about a fact material to the motion for sanctions for spoliation.

Dismissal with prejudice is warranted. A clear pattern of willful contempt exists. Through her intentional conduct, Ms. Jones inhibited the Court's ability to fairly administer justice and forfeited her right to use the judicial system to present her claims. *See ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994) ("False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a 'flagrant affront' to the truth-seeking function of adversary proceedings."); *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) ("[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the

effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly.").

Life Care also requests attorney's fees and costs. Adding a serious sanction to the most serious sanction, at least against Ms. Jones who likely cannot pay attorney's fees and costs, is unwarranted. *See* D52 at 7 (Mr. Jones's representation that Ms. Jones is a "very low-paying employee").

Use of inherent authority instead of rule-based or statutory authority to sanction Ms. Jones is appropriate because neither the rules nor the statute are "up to the task." *See Chambers*, 501 U.S. at 50 (quoted). Rule 11 is geared less toward perjury and more toward factual allegations or assertions lacking support for which curing through withdrawal after warning is appropriate. Rules 16(f), 26(g), and 37(e) address timing and discovery violations. Although Ms. Jones's affidavit and testimony related to a discovery violation, her perjury constitutes an independent, non-discovery affront to the judicial process. And § 1927 authorizes sanctions against only a lawyer, not a party.

Careful consideration has been given to other possible sanctions shy of dismissal with prejudice, including striking the affidavit, admonishing Ms. Jones, and, as she suggests, *see* D56 at 15, instructing the jury to consider her conduct or apply an adverse inference. But none are adequate. Had she perjured herself regarding a fact about a claim or defense, cross-examination would have been adequate, and jurors could have sussed out the lie. Here, she lied to the Court about a fact necessary to the Court's decision-making about a matter important to how her case would be litigated. Under the circumstances, dismissal with prejudice "fit[s] the interests jeopardized and the harm caused by the violation." *See Zocaras*, 465 F.3d at 485 (quoted).

Dismissal with prejudice was the sanction of choice under different but equally egregious circumstances. *See, e.g.*, *Rivera v. Drake*, 767 F.3d 685, 686–88 (7th Cir. 2014) (upholding dismissal with prejudice where the plaintiff falsely stated in an affidavit and testified at a hearing he had exhausted administrative remedies); *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306 (7th Cir. 2002) (upholding dismissal with prejudice where the plaintiff made false statements about his finances when asking to proceed in forma pauperis); *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1049 (8th Cir. 1991) (upholding dismissal with prejudice where the plaintiff, suing for product liability, repeatedly lied under oath about using the product at the time of the accident); *Vargas v. Peltz*, 901 F. Supp. 1572, 1579–82 (S.D. Fla. 1995) (dismissing an action with prejudice where the plaintiff fabricated evidence and committed perjury at a deposition and before the court, finding the conduct "covers the 'full range of litigation abuses'"); *Igbinadolor v. Gwinnett Cnty. Sch. Dist.*, No. 1:08-CV-2402-RWS-AJB, 2009 WL 10666374, at *7–12 (N.D. Ga. Aug. 31, 2009) (recommending dismissal with prejudice where the plaintiff lied in his financial affidavit and "then attempted to mislead the [c]ourt … through sworn testimony"), *report and recommendation adopted*, No. 1:08-CV-2402-RWS, 2009 WL 10671956 (N.D. Ga. Oct. 2, 2009).

Dismissal with prejudice affects Ms. Jones more than Mr. Jones. On his part, he began on the wrong foot by suing "Life Care Centers of America, Inc., d/b/a Life Care Center Jacksonville." *See* D1. After being told the correct entities are Duval Medical Investors, LLC, d/b/a Life Care Centers of Jacksonville, and Life Care Centers of America, Inc., *see* D5 at 1 n.1, he belatedly filed an amended complaint correcting the caption but continuing to allege facts against only Life Care Centers of America, Inc., and otherwise changing the pleading in ways not authorized by the order permitting limited

amendment. *Compare* D1 (original complaint), *with* D27 (amended complaint); *see also* D25 (order).[15]

During discovery, Mr. Jones provided no ESI regarding the photographs in response to Life Care's request for discovery of ESI on October 26, 2020, when Ms. Jones still possessed the Revvlry. *See* D70 at 15–16; D44-7 at 6–7 (supplemental response quoting the original request). Mr. Jones himself possessed at least five digital photographs of alleged conditions at Life Care with related ESI as recently as last month (the photographs he emailed the news reporter) but never produced them during discovery and claimed that the hard-copy photographs produced to Life Care "are all of the photos that [Ms.] Jones has relevant to this litigation that are in her/my possession." D44-9 at 4. Mr. Jones likewise failed to produce during discovery the document Ms. Jones said she had created describing the days she had worked. *See* D45 at 39 (Ms. Jones's testimony about writing down her schedule from information on the Revvlry and then typing her handwritten notes into a document); D51 at 7 & n.5 (Life Care's representation that Ms. Jones produced only handwritten notes after the evidentiary hearing).

When Life Care's counsel asked Mr. Jones for the cell phone that Ms. Jones still possessed (according to her unambiguous deposition testimony) to obtain ESI relating to the photographs and alleged calendar entries, Mr. Jones responded by representing that Ms. Jones could not find "old, broken and inoperable 'Obama' type cell phones [sic] that she had in the calendar years 2019–2020" and accused Life Care's counsel of harassing her. D44-9 at 4. At the conference to discuss whether an evidentiary hearing was necessary, he

---

[15]As discussed, Life Care's counsel made similar procedural errors. Considered alone, neither the procedural errors on Ms. Jones's side nor the procedural errors on Life Care's side would warrant sanctions.

persisted in referencing "temporary-type phones" and represented to the undersigned that Ms. Jones had "testified she had these temporary-type phones. She is a very low-paying employee, barely making it. Homeless nearby, if not today -- that living on these phones that they get temporarily, buy them here, pay here, those things -- she wasn't anticipating litigation." D52 at 7. But she provided no such testimony. To the contrary, later, at the evidentiary hearing, she testified she "didn't have an Obama cell phone," just a regular type of smartphone like a Galaxy, Samsung, or iPhone. D45 at 13. In response to later questioning by the undersigned, Mr. Jones ultimately said Ms. Jones never told him the cell phone was an "Obama phone," but added, "Well, I went by what Ms. Jones said. It's a [Revvlry]. It's Obama. It's some kind of other little phone." D63 at 24.

Mr. Jones presumably prepared and then filed the affidavit with the false chronology, argued against sanctions for spoliation based on the false chronology, and argued against an evidentiary hearing under the rationale that Ms. Jones's hearing testimony would be the same as the statements in the affidavit. *See* D34; D34-1; D52 at 13. If Mr. Jones did not know the chronology was false, he could have learned the chronology was false with little effort. Why would Ms. Jones say she would try to look for the Revvlry in 2021 while also saying with such firm conviction she had lost or replaced the Revvlry in 2020? *See* D34-1 ¶¶ 4, 7, 31, 34; D44-9 at 4, D45 at 13, 21–22. Why is the chronology in the affidavit that Ms. Jones replaced her old cell phone (the Revvlry) before retaining Mr. Jones (i.e., before April 20 or 28, 2020) and obtained her replacement cell phone (the Samsung) after her termination (i.e., after April 23, 2020)? D34-1 ¶¶ 4, 5, 7, 31, 34.

Mr. Jones pressed that Ms. Jones had lost or replaced her cell phone before she retained him and before she decided to sue while simultaneously

arguing Life Care had had more than a year and a half to retain a forensic examiner to "inspect the [p]hotographs." D34 ¶¶ 9, 18.

In the affidavit presumably prepared by Mr. Jones, Ms. Jones stated Mr. Toney and Ms. McGruder had "**lied**" when they testified they had not viewed the photographs, adding, "yet, when [they] viewed the Photographs in discovery, [they] did not deny the fact that the Photographs were taken [sic] the Defendant's residential facilities." D34-1 ¶¶ 17, 18. But Mr. Jones never showed Mr. Toney or Ms. McGruder the photographs or asked them whether they were taken in a Life Care facility. *See generally* D51-2, D51-3.

At the end of the evidentiary hearing, the undersigned asked Mr. Jones if Ms. Jones had possessed a duty to preserve the cell phone considering it contained the ESI regarding the photographs and alleged calendar entries. D45 at 103. Mr. Jones responded, "She would have had a duty ... had she known of the duty." D45 at 103. Later, in response to the report of the forensic examiner, Mr. Jones represented, "Jones retained the legal services of the undersigned on April 20, 2021 [sic]. At that time ... the undersigned counsel made Jones aware of her legal obligation to preserve ESI relevant to the claims and issues in this litigation." D49 ¶ 3.

When the undersigned originally probed whether the ESI could be recovered and asked Mr. Jones if Ms. Jones had ever texted the photographs to him, he answered, "No. No, ma'am. As far as I recall, ... [w]e had them in a brown manila folder." D63 at 36. But when the undersigned asked him to explain how he had sent photographs to the news station and directed him to forward to Life Care's counsel any emails or text messages in which he had attached the photographs, D62, he ultimately admitted Ms. Jones had texted him photographs and provided the text messages while asserting that by then

there was no way to recover the photographs originally included with the text messages, *see generally* D67.

Asked directly about Ms. Jones's inconsistent statements and what the Court should do about them, Mr. Jones asserted she "admitted some of the questions she didn't understand" and "misunderstands a lot of things[.] D63 at 33–34. But no communication issues were apparent at the evidentiary hearing, and questions asked during her deposition and the evidentiary hearing left no room for misunderstanding. *See generally* D44-1, D45.

In the response to the digital forensic examiner's declaration, Mr. Jones represented that Ms. Jones "retained the legal services of [Mr. Jones] on April 20, 2021." D49 at 2. At a later status conference, he confirmed she had retained him on that day but in 2020 and represented he had not seen or talked to her before then because she "is the kind of person going to go face to face" and he never met her before being retained. D69 at 17. Two days later, he represented he was "formally retained" by Ms. Jones on April 28, 2020, and she texted him "the subject photographs" on "April 25, 2022 [sic]." D67 at 2 (emphasis omitted). The undersigned remains unsure of when Mr. Jones was retained or began communicating with Ms. Jones.

In response to the motions for sanctions, Mr. Jones distracted and attacked, rather than explained and apologized, and then he inappropriately requested sanctions against Life Care's counsel. As a procedural matter, under Rule 7(b), a request for a court order must be by motion separate from a response. As a substantive matter, Life Care's counsel has done nothing to warrant sanctions; they appropriately moved for sanctions for spoliation of ESI, and when confronted with perjury and other wrongdoing, appropriately moved for additional sanctions.

Mr. Jones appeared to place some blame on the fact that he is not "computer savvy," D69 at 23, and only recently learned how to store on the cloud photographs taken on a cell phone, D67 at 2. Cloud storage was unnecessary to preserve the ESI relating to the photographs; a digital forensic examination of the cell phone regardless of cloud storage would have sufficed. *See* D29 at 12 (Life Care's argument that the Revvlry cell phone at a minimum would contain time, date, and location information even had Ms. Jones deleted the photographs); D70 at 13 (Life Care's representation that its expert opined the best evidence of metadata is on the cell phone used to take the photographs). In any event, a lawyer practicing in this decade must understand ESI, especially ESI as basic as metadata relating to photographs taken on a cell phone by a client planning at the outset to use the photographs as key pieces of evidence in her case. *See* D67 at 3–5 (Ms. Jones's pre-lawsuit text messages to Mr. Jones attaching photographs to support her claims); D65-1 at 3 (Mr. Jones's pre-lawsuit email to the reporter saying, "We need to talk asap re a huge case that has national implications. I'm filing today and we have pictures and telling evidence.").

During the latest conference, the undersigned asked Mr. Jones to forward to Life Care's counsel the email with photographs Ms. Jones assertedly had sent him early on, and Mr. Jones said he was forwarding "the exact e-mail" and asked opposing counsel if she had received it. D69 at 14–16. But he ultimately forwarded to Life Care's counsel only the email with five photographs Mr. Jones had sent the new reporter. D69 at 20–21. During the same conference, when he purportedly had trouble getting his email to work, he requested a "quick recess" to allow him to "get with [his] technician[.]" D69 at 19. Later during the conference, when asked who helps with information technology at his office, he disclaimed having "an IT person," asserting, "I just

use a computer -- when I have things break down, I call a computer company, whoever I can get to work on it. But rarely do I have computer problems. You know, I go to Office Depot and get my computers repaired, Office Max." D69 at 24–25. During the same conference, Mr. Jones implied he could not get help from his assistant who may have received photographs from Ms. Jones because the assistant is "gone with COVID." D69 at 12–13. Later during the conference, he said, "And God bless my assistant, she's gone in Ireland. I can't even ask her about it." D69 at 22. During the same conference (continued to another day), he said he had visited a T-Mobile and a manager helped him. D70 at 2–3. Later during the conference, he said he "went with a Google representative." D70 at 4. Meandering and inconsistent representations to the Court have made knowing what to believe difficult.

Mr. Jones writes, "It cannot be ignored that [Life Care] attorneys have been in possession of the subject photographs at least since Ms. Jones's participation in her **May 14, 2020** TV 4 interview." D56 at 3 n.7. But the news clip shows only four photographs, and they are not the photographs Mr. Jones produced during discovery. D70 at 14; *compare infra* note 2, *with* D29-1 at 35–41.

In response to the second motion for sanctions, Mr. Jones states, "It is troubling that [Life Care's counsel]'s attempt to make the court not believe that the undersigned mother's sudden, unexpected death occurred[.]" D56 at 10. Life Care's counsel made no such attempt, instead merely observing that when the undersigned asked Mr. Jones to explain what the Court should do about the inconsistencies, Mr. Jones answered that he was dealing with the death of his mother. D51 at 15; *see also* D63 at 25 (conference transcript).

Under these circumstances, an order to show cause is warranted to provide Mr. Jones an opportunity to explain why he should not be sanctioned (1) under Rule 11(c) for violating Rule 11(b) regarding the affidavit and filings based on the affidavit, (2) under Rule 16(f) for failing to produce discovery by the deadline imposed by the Court, (3) under Rule 26(g) to the extent he signed discovery responses to requests for relevant ESI and other evidence and thereby certified that they were complete and correct at the time made when they were not, (4) under § 1927 for unreasonably multiplying the proceedings through his conduct relating to the ESI and the motions for sanctions, and (5) under the Court's inherent authority for his conduct considered as a whole. Appropriate sanctions may include ordering him to pay a fine to the Court, ordering him to pay the attorney's fees and expenses Life Care incurred in bringing the motions, ordering him to attend at least twenty-four hours of continuing legal education on ESI, and initiating an investigation by the grievance committee for the Jacksonville Division under Local Rule 2.04(c).[16]

Thus, the undersigned recommends granting in part the second motion for sanctions, dismissing the action with prejudice, declining to order Ms. Jones to pay attorney's fees and costs, ordering Mr. Jones to show cause, and denying the first motion for sanctions as moot. The parties' mutual intent for both defendants to be part of the lawsuit and agreement to consider both part of the lawsuit warrants dismissal of the action against both.

---

[16]During the March 21, 2022, status conference to discuss the forensic examiner's declaration, Mr. Jones stated three family members had died within ten months (his grandmother, his mother, and his only niece), D63 at 2, and in response to the second motion for sanctions, he filed obituaries of his mother and niece, D61 at 1, 4, suggesting grief may have played a role in some conduct in mid-2021 and later.

**B.    First Motion**

If the action continues, granting the first motion for sanctions and prohibiting Ms. Jones from using the photographs and expert testimony based on the photographs is warranted.

Rule 37(e) applies because the metadata constitutes ESI. The parties agree. D52 at 4.

Ms. Jones had a duty to preserve the metadata because she possessed the metadata on the Revvlry well after she retained Mr. Jones and filed the lawsuit, and the metadata provides important details about the photographs anchoring her claim of retaliation for opposing patient-neglect and safety issues. She alleges that showing the photographs to Mr. Toney spurred the alleged plot to terminate her. Her expert witnesses rely on the photographs for their opinions. And the photographs would be powerful evidence to present to jurors.

Ms. Jones failed to take reasonable steps to preserve the metadata. She successfully preserved the voicemail from "Kim" left on the Revvlry, which she contends supports her claims. She copied from the calendar on the Revvlry the workdays she allegedly recorded before replacing the Revvlry. She apparently was able to send Mr. Jones some relevant photographs in text messages on March 11, 2021—six days after she replaced the Revvlry. D44-11; D67 at 8. She merely had to provide the ESI to Life Care or make her cell phone available for extraction of the ESI. When asked whether she had told T-Mobile to transfer her information to the new cell phone, she gave a non-responsive answer, stating she spoke with "them" *after* she noticed incomplete data had transferred. D45 at 95. When asked whether she followed up with T-Mobile

after she noticed some information had not transferred, she responded she was "happy that the phone was working" and merely asked family to send her shared photographs that failed to transfer. D45 at 96.

Without the cell phone on which she allegedly took the photographs, the metadata cannot be restored or replaced through additional discovery. The parties have tried other means without success, ultimately obtaining only partial ESI about a handful of photographs, four of which were never produced during discovery. As Life Care's counsel explained, the missing cell phone itself holds or held all the metadata.

Life Care is prejudiced by the loss. Without the metadata, Life Care's ability to challenge the photographs is considerably weakened, and the circumstances strongly suggest challenges would have been available. *See, e.g., infra* note 9. Without the metadata, Life Care cannot determine who took the photographs (Ms. Jones, the plaintiff in the other *Jones* case also represented by Mr. Jones, or someone else), when the photographs were taken (before, during, or after Ms. Jones's shift or at some other moment), and where the photographs were taken (at the Life Care facility where Ms. Jones worked, at Brookdale Senior Living where Ms. Jones also worked and which allegedly had the same problems, at the facility where the plaintiff in the other *Jones* case worked, or somewhere else). Despite Mr. Jones's repeated arguments to the contrary, the metadata is not cumulative of the hard-copy photographs, which provide no information about who took them or when they were taken and little information—beyond flooring, walls, and furniture in some—about where they were taken.

Life Care does not request an instruction that the jurors may or must presume the information was unfavorable to Ms. Jones and no longer requests

dismissal for spoliation of ESI only, either of which would require, under Rule 37(e)(2), a finding that Ms. Jones intended to deprive Life Care of the metadata's use in the litigation. *See generally* D29. Life Care asks the Court to prohibit Ms. Jones from using the photographs and expert testimony based on the photographs, a sanction that does not require a finding of intent. That sanction strikes the proper balance; i.e., that sanction is no greater than necessary to cure the prejudice. Because Ms. Jones spoliated metadata important to determine challenges to the photographs, she should not be permitted to use the photographs either as direct evidence or evidence to support the expert opinions.

Life Care requests attorney's fees and "costs" incurred in filing the first motion. D29 at 18, 19. But Life Care provides no argument or analysis on whether the Court may impose attorney's fees and costs when granting a motion for spoliating ESI. *See generally* D29. Other sections of Rule 37 specifically permit an award of "reasonable expenses, including attorney's fees." *See* Fed. R. Civ. P. 37(b)(2)(C), (c)(1)(A), (c)(2), (d)(3), (f). Rule 37(e) does not. Because Life Care provides no argument or analysis on the availability of attorney's fees and costs under Rule 37(e) and the issue is debatable, denying the request is warranted.

Thus, if the action is not dismissed with prejudice, the undersigned recommends granting in part the first motion for sanctions, prohibiting Ms. Jones from using the photographs and expert testimony based on the photographs, and denying Life Care's request for attorney's fees and costs.

If the litigation continues, the procedural oddities can be addressed by striking the amended complaint, D27, ordering Ms. Jones to file an amended complaint in accordance with the order giving her leave to file an amended

complaint, D25, and directing both defendants to answer the amended complaint within twenty-one days of its filing. A new deadline to file dispositive and *Daubert* motions and a new trial schedule would need to be established.

## VII. Recommendation

The undersigned recommends:

(1)    **granting** in part the second motion for sanctions, D51;

(2)    **dismissing** the action with prejudice;

(3)    **denying as moot** the first motion for sanctions, D29; and

(4)    **directing** Eric Jones, Esquire, to show cause why, for the conduct described in this report and recommendation, based on the authority summarized in this report and recommendation, the Court should not sanction him, including by ordering him to pay a fine to the Court, ordering him to pay reasonable attorney's fees and expenses Life Care incurred in bringing the motions, ordering him to attend at least twenty-four hours of continuing legal education on ESI, and initiating an investigation by the grievance committee for the Jacksonville Division.[17]

---

[17]Imposing a sanction against a lawyer is not a judgment on the merits of an action. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) (discussing sanctions for contempt and under Rule 11); *accord Hyde*, 962 F.3d at 1310 (discussing sanctions under § 1927 and inherent authority). "Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter*, 496 U.S. at 396. "Such a determination may be made after the principal suit has been terminated." *Id.*

Here, under this authority, dismissing the action with prejudice does not deprive the Court of jurisdiction to order Mr. Jones to show cause, decide whether sanctions against him are warranted, and, if so, impose them.

## VIII. Objections and Responses

A party may serve and file "specific written objections" to proposed findings and recommendations within fourteen days after service of a report and recommendation. Fed. R. Civ. P. 72(b)(2). A party may respond to objections within fourteen days after service of the objections. *Id.* Failure to serve and file specific written objections alters review by the district judge and the appellate court and results in waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on August 11, 2022.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:    The Honorable Timothy J. Corrigan

87